# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS


UNITED STATES OF AMERICA,    )
                            )  Criminal Case No.
           Plaintiff,   )  4:21-cr-00588
                            )
vs.                       )
                            )
ANTHONY HUTCHISON and BRIAN  )  Wednesday, April 16, 2025
BUSBY,                   )
                            )
           Defendants.   )
_____


TRANSCRIPT OF JURY TRIAL - DAY 18 PM SESSION
HONORABLE ANDREW S. HANEN PRESIDING
UNITED STATES DISTRICT COURT


Official Court Reporter:    Donna Prather
                            515 Rusk St., #8004
                            Houston, TX  77002

Proceedings taken by Certified Stenographic Reporter;
transcribed using Computer-Assisted Translation

1    know.  He's the best in the office.

2    Q.    Okay.  I want to show you what's been marked as

3    Government's Exhibit -- well, let me ask you this:  Do you

4    know how Mr. Hutchison pays for his gambling losses?

5    A.    I do.

6    Q.    How?

7    A.    He takes checks -- he borrows money from the company.  He

8    borrows monies from his companies.  And I've seen him write

9    checks out to -- I want to say Bulldog or somebody.  But

10   there's some checks.  But he borrows money from the companies.

11   Q.    Do you know whether or not he ever tries to pay the

12   company back?

13   A.    Yes, he does.

14   Q.    How?

15   A.    Well, with the -- what he does is he takes whatever he

16   has on this form that -- whatever he has on the form that he

17   writes, he does a monthly report, and he highlights it.  And

18   this report -- this is what I'm saying.  He takes this report

19   and then he puts it on this paper, which is like a monthly

20   gambling report.  And this sheet goes over to ties into this

21   sheet, which is a loan agreement.  And I've seen those sheets.

22   Q.    I want to show you now what's been marked as Government's

23   Exhibit Number 1.

24   A.    Okay.

25   Q.    Have you ever seen that document?

```
 1   A.   That's the sheet.

 2   Q.   Okay.  Have you seen it?

 3   A.   I've seen it.

 4   Q.   Now, to be fair, do you know what anything means on

 5   there?

 6   A.   I can't understand his writing, but -- no.  All I know is

 7   that it's a gambling sheet.

 8   Q.   And have you witnessed him utilize this sheet in

 9   conjunction with another sheet?

10   A.   Yes.

11   Q.   Okay.

12           MS. QUINONES:  May I have a moment, Your Honor?

13           THE COURT:  You may.

14   BY MS. QUINONES:

15   Q.   Now, to be fair, on Government's Exhibit 1 at 8:15 where

16   it says "Derrick, 15,000," do you know what that means?

17   A.   I'm going to tell you, they're good if they can

18   understand it, because I -- oh, okay.

19   Q.   Do you know what that means?

20   A.   No.

21   Q.   Okay.  Do you know who Derrick is?

22   A.   I don't.

23   Q.   Do you know what Garden Oaks is?

24   A.   I want to say --

25   Q.   How it relates to this document, do you know?
```

```
 1              THE COURT:  Mr. DeGuerin?

 2              MR. DEGUERIN:  No.  Thank you.

 3              THE COURT:  All right.  Ma'am, you may step down.

 4              MR. HARDIN:  Your Honor, Mr. Hutchison rests.

 5              THE COURT:  All right.

 6              MR. DEGUERIN:  May we approach the bench?

 7              THE COURT:  Yes.

 8          (Sidebar held.)

 9              MR. DEGUERIN:  I want to call Mr. Hutchison to

10    testify.  I know he will take the Fifth Amendment.  I believe

11    he will at least.

12              MS. QUINONES:  Yes, he will.

13              MR. DEGUERIN:  I don't want to do that in front of

14    the jury.  But I'm in a quandary because I believe if anyone

15    can explain the ledger, he can.  And I think that that will

16    inure to Mr. Busby's benefit.  So, Number 1, I want to call

17    him, and I want to get his testimony about that.  But because

18    I don't want to create a mistrial, I'm not going to blurt

19    anything in front of the jury to that effect.  And I wanted to

20    make a record on that.

21              Secondly, if I can't do that, then I am asking --

22    renewing our motion for severance from Mr. Busby -- from

23    Mr. Hutchison.

24              THE COURT:  Why don't we do this.  Why don't we give

25    the jury a break.  Let's do it right now while they're out of
```

```
 1    the courtroom, so you preserve your record on that.
 2         (Sidebar concluded.)
 3              THE COURT:  Okay.  Ladies and gentlemen, let's take
 4    a break.
 5         (Jury out.)
 6              THE COURT:  All right.  Mr. DeGuerin, if you want to
 7    do it, let's do it now.
 8              MR. DEGUERIN:  Yes, Your Honor.  We would call
 9    Mr. Hutchison as a witness on behalf of Mr. Busby and for the
10    limited purpose of explaining, if anyone can, the ledger.
11              MR. HARDIN:  And, Your Honor, I'd inform the Court
12    that Mr. Hutchison has elected not to testify, and he will
13    take the Fifth if called as a witness.
14              THE COURT:  Do you want to officially put him on the
15    stand and have him say that, or can we take Mr. Hardin's word
16    for it?
17              MR. DEGUERIN:  Of course I'll take Mr. Hardin's word
18    for it, Your Honor.  I expected that, and I'm sure that that's
19    what he would do.  As long as the record will understand that
20    it is useless to have him come up there and do that.
21              THE COURT:  Right.  So understood.  The record will
22    so reflect.
23              MR. HARDIN:  And we would now move -- now that all
24    the evidence is in, we would move for a directed verdict.
25              MR. DEGUERIN:  Well, I haven't rested yet.  That's
```

```
 1   why I wanted to make my record on that before we rest.  And
 2   because I'm deprived of a valuable witness to explain this
 3   ledger, we move -- renew our motion for severance.
 4            THE COURT:  All right.  And I deny that.
 5            MR. DEGUERIN:  Then I will rest.
 6            THE COURT:  All right.
 7            MR. HARDIN:  We'd move for a directed verdict,
 8   Your Honor, on behalf of Mr. Hutchison.
 9            THE COURT:  All right.  That's denied.
10            MR. DEGUERIN:  We move on behalf of Mr. Busby for a
11   directed verdict.
12            THE COURT:  All right.  That's also denied.
13            MR. HARDIN:  Your Honor, may I inquire briefly of
14   Mr. MacVane if he had additional things he would want in my
15   motion for directed verdict?
16            THE COURT:  You can.  Let me -- before that, though,
17   I'm going to take a break here so everybody can stretch.  But
18   what are we going to hear from the government on rebuttal?
19   Because I'd like to get it done today.
20            MR. JOHNSON:  I think we've got three witnesses.
21            THE COURT:  Three?
22            MR. JOHNSON:  Yeah.  I think we can -- depends on
23   cross, but we can probably get close to done by 6:00.  I'm not
24   sure what the cross is going to be, but I think we can get
25   done.
```

1    inhouse grounds crew.

2    Q.    And you've consistently said, according to you, that you

3    always restricted that to inhouse grounds crew?

4    A.    I believe so.

5    Q.    And have you ever said before today that Mr. Busby was

6    the one that was supposedly dealing with ground crew mowing?

7    A.    With the contractor portion of it.

8    Q.    With the outside vendors?

9    A.    Yes, sir.

10   Q.    Okay.  Well, let's see if your memory similarly is --

11   well, let me ask you this.  What about special cuts?  Is it

12   your testimony that that came under Mr. Busby as well and not

13   Mr. Nabors?

14   A.    That's generally how it worked.

15   Q.    That if a -- that if the -- well --

16   A.    I can give an example.

17   Q.    You can tell I'm thrown by your testimony.  So while I'm

18   trying to gather myself on it, let me ask you this.  If

19   Mr. Nabors doesn't have the authority and wasn't the one

20   dealing with the outside counsel for mowing contracts -- for

21   outside vendors, not counsel -- then why would the vendors

22   always be contacting him instead of Mr. Busby?

23   A.    I can't speak to that.

24   Q.    Okay.  And what about the -- let's see.  The jury's heard

25   testimony from different principals that sometimes there might

```
 1    be special cuts of 10 or 12 a year.  Are you aware of that?
 2    A.    Not that -- I'm not aware of the number.
 3    Q.    All right.  You're aware that they do have them; correct?
 4    A.    They do have a few, yes, sir.
 5    Q.    And how many is your understanding they would have?
 6    A.    Generally, when I was aware of them, they would be around
 7    open house, start of the school year, you know, or someone --
 8    a dignitary was going to a campus to visit it, those would
 9    call for special cuts.  But that was not consistent.
10    Q.    So how many would you estimate a year then?
11    A.    I wouldn't be able to guess.
12    Q.    Because it wasn't your area, was it?
13    A.    Correct.
14    Q.    You just rendered an opinion about Mr. Busby being the
15    person because you didn't see Mr. Nabors do any; correct?
16    A.    No, sir.
17    Q.    No, sir, what?
18    A.    He was listed in the contract as the one to interact with
19    the vendor.
20    Q.    Who was?
21    A.    Mr. Busby.
22    Q.    Ah.  That's why you're saying it?
23    A.    Yes, sir.
24    Q.    Not by any personal knowledge of how it worked.
25    A.    From the contract and what I've seen, I've never seen --
```

```
 1   A.   I don't know where the two or three months behind comes

 2   from.

 3   Q.   Oh, don't you?

 4        Okay.  When you -- on August the 3rd of '17 -- I

 5   believe it was '17.  Was it '17 or '18 where you told -- you

 6   wanted -- the superintendent told you that she wanted

 7   direct -- she wanted to have people paid immediately, and that

 8   includes AMS.

 9   A.   Yes, sir.

10   Q.   Right?

11   A.   Yes, sir.

12   Q.   Carrier; right?  Or -- and Wholesale -- Southwest

13   Wholesale; do you remember that?

14   A.   Yes, sir.

15   Q.   And we had the big checks we all talked about.

16   A.   Mm-hmm.

17   Q.   Didn't that have mowing and stuff that was sometimes 120,

18   180 days behind?

19   A.   I don't recall specifically if it was mowing.  I know it

20   was Just Construction project-based stuff that would be

21   delayed.

22   Q.   Okay.  And that could have been.  That could have been.

23   A.   Yes, sir.

24   Q.   All right.  But they were controlled by the same type of

25   circumstances, wouldn't they?  Or were they?  Would Just
```

 1    Construction have the same kind of obligation to be paid

 2    timely?

 3    A.    Yes, sir.

 4    Q.    And they were supposed to be paid 30 days net.

 5    A.    Yes, sir.

 6    Q.    And they weren't.

 7    A.    There are several reasons.  But that's correct.

 8    Q.    All right.  Now, final thing I have that was raised by

 9    the government was this issue who controlled the purse

10    strings.  And did Mr. Hoskins, to your knowledge -- he wasn't

11    the one that was going to pay or control the money, was he?

12    A.    He wasn't the one that was going to pay?

13    Q.    He wasn't going to be the one that was in charge of

14    payment for the funds of what was done to people that worked

15    under him, was he?

16    A.    When you say "in charge of payment," he was not in charge

17    of the payment.  He was in charge of requesting work.

18    Q.    He could request his work.

19    A.    Yes, sir.

20    Q.    But he could -- he couldn't see that he got paid, could

21    he?

22    A.    That's a function of their validation of the work being

23    completed, yes, sir.

24    Q.    But he couldn't -- he didn't control those funds, did he?

25    A.    I think that's too vague.  I'm not sure I understand what

 1  the money himself, or does he have to ask somebody else to pay

 2  money?

 3  A.    He had authority over funding.

 4  Q.    And when you say "authority," he had authority to ask for

 5  it; correct?

 6  A.    He had authority to create a shopping cart, to have his

 7  team create a shopping cart for work that he wanted done.

 8  Q.    But he could not issue the check, could he?

 9  A.    That's not how the district works.  Yes, sir, that's

10  correct.

11  Q.    All right.  And neither could the others that I just

12  listed for you; correct?  They couldn't write the check.  They

13  were area managers; right?

14  A.    They are area managers.

15  Q.    And they don't control the money, do they?

16  A.    They do.

17  Q.    Really?

18  A.    Yes, sir.

19  Q.    Well, who writes the checks?

20  A.    Our accounts payable.

21  Q.    Does it have to go through everybody else -- anybody else

22  besides -- when the check is written, the work done in one of

23  their areas, where does it go?  Not when the check -- when the

24  request is made.  If he asks somebody to do some jobs --

25  A.    Yes, sir.

1    Q.    -- what happens with it then?  Just take me on the trail.

2    A.    When a request for work is --

3    Q.    And by the way, this applies to all five people -- or

4    four people, I take it.

5    A.    Yes, sir.

6    Q.    Not Ms. Rhonda Skillern-Jones.

7         Go ahead.

8    A.    A request for work is done so a shopping -- a proposal is

9    received by the venues or the area manager.  For example, they

10   get a proposal.  They agree with what's on the proposal.

11   They'll turn it into their clerk.  The clerk will create a

12   shopping cart in our financial system, SAP.  That gets

13   approved by his next-level manager in the system, and then it

14   goes to purchasing.  And it depends on the dollar amount.

15   Because certain dollar amounts go potentially to the next

16   level up to get approved.  And then it goes to purchasing for

17   a purchase order to be approved.

18   Q.    And so the final question to you on this, sir,

19   Mr. Salazar, is did you just say there was an area manager

20   above him that has to approve it?

21   A.    It depends on the dollar amount.

22   Q.    Yeah.

23   A.    Certain dollar amounts they have the ability to go

24   straight to purchasing.

25   Q.    And what is that?

 1    speaking about.

 2    BY MR. DEGUERIN:

 3    Q.    Well, it was Exhibit 954H, the calls between Hutchison

 4    and Larry Nabors for years.  Did you review that before he was

 5    going to offer it through you?

 6    A.    A couple of portions, but not the whole thing.

 7    Q.    Not all of it.

 8    A.    No, sir.

 9    Q.    It's true, isn't it, that Larry Nabors had full authority

10    to make and approve of off-the-schedule mowing of the grounds?

11    Landscaping.  Did I make my question clear?

12    A.    Can you repeat that?

13    Q.    Yeah.  Larry Nabors had full authority to request

14    landscaping that was not on the schedule.

15    A.    Yes, sir.

16    Q.    In fact, Larry Nabors had weekly meetings with the

17    grounds vendors, which would of course include Mr. Hutchison

18    after he became the sole ground vendor, he had weekly meetings

19    with the vendors that did all that, didn't he?

20    A.    I don't know that.

21    Q.    You don't know because that wasn't your area; right?

22    A.    That's correct.

23    Q.    In all of the RFPs that this jury has seen, at the bottom

24    of the schedule for cutting, it says, "This schedule can be

25    changed to increase or decrease."  Do you remember that

```
1    language?

2    A.    Yes, sir.

3    Q.    Larry Nabors is the one that could do that, isn't he?

4    A.    Yes, sir.

5          MR. DEGUERIN:  All right.  That's all.

6          MR. JOHNSON:  Very briefly.

7                    REDIRECT EXAMINATION

8    BY MR. JOHNSON:

9    Q.    Mr. Salazar, you were asked about the time period that

10   the charges in this case involve.  Do you remember that?

11   A.    Yes, sir.

12   Q.    Did you know that the conspiracy charge, the conspiracy

13   starts in 2011?

14   A.    No, sir.

15   Q.    And if we look at the contract, the one that you were

16   speaking about, RFP 12-8-03 contract, is that the one where

17   you sat on the selection panel?

18   A.    Yes, sir.

19   Q.    And that begins in 2012.

20   A.    Yes, sir.

21   Q.    If we look at Bates Number 282 of that contract, could

22   you read the paragraph 15 there?

23   A.    Yes, sir.  Reporting -- "the successful proposer" --

24   excuse me, my voice is giving out.

25              "The successful proposer will be required to provide
```

 1    paragraphs before.  But also it, you know, delves into areas

 2    that were not delved into here.  And ultimately, it's already

 3    subsumed within the -- you already lay out the two different

 4    methods and what's required to prove each of them instead of

 5    delving into, you know, what -- I guess what the --

 6              MR. JOHNSON:  All the specific categories, like

 7    interest, rent, dividends, securities, there was no testimony

 8    about dividends, securities, interest.  You know, I'm not sure

 9    we need all that specificity.

10              THE COURT:  Mr. White, what is it you want me to

11    add?

12              MR. WHITE:  The language that involves the

13    methodology, so the paragraph in what I've recommended to the

14    Court is the page that starts off "expenditures method of

15    proof."

16              THE COURT:  I have it.

17              MR. WHITE:  The paragraph, the third one of the page

18    starts, "Under the expenditures method the first step is..."

19              THE COURT:  I'm not sure we have it, so.

20              MR. WHITE:  Say again, sir.

21              THE COURT:  I'm not sure we have what you're reading

22    from.  I'm not saying we didn't have it.  I'm just saying we

23    don't have it here at the bench.

24              MR. WHITE:  I can bring some copies up.

25              THE COURT:  If you have a copy, that would be

```
1    helpful.
2              MR. WHITE:  I have one copy, but I'm happy to share
3    it with you.
4              THE COURT:  Yeah, go make a copy.  Go make several,
5    because the government needs a copy.
6              MS. WINTER:  And I guess the bottom line objection,
7    Your Honor, is it's surplusage.
8              THE COURT:  Well, and it might be.  But as long
9    as -- I may leave it in, because I think it's a correct
10   statement of the law.
11             And Rhonda is making copies.
12             Any other objections from the government's side.
13             MS. WINTER:  I think that covers it for us,
14   Your Honor.
15             THE COURT:  Okay.  All right.
16             Mr. MacVane, what about from --
17             MR. MACVANE:  Your Honor, for Mr. Hutchison, John
18   MacVane.  I know we've made two Rule 29 motions at the close
19   of the government's evidence and at the close of our evidence,
20   and we'll make another one, I reckon, at the close of rebuttal
21   evidence.  But we do move for judgment of acquittal under Rule
22   29 because the government failed to prove any element of any
23   of the offenses in the indictment beyond a reasonable doubt.
24   I want to make sure we preserve that issue.
25             THE COURT:  Okay.  I overruled that.
```

1           MR. MACVANE:  Thank you, Judge.

2           THE COURT:  It's preserved.

3           MR. MACVANE:  Thank you, Your Honor.

4           And then -- I just get flop sweats in these kind of

5     conferences about waiving something.

6           So the other thing, housekeeping-wise --

7           THE COURT:  I'm not big on gotcha; so you're all

8     right.

9           MR. MACVANE:  You aren't but the Fifth Circuit is.

10    So the other thing -- I meant no offense to anybody on the

11    Fifth Circuit.

12          The other thing I think I need to do

13    housekeeping-wise, Judge, is we tendered several instructions

14    that we filed at Document Number 130 and 144.  And I take it

15    to the extent those aren't incorporated in the instruction,

16    the Court's ruling is that those are refused?

17          THE COURT:  Yes.

18          MR. MACVANE:  Thank you, Your Honor.  Because I

19    think I need a ruling on that.

20          The other thing I want to raise is, Judge, on our

21    first set of proposed instructions at Document 130 -- and this

22    was done at -- excuse me, at Instruction Number 8 on page 12

23    to 13, we suggested a definition of "official act."  And I

24    think I understand how the Court's probably looking at that

25    instruction by virtue of the fact it wasn't included.  But

 1    actually, I think this is a specific basis for a directed

 2    verdict on two issues, and it goes to what I think is a charge

 3    error by not including that instruction that I think I need to

 4    address to preserve some things.

 5            So, first of all, the Supreme Court in *Snyder*, the

 6    first two sentences of that opinion talk about how Section 666

 7    requires an official act.  The official act we all know is not

 8    used.  Those words, "official act," are not used in

 9    Section 666.  And what Section 666 --

10            THE COURT:  Well --

11            MR. MACVANE:  Go ahead.

12            THE COURT:  Judge Kavanaugh is probably wrong.

13            MR. MACVANE:  Well, we won't find out until someone

14    goes and asks again, I suppose, which maybe a case between now

15    and then or maybe something we want to raise.  So that's kind

16    of the only reason I'm bringing it up.

17            THE COURT:  Isn't it the case concerning Mayor Adams

18    in New York?

19            MR. MACVANE:  I think I did look at that case,

20    Judge.

21            THE COURT:  The Court said there Kavanaugh was wrong

22    and actually deleted "official acts."

23            MR. MACVANE:  Well, exactly.

24            THE COURT:  The only current case I can find in the

25    Fifth Circuit, but it's pre-Snyder, said that official acts

```
 1   aren't needed.
 2          MR. MACVANE:  Okay.  I actually didn't find that
 3   authority, Judge; so you-all are ahead of me on that.  I did
 4   look for Fifth Circuit authority, but I didn't find it.  The
 5   Lindburg case goes through a lot of different authorities on
 6   the issue.
 7          The reason I bring it up, Judge, is because I don't
 8   know if it's going to be addressed by somebody else between
 9   now and whenever it might get addressed by somebody else.
10          But there are two issues.  One is I think that the
11   statute Section 666, to the extent that it allows a criminal
12   charge with respect to any kind of broad -- quote/unquote, any
13   kind of gift with an expectation of some future action and it
14   does so in connection -- this is the language from
15   Section 666 -- "in connection with any business of --"
16   omitting some words "-- an agency involving anything of value
17   of $500 or more."  That's unconstitutionally vague.
18          I don't believe that applies to Mr. Hutchison and
19   the gifts or money that was allegedly given in this case that
20   provided fair notice that his conduct was prescribed by this
21   statute.  And I -- you know, we believe the Constitution is
22   unconstitutionally vague as applied to him under the First and
23   Fifth Amendment to the U.S. Constitution, and we would ask for
24   directed verdict on that basis as well, specifically.
25          THE COURT:  Okay.  I'll overrule that.
```

```
 1              MR. MACVANE:  Thank you, Judge.

 2              And then we also believe that the official act

 3     definition or some definition of official act cabining those

 4     issues needs to be given to the jury, needs to be read under

 5     the statute to avoid those constitutional concerns.  It also

 6     is the exact same federalism concerns that motivated Snyder;

 7     so we'd move for directed verdict on that basis.

 8              THE COURT:  Okay.  And I'm -- I'm going to deny your

 9     request for a definition of official acts.  I'm leaving in the

10     official acts requirement because of Judge Kavanaugh's

11     opinion.  But you're asking me to define a term that's not

12     even in the statute.

13              MR. MACVANE:  I understand.  I understand, Judge,

14     and I just want to make sure that --

15              THE COURT:  Yeah.  No, you're preserved.

16              MR. MACVANE:  Thank you, Judge.

17              The next, I think, big thing, Judge, is paragraph --

18     let me get to this.

19              Well, before I do that, Judge, I noticed the Court

20     put this language about expert witnesses in the charge.

21              MR. HARDIN:  Yeah, page 8.

22              MR. MACVANE:  Thanks.  On page 8, going into page 9,

23     it's my understanding, but I'm happy to be corrected, that no

24     witness in this case was designated as an expert.

25              MR. HARDIN:  On either side.
```

```
 1              THE COURT:  No, I agree with that.  One of the
 2   defendants asked for this.
 3              MR. MACVANE:  Oh.  Well, it wasn't me, so I guess
 4   Mr. White.
 5              THE COURT:  Asked for the expert.
 6              MR. WHITE:  I asked for it to be put in, Judge.
 7   Nobody on the government's side --
 8              MR. HARDIN:  I hate it and would urge you to take it
 9   out.
10              MR. WHITE:  I don't feel that strongly about it.
11              MR. HARDIN:  No, the government had all these
12   witnesses that testified, not designated as experts, who gave
13   opinions, and this calls attention to them and legitimizes it.
14              MR. WHITE:  But we had one that testified, and we
15   kept trying to call her an expert, and they kept insisting she
16   wasn't an expert.  But she seemed like an expert to any
17   reasonable bystander that may have heard what she had to say
18   about taxes.
19              MR. HARDIN:  We have somebody outside right now
20   taking the air out of all your tires.
21              MR. WHITE:  I don't have really strong feelings
22   about it, and I sense that you do.  I sense that because
23   you're telling me.  I don't mind pulling it out.  I'll agree
24   to pull it out.
25              MR. HARDIN:  Oh, then I'll shut up.
```

```
1              MS. WINTER:  There you go.

2              THE COURT:  Then it's gone, then.  Quit when you

3    win.

4              MR. MACVANE:  Then, Judge, let's see if we can keep

5    this streak going.  On the bottom of page 9, the Court added

6    the instruction that "an alleged breach of contract may be

7    considered by you."  And I think we need to add some language,

8    "only if you find that such a breach of contract occurred" or

9    something to that effect.  Because I think the way that it's

10   written right now is allowing the jury to consider the

11   allegation --

12             THE COURT:  Okay.  "Only if you find such a breach

13   occurred and only to the extent" --

14             MR. MACVANE:  And I agree with that, Judge.

15             THE COURT:  "-- that you find it to be evidence --"

16   should I put evidence or relevant to a defendant?

17             MR. MACVANE:  I don't have a strong opinion either

18   way you want to do it, Judge.  Whatever you think is best.  I

19   think both capture it.

20             THE COURT:  All right.  I'll leave "evidence of a

21   defendant."  All right.  I'm adding that.

22             MR. MACVANE:  Okay.  And, Judge, this is -- this I

23   think is very important.  On page 13, and this is -- I think

24   has been lurking since the first time we had a charge

25   conference about little c.  And that's the theft of government
```

1    funds substantive offense in the conspiracy charge.

2             Now, for this -- for there to be a conspiracy to

3    commit this offense, we would need some evidence from the

4    government, not an agent of HISD taking a bribe, but of an

5    agent of HISD obtaining by fraud, really.  That's the only

6    theory that's out there.  The only paragraph that I found in

7    the indictment that really spoke to this issue in terms of

8    overt acts or anything was I think paragraph 13 on page 4 of

9    the superseding indictment.  And what that paragraph says is

10   that over the span of the conspiracy Hutchison systematically

11   overbilled HISD for mowing services and for mulch causing

12   millions of dollars lost to the school district.

13            Now, Hutchison doing that would not -- that's the

14   wire count basically, Judge.  But Hutchison doing that is not

15   a violation of Section 666 because Hutchison is not an agent

16   of HISD for purposes of Section 666.

17            And then the next sentence in paragraph 13 of the

18   superseding indictment, it says, "Mr. Hutchison inflated his

19   mowing bills to HISD by invoicing for more cuts than he would

20   instruct the subcontractors to perform, and he overbilled for

21   mulch by invoicing for falsely inflated costs."  Again, that's

22   the wire fraud count that we've heard about throughout this

23   whole case.  Even if Mr. Hutchison is guilty of wire fraud,

24   that doesn't mean an agent of HISD defrauded HISD.

25            And then the last sentence here does say that

1    "Hutchison paid a portion of his fraudulently boosted profits

2    to Busby in the form of cash payments and free home

3    remodelling."  But, again -- actually, even that, Judge,

4    doesn't describe an intent of Mr. Busby to join the

5    conspiracy, to further its unlawful purpose, that he possessed

6    his own intent to defraud HISD.

7         And my understanding of the evidence in the case,

8    Judge, is that there were several witnesses put on from HISD

9    who had no knowledge whatsoever of either of these sort of

10   schemes that are alleged in the wire fraud count and on which

11   the government has relied in support of using this section

12   little c in this part of Section 666.

13        So from our perspective, Judge, there is no evidence

14   to support instructing the jury on this theory, and it could

15   potentially be, I think, a really big problem if the jury

16   ultimately comes back a certain way on this count and we can't

17   put Humpty Dumpty back together again.  I think the only

18   really proper course is to take out c and all this stuff

19   altogether because it's not supported by the evidence.

20        And I'd cite the Court again to -- this is a case

21   that I cited in my last submission, but that was *U.S. v.*

22   *Hamilton*, 37 F.4th 246.  It's a 2022 case.

23        The Fifth Circuit talks about "an agreement to

24   commit a crime is not to be lightly inferred."  To infer from,

25   really, what's in this record that Mr. Busby was defrauding

 1    HISD or intentionally misapplying HISD's money with some kind

 2    of knowledge of this, candidly, I think is very tenuous wire

 3    fraud conspiracy, which is based on neglect of certain aspects

 4    of the contract from our perspective.  But for Mr. Busby to

 5    have the intent to deceive and cheat HISD based on the cuts

 6    not happening, with the Kiddie Cushion invoices being

 7    inflated, I do not think it's there.  I certainly don't think

 8    it's there for any of the other agents at HISD we've heard

 9    about on this case; so I don't think they can get there on the

10    substantive count, and, therefore, I don't think they can get

11    there on the conspiracy, and the jury should not be instructed

12    on that.

13         THE COURT:  What does this add?  Obviously, it's in

14    the indictment.  But Number 1, what does it add?  I mean, I

15    know everybody wants three bites at the apple instead of two,

16    Number 1.  And then Number 2, what evidence do I have that

17    anybody stole or embezzled or --

18         MR. JOHNSON:  Judge, the two key pieces of evidence

19    that tie Mr. Busby to the fraud scheme to the overbilling on

20    mowing is -- and, again, it's a conspiracy charge.  The

21    allegation is not --

22         THE COURT:  No, I understand he might --

23         MR. JOHNSON:  -- Mr. Busby was overbilling.  It's

24    that Mr. Hutchison was overbilling and Mr. Busby was

25    conspiring with him to allow that to happen and benefitting

1    from it.  And so the two key pieces of evidence that tie

2    Mr. Busby to that are, first, that Derrick Sanders testified

3    that Busby told him, "You can benefit from the construction

4    services contracts, because I'm getting mine on -- under the

5    mowing side, under the grounds maintenance side."  I mean,

6    that's not exactly how he phrased it, but that's the point.

7            And the second piece of evidence is Busby signing

8    off on those invoices that say that four cuts have been

9    performed each of those months and four cuts had not been

10   performed.  And he's the one authorizing those as approved

11   invoices.  And based on that, HISD paid.  And if someone

12   doesn't sign those invoices, HISD doesn't pay.

13           MR. MACVANE:  And, Judge, I don't even know if I

14   need to keep talking, but -- tell me if I don't.

15           THE COURT:  You don't.  I'm going to overrule your

16   objection.

17           MR. MACVANE:  Maybe let me keep talking a little

18   bit.

19           THE COURT:  I think it's thin.

20           I agree with the defense that it's pretty thin.

21           MR. MACVANE:  And I'll just -- if you let me say one

22   more thing, I will stop.

23           THE COURT:  All right.

24           MR. MACVANE:  I think it is very thin, and I would

25   hate to have this in here and we're going to be some day

 1    arguing with some other people about whether this evidence was

 2    enough, and we can't tell whether the jury did it based on the

 3    first two which seemed to have a fair amount of evidentiary

 4    support.  It's going to be a lot more in this third one, and

 5    this third one is here, in our view, not supported by the

 6    evidence.  The fact that Mr. Busby told Mr. Sanders you can

 7    benefit, that's no evidence at all of any fraud was going on.

 8    That's evidence for the bribe in the first two, if it's

 9    evidence of anything.

10         The idea that he said he's signing off on the

11    invoices, there's literally no evidence, I don't think, in the

12    case that he knew these invoices were inaccurate or any

13    evidence of how he could have known that.  So he's got to

14    have -- and Mr. Johnson kind of made my point for me.  He

15    said, "Mr. Hutchison was overbilling."  Well, if Mr. Hutchison

16    is the one defrauding HISD, no one violated Section 666.

17    Because Section 666 requires an agent of the organization to

18    be doing the defrauding.  So I just would respectfully suggest

19    we don't get there, Judge.  It might be easiest to take that

20    part out, but I understand the Court's ruling.

21         THE COURT:  All right.  Anything else?

22         MR. MACVANE:  Yes.  The intentionally misapply is

23    still in here, Judge, for the definition -- for the means of

24    violating that Section c.  And --

25         THE COURT:  Tell me where you're at.

1          MR. MACVANE:  I'm still on page 13 going into

2     page 14.  Section c -- actually, I just caught this.  In

3     Section c, where the paragraph proffer is on page 13, we

4     should take out "embezzles," the word "embezzles," the word

5     "steals."  I would actually say we should also take out -- the

6     Court, I don't know if its ruled about this or if the

7     government agrees with it -- but we should also take out

8     "knowingly converts without authority and intentionally

9     misapplies."

10          The reason for that, Judge, is the word "convert" is

11     defined in here to mean basically the same thing as "steal."

12     And I don't think there's any evidence of taking and carrying

13     away or wrongfully taking anything.  I think obtained by fraud

14     is the only one that fits.  And intentionally misapplying,

15     that definition, it says intentionally convert.  So, I mean,

16     that also should not be in there, either in paragraph C or in

17     the sub -- definition.  I think all we really have left that

18     is remotely supported by the evidence is "obtained by fraud."

19          THE COURT:  Okay.  What about that, Ms. Winter?

20          MS. WINTER:  Your Honor, we're fine.  I mean, we

21     agree.  And we've already cut "embezzle and steal and

22     convert."  So those words and definitions are out of the words

23     that you struck from pages 13 and 17.  But we'll just stick in

24     subparagraph c "to obtain by fraud," and we can take out

25     "knowingly converts without authority or intentionally

1               **REPORTER'S CERTIFICATE**

2

3          I, DONNA J. PRATHER, do hereby certify that the

4    above and foregoing, consisting of the preceding 225 pages,

5    constitutes a true and accurate transcript of my stenographic

6    notes and is a full, true, and complete transcript of the

7    proceedings to the best of my ability.

8          Dated this 14th day of June, 2025.

9

10

11          DONNA J. PRATHER, RMR, CRR, CCP, CBC
            Federal Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25