United States District Court
Southern District of Texas
**ENTERED**
August 11, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| VS. | § | CRIMINAL ACTION NO. 4:21-CR-588 |
| | § | |
| ANTHONY HUTCHISON and BRIAN BUSBY, | § | |
| | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**ORDER**

Pending before the Court are the Defendants' post-trial motions. Anthony Hutchison filed his Motion for Judgment of Acquittal or New Trial Under Rules 29 and 33, (Doc. No. 296), and Brian Busby filed his Motion for Acquittal or New Trial Under Rules 29 and 33, (Doc. No. 294). The United States of America (the "Government") responded in opposition to each motion, (Doc. Nos. 308, 309), and the Defendants each filed a reply, (Doc. Nos. 320, 321). The Court held a hearing on the motions where it heard arguments from Hutchison and Busby's respective counsel and counsel from the Government. Upon considering the evidence, the parties' arguments, and the applicable law, the Court hereby:

**DENIES** Anthony Hutchison's Motion for Judgment of Acquittal or New Trial in its entirety, and

**DENIES** Brian Busby's Motion for Acquittal or New Trial in its entirety.

## I. Factual and Procedural Background

This case involves multiple allegations of criminal activity arising from an alleged corruption and fraud scheme involving employees and contractors of the Houston Independent

School District ("HISD").[1] Defendant Brian Busby was at the time the Chief Operating Officer of HISD. Defendant Anthony Hutchison was an HISD grounds-maintenance and construction contractor primarily through his landscaping company, Southwest Wholesale LLC ("Southwest Wholesale"), and his construction company, Just Construction LLC ("Just Construction"). Hutchison's home remodeling company, AL&H Custom Homes, was also involved in part of the alleged scheme.

On April 7, 2022, the grand jury returned a Superseding Indictment charging Hutchison and Busby with multiple crimes. Hutchison was indicted on one count of conspiring to commit offenses against the United States, in violation of 18 U.S.C. § 371 (Count 1); six counts of bribery concerning programs receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(2) and 2 (Counts 2–7); eleven counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2 (Counts 14–24); one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count 25); and two counts of willfully filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts 27–28). (Doc. No. 42) (Superseding Indictment); *see also* (Doc. No. 1) (Original Indictment).

Busby was indicted on one count of conspiring to commit offenses against the United States, in violation of 18 U.S.C. § 371 (Count 1); six counts of bribery concerning programs receiving federal funds, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 2 (Counts 8–13); one count of witness tampering, in violation of 18 U.S.C. § 1512(b)(3) (Count 26); and five counts of willfully filing a false tax return, in violation of 26 U.S.C. § 7206(1) (Counts 29–33). (Doc. No. 42) (Superseding Indictment); *see also* (Doc. No. 1) (Original Indictment).

To contextualize Defendants' arguments and the issues they have raised, the Court will briefly summarize the proceedings leading up to now. In writing this Order, the Court makes no

[1] Despite the fact that the jury found the Defendants guilty on all counts, the Court frequently describes some allegations as "alleged" in this Order because it has not yet entered final judgment in this case.

attempt to summarize the entire record of these voluminous proceedings, just certain portions which are helpful in resolving the present motions.

### A. The Investigation and Search Warrant Execution

After a roughly two-year investigation, on February 27, 2020, agents from the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS") executed search warrants at four locations: (1) Hutchison's Southwest Wholesale and Just Construction company office, (2) Hutchison's home, (3) Busby's HISD office, and (4) Busby's home. (Doc. No. 207, Trial Tr. Day 3 AM at 7–8) (Testimony of Kalford Young). Among other things, agents removed a large volume of business records from the Southwest Wholesale and Just Construction offices and from Hutchison's home. They also seized Hutchison's and Busby's respective cell phones. One of the items that agents recovered from Hutchison's home office was a hand-written ledger. At trial, an excerpt of that ledger was introduced as Government's Exhibit 1 ("GEX 1"), which the Government characterized as Hutchison's "bribery ledger." Throughout the trial, Hutchison's counsel portrayed it as a "gambling ledger." *See generally* (Trial Record).

Initially, the agents who recovered the ledger did not understand exactly what it was. The ledger entries began on a page that had a yellow tab labeled "Payments" attached. The Payments section listed HISD schools where Hutchison's companies did work, the type of work, the invoice amount paid by HISD for the work, names or initials, additional dollar figures, and sometimes a location indicator. After agents reviewed additional records, including HISD contracts, Just Construction and Southwest Wholesale proposals and invoices, telephone records, bank records, emails, and other information from Hutchison's cell phone, the agents concluded that Hutchison's ledger was, at least in part, itemizing bribery/kickback activity that occurred from September 2017

to January 2018. Law enforcement conducted an extensive investigation which eventually resulted in many more indictments (and convictions) than the ones at issue here.

The existence and pervasiveness of the alleged scheme was confirmed by Hutchison and Busby's coconspirators, who were mentioned in the ledger by initials or sometimes their first names. According to the testimony at trial (and to a certain extent confirmed by the ledger), Hutchison paid bribes to "A" for Alfred Hoskins, the former General Manager of HISD's Facilities Maintenance and Operations ("FMO") group, "G" for Gerron Hall, former FMO Area Manager South, "L" for Luis Tovar, former FMO Area Manager North, "D" or "Derrick" for Derrick Sanders, former HISD Officer of Construction Services, and "Rhonda" for Rhonda Skillern-Jones, who was an HISD Trustee, and for a time, was the President of the HISD Board of Trustees. There was also testimony implicating Brian Busby in the bribery scheme. The ledger contained notations that referenced "BB" for Brian Busby, the primary bribe recipient. Other than Busby, all the bribe recipients (and coconspirators) identified confessed to their involvement in the scheme. Alfred Hoskins, Gerron Hall, Luis Tovar, Derrick Sanders, and Rhonda Skillern-Jones each pleaded guilty to conspiracy in violation of 18 U.S.C. § 371, and they all testified at trial as cooperating witnesses.

### B. The Trial and Post-Trial Proceedings

Beginning on March 24, 2025, this Court oversaw twenty days of trial which spanned almost four weeks. Hundreds of exhibits were admitted, the jury heard testimony from over fifty witnesses, and the trial record is thousands of pages long. It is unnecessary and impracticable to review every single aspect of the trial here; instead, the Court will simply reference and summarize some of the testimony and exhibits relevant to each issue as it is resolved by the Court.

The jury returned its guilty verdict on all counts on April 18, 2025. Eleven days later, Hutchison and Busby separately moved the Court to extend the deadlines to file post-trial motions,

which the Government did not oppose. (Doc. Nos. 166, 168). The Court granted the extension. (Doc. No. 167). Both Defendants jointly asked the Court to extend their post-trial motion deadlines two more times without opposition from the Government. (Doc. Nos. 174, 288). The Court again granted the extensions. (Doc. Nos. 175, 289). Busby filed his motion on September 17, 2026, and Hutchison filed his motion the next day. (Doc. Nos. 294, 296). These motions were timely filed. The Government responded in opposition to each Defendant's motion, (Doc. Nos. 309, 308), and Busby and Hutchison each then replied, (Doc. No. 321, 320). These motions are now ripe for resolution.

## II. Legal Standards

### A. Motion for Judgment of Acquittal Under Rule 29

Federal Rule of Criminal Procedure 29 provides, in part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." FED. R. CRIM. P. 29(c)(2). "A defendant may move for a judgment of acquittal, or renew such a motion, within 14 days after a guilty verdict or after the court discharges the jury, whichever is later." FED. R. CRIM. P. 29(c)(1). "A motion for judgment of acquittal challenges the sufficiency of the evidence to convict." *United States v. Lucio*, 428 F.3d 519, 522 (5th Cir. 2005) (quoting *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)). Thus, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

A court must examine the evidence as a whole, drawing all reasonable inferences to support the verdict. *United States v. Charles*, 469 F.3d 402, 406 (5th Cir. 2006). The evidence need not exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt. *United States v. Lage*, 183 F.3d 374, 382 (5th Cir. 1999). "All credibility

determinations and reasonable inferences are to be resolved in favor of the verdict." *United States v. Resio–Trejo*, 45 F.3d 907, 911 (5th Cir. 1995) (citing *United States v. Nguyen*, 28 F.3d 477, 490 (5th Cir. 1994)).

**B. Motion for New Trial Under Rule 33**

Federal Rule of Criminal Procedure Rule 33 permits a district court, upon the defendant's motion, to vacate a judgment and grant a new trial "if the interest of justice so requires." FED. R. CRIM. P. 33. New trial requests generally take two forms. The first, like sufficiency review, focuses on the evidentiary support for the verdict, with the movant having to show that the verdict is so strongly against the weight of the evidence that it affects the defendant's substantial rights. *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011). A new trial request can also be based on procedural problems with the trial if they caused a miscarriage of justice. *Id.*

"In determining whether to grant the motion, the district court must carefully weigh the evidence and may assess the credibility of the witnesses during its consideration of the motion for new trial, but must not entirely usurp the jury's function or simply set aside a jury's verdict because it runs counter to [the] result the district court believed was more appropriate." *United States v. Tarango*, 396 F.3d 666, 672 (5th Cir. 2005) (internal citations and quotation marks omitted). "The remedy of a new trial is rarely used; it is warranted only where there would be a miscarriage of justice or where the evidence preponderates heavily against the verdict." *United States v. O'Keefe*, 128 F.3d 885, 898 (5th Cir. 1997) (internal quotation omitted). "Generally, motions for new trial are disfavored," *United States v. Piazza*, 647 F.3d 559, 565 (5th Cir. 2011), and are granted "only upon demonstration of adverse effects on substantial rights of a defendant." *United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011). "A motion for new trial 'is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be

invoked only in exceptional cases.'" *United States v. Scroggins*, 485 F.3d 824, 831 (5th Cir. 2007) (quoting *United States v. Robertson*, 110 F.3d 1113, 1120 n.11 (5th Cir. 1997)) (internal alterations omitted).

## III. Anthony Hutchison's Motion for Judgment of Acquittal or New Trial Under Rules 29 and 33 (Doc. No. 296)

In his motion, Hutchison challenges his convictions for bribery, wire fraud, and tax fraud. He also argues that the Government engaged in prosecutorial misconduct warranting a new trial, and he contends his trial counsel's performance was constitutionally deficient. Hutchison does not challenge his witness tampering conviction. The Court will review each of these topics in detail below.

### A. Hutchison's Challenges to the Bribery Counts (Counts 2–7)

Hutchison asks for acquittal or alternatively a new trial on each bribery count. The jury convicted Hutchison of six counts of federal programs bribery under 18 U.S.C. § 666(a)(2) (Counts 2–7). (Doc. No. 153 at 17–18) (Final Jury Instructions); (Doc. No. 160) (Jury Verdict). Hutchison makes several arguments related to the bribery counts, and the Court will address each in turn.

#### 1. Government Exhibit 1: The Ledger

First, Hutchison argues that GEX 1—Hutchison's handwritten ledger—did not meet the evidentiary standard for admission. Hutchison claims the Government never authenticated the exhibit or established that it was a *bribery* ledger; therefore, the statements within were inadmissible hearsay.

When the Court was preadmitting exhibits at the pretrial conference, Hutchison did not object to the admission of GEX 1. In fact, his counsel explicitly stated, "[w]e're not objecting to the admissibility of the ledger." (Doc. No. 224, Trial Tr. Day 1 PM at 160:1–9). Instead, only Busby objected to GEX 1 as hearsay and as a violation of his rights under the Confrontation Clause. (Doc.

No. 290, Pretrial Conf. Tr. at 40–48). The Court overruled Busby's Confrontation Clause objection, which will be discussed in more detail later. (Doc. No. 206, Trial Tr. Day 2 AM at 75–76). As to the hearsay objection, the Government argued GEX 1 was admissible against *Busby* as a statement of a coconspirator under Rule 801(d)(2)(E). *See* (*id.*). The Court deferred ruling on GEX 1's admissibility until hearing from its sponsoring witness(es). (*Id.*). As a result, the Court carried Busby's hearsay objection into the trial, while allowing the Government to refer to the exhibit during opening statements and during its case-in-chief, which the Fifth Circuit permits. *United States v. Fragoso*, 978 F.2d 896, 900 (5th Cir. 1992); (Doc. No. 206, Trial Tr. Day 2 AM at 75–76). On the fourteenth day of trial, after the Government rested its case-in-chief, the Court found with respect to GEX 1, the Government had satisfied the Rule 801(d)(2)(E) predicate requirements by a preponderance of the evidence, thus, overruling Busby's hearsay objection and admitting GEX 1 into evidence as a coconspirator statement made during and in furtherance of a conspiracy. (Doc. No. 244, Trial Tr. Day 14 PM at 54:2–8).

Two rules of evidence specifically guide the Court's analysis on this issue. Initially, Rule 901(a) instructs that authentication of a document is a condition precedent to its admission, meaning that "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." FED. R. EVID. 901(a). "A proponent may authenticate a document with circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery." *In re McLain*, 516 F.3d 301, 308 (5th Cir. 2008) (internal citations omitted). "[The Fifth Circuit] does not require conclusive proof of authenticity before allowing the admission of disputed evidence . . . . Rule 901 does not limit the type of evidence allowed to authenticate a document. It merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be." *United States v.*

*Jackson*, 636 F.3d 687, 693 (5th Cir. 2011) (quoting *United States v. Jimenez Lopez*, 873 F.2d 769, 772 (5th Cir. 1989)). Once the proponent has made the requisite preliminary showing of authenticity, the evidence should be admitted, as "[t]he ultimate responsibility for determining whether evidence is what its proponent says it is rests with the jury." *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009). Assuming this threshold is met, alleged flaws in authentication "go to the weight of the evidence instead of its admissibility." *United States v. Isiwele*, 635 F.3d 196, 200 (5th Cir. 2011) (internal quotation marks omitted).

Secondly, Rule 801(d)(2)(E) instructs that a statement is not hearsay if "[t]he statement is offered against a party" and the statement was "made by the party's coconspirator during and in furtherance of the conspiracy." FED. R. EVID. 801(d)(2)(E). For a statement to be admissible under this rule, "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (quoting FED. R. EVID. 801(d)(2)(E)). When these predicate facts are challenged or disputed, the offering party must prove them by a preponderance of the evidence, and it is the trial court's duty to determine whether the offering party has done so. *Id.* at 181; *Fragoso*, 978 F.2d at 900.[2] Nevertheless, the trial court is not required to make its findings on admissibility before the coconspirator statements are introduced at trial; "the court may conditionally admit the statement subject to a subsequent final determination." *United States v. Gonzalez-Balderas*, 11 F.3d 1218, 1224 (5th Cir. 1994). It is appropriate for the trial court to defer its ruling until the close of the Government's case, or in other words, to "carry" the hearsay objection (or Rule 801(d)(2)(E) determination) through trial. *Id.*

---

[2] One potential method for a court to ensure the Government can satisfy the predicate facts needed under this rule is by holding a pre-trial hearing outside the presence of the jury. *Fragoso*, 978 F.2d at 900 (citing *United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979) (en banc)) This type of hearing is often referred to as a *James* hearing. Despite the fact that this case was pending for years, no party requested this Court hold a *James* hearing.

Later in the trial, the court may rule on whether the offering party has sufficiently proved the required predicate and then admit the coconspirator statements under Rule 801(d)(2)(E). *Id.*[3]

These two rules of evidence are distinct, but they are both applicable to the analysis regarding GEX 1. The Government, as the offering party, must produce evidence to support a finding that GEX 1 is what the Government claims it to be—a ledger documenting a portion of the alleged scheme and some of the illegal payments. Additionally, because of Busby's hearsay objection (and the Government's intention to admit GEX 1 against Busby under Rule 801(d)(2)(E)), the Government must establish the predicate facts under that rule: (1) evidence that there was a conspiracy involving Hutchison (the declarant) and Busby (the nonoffering party), and (2) that the ledger (the statement) was made during the course and in furtherance of the conspiracy. *Bourjaily*, 483 U.S. at 175. Often the same facts can establish both authenticity and the coconspirator predicate facts. *See Jackson*, 636 F.3d at 694 (explaining that "documents purporting to be the statements of a coconspirator made in the course and in furtherance of a conspiracy must be authenticated as such in order to be admissible.").

To begin, the Government argues Hutchison has waived any challenge to GEX 1's admission because of his explicit statement of "no objection" before trial. While this argument is meritorious,[4] Busby has clearly preserved his challenge to GEX 1's admission, and so the Court

[3] In the event the offering party has *not* proved the predicate facts by a preponderance of the evidence, "the judge must decide whether the prejudice arising from the erroneous admission of the coconspirator's statements can be cured by a cautionary instruction to disregard the statement or whether a mistrial is required." *James*, 590 F.2d at 582–83.

[4] In certain circumstances, "when one party has made an objection or offer of proof, it should be presumed, *unless the contrary appears*, that co-parties aligned with him have joined in the objection or offer." *Howard v. Gonzales*, 658 F.2d 352 (5th Cir. 1981) (citing FED. R. EVID. 103(a)) (emphasis added). *But see United States v. Harris*, 104 F.3d 1465, 1472 (5th Cir. 1997) ("In the instant case, rather than joining his codefendant's objection, the appellant's counsel told the trial judge, 'I don't have any objections to the charge.' Having chosen not to object or at least to join his codefendant's objection, the appellant did not preserve the issue for appeal, leaving us to examine the [jury] instruction only for plain error.") (citation omitted). Hutchison not only did not join in Busby's objection, but he expressly told the Court he had no objection. He presumably chose to inform the Court that he had no objection to GEX 1 because that exhibit was clearly admissible against Hutchison under the federal evidence rules either as an admission of a party opponent under Rule 801(d)(2)(A) or as a statement against interest under Rule 804(b)(3). The Court was entitled to

will proceed to a merits analysis because GEX 1's authentication and its admission under Rule 801(d)(2)(E) are closely related issues and relevant to resolving both Hutchison's and Busby's motions.

The Government relies on *United States v. Ceballos* to argue the ledger was properly authenticated. 789 F.3d 607 (5th Cir. 2015). In *Ceballos*, the Fifth Circuit affirmed the trial court's finding of authenticity regarding the defendant's smuggling ledger. *Id.* at 619–20. The ledger was recorded in a notebook found in the defendant's purse, which was inside her car, at the time of her arrest. *Id.* at 620. The contents of the notebook, "which the court was able to examine," provided some corroboration of the alleged criminal activity. *Id.* For example, the ledger contained references to money owed to individuals who were both contacts in the defendant's phone and who she called around the time of her arrest. *Id.* Moreover, the contents of the notebook were "generally consistent with a ledger recording smuggling activity." *Id.* The agent who handled the defendant's belongings after her arrest served as the prosecution's sponsoring witness, and the Fifth Circuit found the agent's testimony supported the notebooks' characterization as a smuggling ledger. *Id.* As a result, the *Ceballos* ledger was sufficiently authenticated. *Id.*

Hutchison relies on *United States v. Jackson* to argue the ledger was *not* properly authenticated. 636 F.3d 687 (5th Cir. 2011). In *Jackson*, the Fifth Circuit found that the prosecution failed to meet the authenticity standards regarding notebooks it claimed to be drug ledgers; thus, the trial court's admission of the notebooks was error. *Id.* at 694. The ledgers were not trustworthy because they were not found in the coconspirator's home; they were produced by the coconspirator at a proffer session, "under circumstances that raise[d] question in and of themselves." *Id.* at 693. The trial court had no information to indicate the coconspirator *actually prepared* the ledgers, and

---

rely on counsel's representation. As such, the principle that one can rely on the objection of a codefendant does not apply. Nevertheless, the Court will discuss the objections' relative merits.

the ledgers contained no dates to indicate the events recorded had taken place during the course of the relevant conspiracy. *Id.* at 693–94. No handwriting analysis was performed, and no member of the conspiracy testified regarding the entries' trustworthiness. *Id.* at 694. Additionally, the prosecution's sponsoring witness (the officer who conducted the proffer session) could not personally vouch for the credibility of any entries in the ledgers, and he conceded that the coconspirator's "motive in turning over the ledgers was to obtain a benefit for himself." *Id.* at 693. All of these facts combined led the Fifth Circuit to conclude the prosecution failed to satisfy the authenticity requirements and that admission of the notebooks was error. *Id.* at 694.

Considering *Ceballos* and *Jackson*, it is clear the Government properly authenticated GEX 1 at trial. First, FBI Special Agent Paul Kindred, who executed the search warrant at Hutchison's home, testified that the ledger was found in Hutchison's home office alongside other personal and business documents, including his tax returns. (Doc. No. 207, Day 3 AM at 55:7--56:3, 83–85) (Testimony of Paul Kindred). There was no indication anyone else lived at Hutchison's home other than himself. (*Id.* at 67, 71). Multiple witnesses also testified that they saw Hutchison write in a ledger or notebook, including his former assistant Diane Jones, who testified that she recognized GEX 1 as a document Hutchison maintained, although she did not understand its contents. (Doc. No. 250, Trial Tr. Day 18 PM at 30–34) (Testimony of Diane Jones). In fact, throughout trial, Hutchison never disputed that he prepared the ledger or offered evidence that might suggest otherwise. He only disputed its characterization as a *bribery* ledger, insisting the ledger simply recorded his *gambling* debts. The facts and the law support the document's authenticity because it was in Hutchison's exclusive possession and evidence demonstrates that he prepared and maintained the ledger. *See Ceballos*, 789 F.3d at 620.

Second, the ledger contained entries by year of HISD schools Hutchison's companies had contracts with and the total invoice amount of the contract. FBI agents were able to match up many of these entries with actual invoices recovered from the Southwest Wholesale and Just Construction offices. For example, the first notation on the ledger in 2017 indicates a landscaping and irrigation project at "Codwell" for $101,820.46. (GEX 1, Doc. No. 177). Agents recovered a Southwest Wholesale file regarding Codwell Elementary. The file included a purchase order reflecting a landscaping project at Codwell Elementary School dated August 24, 2017. The file also contained a "client payment" document indicating Southwest Wholesale received payment from HISD on October 18, 2017 in the amount of $101,820.46. (Doc. No. 207, Trial Tr. Day 3 AM at 89–95) (Testimony of Paul Kindred). For numerous other ledger entries, the Government demonstrated this same consistency between Hutchison's ledger, the schools at which his companies worked, and the amounts HISD paid to his companies. (*Id.* at 95–128) (discussing corresponding ledger entries for Waltrip High School, Garden Oaks Elementary School, and Shearn Elementary School, among others). This supports the document's trustworthiness as it was corroborated by other evidence. *See Ceballos*, 789 F.3d at 619–20.

Third, the ledger contains multiple dates and notes indicating payments made to specific coconspirators, and those payments were largely corroborated by witness testimony or documentary evidence at trial. For example, Derrick Sanders testified that he received multiple payments listed in the ledger, including a payment in Las Vegas, labeled "Paid LV" on the ledger. *Compare* (Doc. No. 225, Trial Tr. Day 2 PM at 50–52, 72–75) (Testimony of Derrick Sanders), *with* (GEX 1, Doc. No. 177). The ledger also indicated a payment made to "BB" on December 13, 2017 at "Chevron," and that same day Busby's credit card made a $64.92 purchase at a Chevron gas station. *Compare* (Doc. No. 226, Trial Tr. Day 3 PM at 57–60) (Testimony of Paul Kindred)

*and* (GEX 834, Doc. No. 197-32) (Busby Chevron Payment), *with* (GEX 1, Doc. No. 177). The fact that the notations in the ledgers correspond to known transactions supports the ledger's authenticity. *See Ceballos*, 789 F.3d at 619–20.

Fourth, the circumstances surrounding the discovery of Hutchison's ledger are quite distinguishable from those in *Jackson*. GEX 1 was found in Hutchison's home office, and there is no indication of any suspicious circumstances around its discovery that might raise questions about the ledger's trustworthiness. There was no indication anyone else lived at Hutchison's home other than himself. (Doc. No. 207, Trial Tr. Day 3 AM at 67, 71) (Testimony of Paul Kindred). Moreover, no one turned over the ledger, and so there could be no concern about any untoward motivation about why the ledger was produced as there was in *Jackson*.

Hutchison contends that the Government has not met its "low" authentication burden because it did not present any handwriting analysis, testimony from anyone who witnessed Hutchison use the ledger for *bribery* purposes, or direct evidence establishing when the ledger was created. (Doc. No. 320 at 14). First, as *Ceballos* clearly establishes, "handwriting analysis is not a prerequisite to authentication." *Ceballos*, 789 F.3d at 618; *see also United States v. Wake*, 948 F.2d 1422, 1434–35 (5th Cir. 1991) ("Likewise, the fact that no handwriting analysis was done is not a bar to admission.") (internal quotation removed). At trial, Hutchison seemingly did not dispute that he prepared the ledger. Second, while none of Hutchison's coconspirators were familiar with the ledger, the recorded payments within were largely corroborated by his coconspirators or by documentary evidence as explained above. After the Government meets its "low" authentication burden and establishes the ledger's trustworthiness, "[t]he ultimate responsibility for determining whether evidence is what its proponent says it is rests with the jury." *Barlow*, 568 F.3d at 220. Furthermore, Hutchison's coconspirators confirmed that they received payments within the

timeframe noted by the ledger—September 2017 to January 2018. This is ample evidence to support the Court's finding of authenticity regarding GEX 1. After GEX 1 was admitted, Hutchison was able to present competing evidence that the notebook was in fact a *gambling* ledger documenting his gambling debts—and "it was the province of the jury to credit one account over the other." *Ceballos*, 789 F.3d at 620.

Finally, the Government also satisfied its burden to prove the predicate facts to admit the ledger as a coconspirator statement made during and in furtherance of a conspiracy under Rule 801(d)(2)(E). First, there was clearly evidence that there was a conspiracy between Hutchison, Busby, and others. Multiple witnesses testified that Hutchison was paying Busby bribe payments and that Busby pressured his subordinates to funnel work to Hutchison. (Doc. No. 225, Trial Tr. Day 2 PM at 35–36, 53) (Testimony of Derrick Sanders); (Doc. No. 326, Trial Tr. Day 5 PM at 28–33, 35–38) (Testimony of Rhonda Skillern-Jones); (Doc. No. 208, Trial Tr. Day 4 PM at 141:17–143:19) (Testimony of Alfred Hoskins). Second, as stated above, both witness testimony and documentary evidence corroborated payments notated on Hutchison's ledger, suggesting it was more likely than not prepared during the 2017 to 2018 timeframe, which was during the ongoing conspiracy. The ledger was also in furtherance of the conspiracy because it tracked Hutchison's bribe payments to his coconspirators. As a result, it was appropriate for the Court to admit GEX 1 as a coconspirator statement made during and in furtherance of a conspiracy. Hutchison's challenge to GEX 1 fails.

**2. Jury Instructions Regarding § 666 (Counts 2–7)**

In Hutchison's second challenge to the bribery counts, he argues that the Court's failure to include a definition of "official act" in the jury instructions was error that necessitates a new trial on Counts 2 through 7. It is the trial judge's duty to "instruct the jurors, fully and correctly, on the

applicable law of the case . . . ." *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 424–25 (5th Cir. 1985) (internal quotation omitted). Refusing to include a defendant's requested instruction is only reversible error if (1) the requested instruction is substantially correct, (2) the actual charge given the jury did not substantially cover the content of the proposed instruction, and (3) omitting the proposed instruction would seriously impair the defendant's ability to present a defense. *United States v. Pettigrew*, 77 F.3d 1500, 1510 (5th Cir. 1996). It is also reversible error to charge the jury with an erroneous view of the law. *United States v. Hamilton*, 46 F.4th 389, 394 (5th Cir. 2022).

Hutchison was convicted of six counts of federal programs bribery under 18 U.S.C. § 666(a)(2), which "makes it a crime for anyone to corruptly give, offer, or agree to give anything of value to any person, with *intent to influence or reward* an agent of an organization, state or local government, or any agency thereof . . . in connection with any business, transaction, or series of transactions of such organization, government, or agency . . . ." (Doc. No. 153 at 17–18) (Final Jury Instructions) (emphasis added); *see* 18 U.S.C § 666(a)(2). "A state or local official can violate § 666 when he accepts an up-front payment for a future official act or agrees to a future reward for a future official act." *Snyder v. United States*, 603 U.S. 1, 19 (2024).

The jury instructions regarding Counts 2 through 7 defined the term "intent to influence or reward" and explained that: "[b]ribery requires a quid pro quo—a specific intent to give or receive something of value in exchange for an *official act*." (Doc. No. 153 at 19) (emphasis added). The instructions did not define "official act." *See* (*id.*). Hutchison's counsel requested that the following definition of "official act," largely taken from *McDonnell v. United States*, 579 U.S. 550 (2016), be included in the jury instructions:

> An "official act" is a decision or action on a question, matter, cause, suit, proceeding or controversy. The question, matter, cause, suit, proceeding or controversy must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a

> committee. It must also be something specific and focused that is pending or may by law be brought before a public official. To qualify as an "official act," the public official must make a decision or take an action on that question, matter, cause, suit, proceeding or controversy, as defined above, or agree to do so. Setting up a meeting, talking to another official, or organizing an event (or agreeing to do so)—without more—does not fit the definition of "official act."

(Doc. No. 130 at 12) (Hutchison's Proposed Jury Instructions). However, the Court denied the request for the instruction. (Doc. No. 250, Trial Tr. Day 18 PM at 188:2–12).

Hutchison argues the Court's instructions were incorrect because they did not define the term "official act," which he claims is an essential requirement to convict under § 666. A brief overview of § 666, its history, and its relationship to a different bribery statute—18 U.S.C. § 201—is helpful because, as explained below, the parties' arguments are based in large part on a disagreement about how the two statutes relate to each other.

**a. 18 U.S.C. § 201 as opposed to 18 U.S.C. § 666**

Keeping in mind the Defendants were indicted for violations of § 666, the Court begins its discussion with § 201 because that section is the basis for Hutchison's argument. Section 201 is entitled "Bribery of public officials and witnesses," and is known as the general federal bribery statute. It makes it a crime for a public official to "receive or accept anything of value . . . in return for: being influenced in the performance of any official act." 18 U.S.C. § 201(b)(2)(A). Section 201 prohibits *quid pro quo* bribery agreements. *See McDonnell*, 579 U.S. at 573–74. *Quid pro quo* means "this for that" or "these for those." *See United States v. Vasquez*, No. 22-10766, 2023 WL 7381427, at *3 (5th Cir. Nov. 7, 2023) (per curium).

To prove a *quid pro quo* under § 201, the Government must establish that a public official agreed to perform a particular kind of *quo*—an "official act," which the statute defines as "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at

any time be pending, or which may by law be brought before any public official, in such official's official capacity." 18 U.S.C. § 201(a)(3).

In *McDonnell*, the Supreme Court held that under § 201, the *quo* in a *quid pro quo* must entail: (1) a decision to take action or to exert pressure on another public official to do so (as opposed to "[s]imply expressing support" for something "at a meeting, event, or call" with another official, "as long as the public official does not intend to exert pressure," 579 U.S. at 573, or (2) a specific question or matter involving a formal exercise of governmental power (as opposed to something more "nebulous," *id.* at 578, or described at a "higher level of generality," *id.* at 570.

On the other hand, § 666, entitled "Theft or bribery concerning programs receiving Federal funds," criminalizes bribery and applies to any "agent of an organization or of a State, local or Indian tribal government, or any agency thereof," receiving over $10,000 per year of federal funds. *See* 18 U.S.C. § 666. This group would include state and local officials. Congress passed § 666 in response to a circuit split about whether the general federal bribery provision (§ 201) extended to state and local officials. *See Snyder*, 603 U.S. at 8 (explaining the statutory history of § 666). As a result, § 666 tracks closely with § 201(b)'s bribery provision, but the statutes are still distinct and their wording is different. *Hamilton*, 46 F.4th at 397. The parties chiefly dispute whether the definition of "official act" in § 201 also applies to § 666—that is, whether § 666 requires that the *quo* that a defendant performs in exchange for a bribe be the exact same definition of "official act" as that term is defined under § 201, or whether § 666 prohibits a broader range of conduct.

While § 201 includes public officials in its title and § 201(b)(2)(A) contains the term "official act" in its text, § 666(a)(1)(B) *does not have either*. Section 201(b)(2)(A) prohibits the acceptance of "anything of value . . . in return for being influenced in the performance of any *official act*." 18 U.S.C. § 201(b)(2)(A) (emphasis added). In contrast, § 666 prohibits bribery "in

connection with any business, transaction, or series of transactions of [an] organization, government, or agency . . . ." *Id.* § 666(a)(1)(B). Significantly absent from § 666 is the term "official act." *See id.*

The Court was aware at the time that the Supreme Court in *Snyder* had used the words "official act" multiple times in connection with § 666. The Supreme Court used the term to refer to the action solicited by the defendant from a public official. Even so, *Snyder* was not specifically addressing whether the *quo* of a § 666 *quid pro quo* must be an "official act," nor did it define "official act" in the context of § 666. *See Snyder*, 603 U.S. at 5. The Supreme Court was addressing a different question entirely. *Snyder* considered whether § 666's prohibitions extended beyond bribes to also prohibit "gratuities." *See id.* at 19. The language in *Snyder* has introduced confusion among some lower courts, as some have questioned whether § 666 contains an "official act" requirement. If so, does the "official act" that the *Snyder* Court discussed in relation to § 666 share the same definition as the "official act" the *McDonnell* Court discussed in relation to § 201? Or are these two "official acts" distinct just like their respective statutes?

This is the first building block of Hutchison's argument—namely, that the *Snyder* decision signaled that § 666 liability requires proof of an "official act" pursuant to the § 201 standard as set forth in *McDonnell*. Hutchison argues the next block is this Court's failure to include *McDonnell*'s definition of "official act"—or any definition of "official act." The third block is that this failure constitutes reversible error. Hutchison needs to prevail on all three requirements to have a winning argument.

**b. Discussion**

The Court rejected this argument initially at trial and again does not find it persuasive. The Court studied this issue before trial, during the trial, and has now repeated those efforts in

addressing these post-trial motions. Hutchison reads "official act" into § 666 where it simply does not exist. *See* 18 U.S.C. § 666. He claims that *Snyder* supports the principle that "the official act definition in *McDonnell* is applicable in a claim under § 666 as well." (Doc. No. 296 at 41) (citing *Snyder*, 603 U.S. at 19). Nevertheless, the Court finds no support for this assertion in Fifth Circuit case law or even in *Snyder* itself.

First, the Fifth Circuit "ha[s] never held that § 666 incorporates an 'official act' requirement of the kind set out in 18 U.S.C. § 201(a)(3) with respect to bribery of federal officials." *United States v. Crisler*, No. 25-60099, 2026 WL 608334, at *4 (5th Cir. Mar. 4, 2026) (per curium) (unpublished) (quoting 18 U.S.C. § 201(b)(2)(A)). Other courts of appeals that have addressed the issue of whether § 666 incorporates an "official act" requirement as set out in § 201 have all held "that it does not." *Id.* at *4 (citing *United States v. Lindberg*, 39 F.4th 151, 165–69 (4th Cir. 2022); *United States v. Roberson*, 998 F.3d 1237, 1245–47 (11th Cir. 2021); *United States v. Np Lap Seng*, 934 F.3d 110, 131–38 (2d Cir. 2019); *United States v. Porter*, 886 F.3d 562, 565–66 (6th Cir. 2018)). The Fifth Circuit agrees. *Crisler*, 2026 WL 608334, at *4.

*Crisler* is unpublished and therefore nonbinding, but it is not the only time the Fifth Circuit has reached the same conclusion. For example, in *Winfield v. United States Probation and Pretrial Services*, the Fifth Circuit held that "[t]he decision in *McDonnell* did not address § 666 and interpreted a component of a materially different crime . . . . Moreover, a bribery offense under § 666 is not restricted to 'official acts,' as defined in § 201(a)(3) and interpreted by *McDonnell* . . . ." 810 F. App'x 343, 344 (5th Cir. 2020) (per curium) (unpublished). *Winfield* is also unpublished and therefore nonbinding. Nevertheless, it is quite persuasive that the Fifth Circuit has twice rejected (both before and after this trial) Hutchison's position regarding § 666.[5]

[5] Between these two decisions, five different judges on two different Fifth Circuit panels decided that an official act is not a requirement for a § 666 violation. (Judge Clement sat on both panels.) That means that approximately 20% of

*See also United States v. Owens*, No. 3:24-CR-103-DPJ-LGI, 2026 WL 1350787, at *6 (S.D. Miss. May 14, 2026) (citing *Winfield* and *Crisler* to hold that § 666 is not restricted to "official acts" as defined in § 201(a)(3)). Furthermore, the *Crisler* court had *Snyder* and its many references to § 666 and "official acts" before it, and yet, it chose *not* to adopt Hutchison's view and read an "official act" requirement into § 666. *See Crisler*, 2026 WL 608334, at *3 (citing and quoting *Snyder*, 603 U.S. at 5, 8).

Second, this Court's reading of *Snyder* does not support Hutchison's argument. *Snyder* addressed the issue of "whether 18 U.S.C. § 666(a)(1)(B) makes it a federal crime for state and local officials to accept gratuities for their past official acts." *Snyder*, 603 U.S. at 10. While some may argue that the *Snyder* Court implied that § 666 might involve an official act, that Court was not asked to decide, nor did it decide, whether § 201(a)(3)'s definition of "official act" applied to § 666. *See id.*; *see also United States v. O'Donovan*, 126 F.4th 17, 39 n.14 (1st Cir. 2025) ("Whether § 666 includes an official-act requirement was not, however, a question presented or expressly addressed in *Snyder*.").

More importantly, even if § 666 did require an "official act," the specific definition of "official act" that Hutchison proposed was not the right definition for § 666. Hutchison's proposed definition contained the term "public official" referencing the person receiving the bribe. "Public official" is a specific term used in and defined by § 201. *Id.* § 201(a)(1). Section 666 does not use the term "public official" to describe the bribe recipient/payee. Instead, it describes the bribe recipient merely as "an agent of an organization or of a State, local or Indian tribal government, or any agency thereof." *Compare id.* § 666(1), (2), *with id.* § 201(b)(1), (2) (criminalizing *quid pro quo* bribes to public officials or those selected to be a public official). This wording aligns with the

---

the sitting Fifth Circuit judges (and 100% of the Fifth Circuit judges who have had to address this question) have already decided this issue in the same manner as this Court did.

Court's instructions to the jury (and the Fifth Circuit Pattern Jury Instructions) which instructed the jury that in order to find Hutchison guilty of any of the bribery counts, they must be convinced beyond a reasonable that, among other things, "the person receiving the alleged bribe was an agent of the Houston Independent School District." (Doc. No. 153 at 18) (Final Jury Instructions). Similarly, for the jury to convict Busby of his charged bribery counts, the jury had to find beyond a reasonable doubt that "the defendant, Brian Busby, was an agent of the Houston Independent School District." (*Id.* at 20). *See also* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) §§ 2.33B, 2.33C (2024).[6]

Further, Hutchison's proposed definition purported to narrow § 666's application to a "formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." (Doc. No. 130 at 12) (Hutchison's Proposed Jury Instructions). This language is far afield from the language of § 666. That statute outlaws bribes "in connection with any business, transaction, or series of transactions of such organization . . . ." 18 U.S.C. §§ 666(a)(1)(B), (a)(2). It does not require "a formal exercise of governmental power" as suggested by Hutchison's proposed instruction. For at least these reasons, Hutchison's proposed definition of "official act" was incorrect. Refusing to include this proposed instruction would only be reversible error if the instruction was, among other things, substantially *correct*, so the Court did not err by refusing his proposed instruction. *Pettigrew*, 77 F.3d at 1510.[7]

---

[6] This Court recognizes that unless an instruction from the Fifth Circuit Pattern Jury Instructions manual has been specifically adopted by the Fifth Circuit, itself, it is not binding law. *United States v. Peterson*, 977 F.3d 381, 390 n.2 (5th Cir. 2020). That being said, the instructions in that manual represent the considered judgment of practitioners (both prosecutors and defense lawyers), law professors, and district judges from throughout the Circuit.

[7] The Court included the phrase "official acts" in the actual instruction, despite the fact that the Fifth Circuit's § 666 cases demonstrate it is not required, because Defendants requested it, the Government did not object, and because it is included in the Fifth Circuit Pattern Jury Charge. *See* FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) §§ 2.33B, 2.33C (2024). *See also* (Doc. No. 231, Trial Tr. Day 7 PM) (First Informal Charge Conference);

Overall, the Court finds no error warranting acquittal or a new trial related to the jury instructions pertaining to the bribery counts and their omission of a definition of "official act."

### 3. Whether the Government Proved Hutchison's Payments were Bribes and Not Gratuities

Next, Hutchison contends that the Government failed to prove that his payments amounted to bribes, as opposed to gratuities, as required under § 666. He maintains that the Government prosecuted the case as a gratuities case, rather than a bribery case. The distinction between a bribe and a gratuity is important in the context of § 666. Both federal and state laws "distinguish between two kinds of payments to public officials—bribes and gratuities." *Snyder*, 603 U.S. at 5. In general, "[b]ribes are payments made or agreed to *before* an official act in order to influence the official with respect to that future official act." *Id.* Gratuities, on the other hand, "are typically payments made to an official *after* an official act as a token of appreciation." *Id.* "A state or local official can violate § 666 when he accepts an up-front payment for a future official act *or* agrees to a future reward for a future official act." *Id.* (emphasis added). "[A] state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to, much less given." *Id.* at 19. "Although a gratuity offered and accepted after the official act may be unethical or illegal under other federal, state, or local laws, the gratuity does not violate § 666." *Id.*

As mentioned before, the grand jury returned the Superseding Indictment on April 7, 2022. At the time, the circuit courts were divided on whether § 666 criminalized *both* bribery *and* gratuities, or just bribery. *United States v. Hamilton*, 46 F.4th 389, 396–97 (5th Cir. 2022). A few months later, the Fifth Circuit held that "[§] 666 criminalizes only a *quid pro quo*, not mere gratuities," *Hamilton*, 46 F.4th at 399, and two years later, the Supreme Court affirmed that

---

(Doc. No. 248, Trial Tr. Day 16 PM at 192–228) (Second Informal Charge Conference); (Doc. No. 250, Trial Tr. Day 18 PM at 169–223) (Formal Charge Conference).

holding, when it declared § 666 does not criminalize the acceptance of gratuities. *Snyder*, 603 U.S. at 5. After these developments, the Government did not seek to amend the Superseding Indictment, and so the parties tried the case under a Superseding Indictment that was issued pre-*Hamilton* and pre-*Snyder*.

Hutchison finds it concerning the Government did not amend the indictment after *Snyder*'s clarification that gratuities are not criminalized by § 666. He contends he was indicted based on payments that qualified as gratuities under *Snyder*, or what he calls a "gratuities theory." The only "support" he has for this position is the fact that the indictment is pre-*Snyder*. This fact alone does not invalidate the indictment. Moreover, the Government has consistently maintained that these payments were bribes, not gratuities.

Due to the critical distinction between bribes and gratuities, the jury was instructed that in order to find Hutchison guilty of any of the § 666 bribery counts, the Government must prove beyond a reasonable doubt the existence of a "*quid pro quo*—a specific intent to give or receive something of value in exchange for an official act." (*Id.* at 19) (Final Jury Instructions). The jury was also instructed that § 666 "does not criminalize mere gratuities or gifts to a person . . . when no action or omission is requested in return." (*Id.*). Regardless of Hutchison's concerns with the indictment's lack of amendment, at trial the jury was explicitly instructed with post-*Snyder* law: that the jury could not convict Hutchison of § 666 bribery if they found that the evidence demonstrated the payments were gratuities or gifts. *See* (*id.*).

It is clear from the record that the Government chose to, and did, prosecute a bribery case, regardless of the fact that it did not seek amendment of the Superseding Indictment post-*Snyder*. Conversely, Defendants chose to defend the case, at least in part, as a gratuities case, and the jury did not accept their view of the evidence. The Government provided evidence that supports the

jury's verdict on each bribery count. Specifically, it submitted evidence of payments in exchange for action. In other words, evidence of the existence of a *quid pro quo* as required by § 666. As a result, Hutchison's argument regarding the timing of the indictment or of the Supreme Court's decision fails.

**4. Sufficiency of the Evidence Regarding Hutchison's Bribery Convictions**

Hutchison also challenges whether there is evidence to support the verdict and demonstrate a *quid pro quo* in Counts 4, 5, and 6, specifically. In response, the Government argues it presented sufficient evidence to establish that each of the alleged transactions in Counts 4, 5, and 6, qualified as bribes under § 666. The Court will take each count in turn.

**a. Count 4: Payments to Alfred Hoskins**

Count 4 of the Superseding Indictment alleges that, on or about November 16, 2017, Hutchison paid Alfred Hoskins approximately $20,000 in bribe payments for projects connected to the HISD McCarty Building, Fonwood Elementary School, Terrell Middle School, and Chatham Elementary School. (Doc. No. 42 at 10) (Superseding Indictment). The evidence at trial was sufficient for the jury to find Hutchison guilty on this count.

The Government demonstrated that Hoskins met Hutchison in August or September of 2017 through a lunch with Busby. (Doc. No. 208, Trial Tr. Day 4 PM at 123–24) (Testimony of Alfred Hoskins). Busby was Hoskins' boss. At that lunch, Busby introduced Hutchison and Hoskins, and from Hoskins' point of view, Busby basically told him that he wanted Hoskins to keep Hutchison busy and give him business. (*Id.* at 124). Busby then told Hoskins, "[A]nything y'all work out between y'all self, that's between y'all. I don't want to know about it." (*Id.* at 125). After that, Hutchison started to tell Hoskins, "he would get" something by working with Hutchison, but Hoskins interrupted and stopped him, saying "I'm just going to do what I'm told."

(*Id.* at 127–28). Hoskins understood what he had been "told" was to make sure Hutchison got work, and Hoskins did just that. (*Id.* at 128). Hoskins told Luis Tover and Gerron Hall, the area managers he supervised, to start putting Just Construction (Hutchison's construction company) on projects, which they did. (*Id.*).

Hoskins in return received several payments from Hutchison, ranging anywhere from $2,500 to $5,000 to $10,000. (*Id.*). Hoskins received his first payment in October or November of 2017 at Shearn Elementary School. (*Id.*). Hutchison also paid Hoskins at Wilson Middle School, Browning Elementary School, and Hutchison's townhouse on Purdue Street. (*Id.*). When Hutchison paid Hoskins, he would say something like "Thanks, it's for Waltrip," to indicate the associated project. Hoskins also testified that Hutchison would avoid meeting with him for payments where cameras were present. (*Id.*).

In addition to Hoskins' testimony, GEX 1, Hutchison's ledger, listed several projects associated with Hoskins including those at Shearn Elementary and Fonwood Elementary. (GEX 1, Doc. No. 177). Hoskins' testimony and text messages between Hoskins and Hutchison demonstrated the two met near Woodson Middle School in October to transfer a $10,000 payment for the Fonwood project. (Doc. No. 209, Trial Tr. Day 5 AM at 110–13) (Testimony of Alfred Hoskins); (GEX 954-G, Doc. No. 200-12 at 12–13). The ledger also noted payments to "A," meaning Alfred Hoskins, for Chatham Elementary, Terrell, "North Maint.," "South Maint.," and "McC." (GEX 1, Doc. No. 177).

This evidence, viewed in the light most favorable to the jury's verdict, is sufficient to sustain the conviction on Count 4. As the jury was properly instructed, the payee and the payor need not state the *quid pro quo* in express terms. Rather, the intent to exchange may be established by circumstantial evidence. *See United States v. Nagin*, 810 F.3d 348, 351–52 (5th Cir. 2016);

(Doc. No. 153 at 19) (Final Jury Instructions). There was sufficient evidence for the jury to find that Hutchison had the required specific intent, that a payment or agreement was made between Hutchison and Hoskins *prior* to any act by Hoskins, and the required "*quo*" in the *quid pro quo*, which are the only elements Hutchison disputes.

**b. Count 5: Payments to Gerron Hall**

Next, Hutchison challenges Count 5, which alleges that, on or about January 11, 2018, Hutchison paid Gerron Hall approximately $20,000 in bribe payments for projects connected to Gross Elementary School and The Rice School. (Doc. No. 42 at 10) (Superseding Indictment). Here again, the evidence at trial was sufficient for the jury to find Hutchison guilty on this count.

First, Hutchison contends that the evidence was insufficient because Hall did not receive payments from Hutchison until *after* work was completed on the designated school projects. Section 666 is still violated, however, when one "agrees to a future reward" for a future act. *Snyder*, 603 U.S. at 5; *see also United States v. Macrina*, 109 F.4th 1341, 1351 (11th Cir. 2024) ("If there were an agreement before the official act was complete to make a payment for that act, the payment received after the act could still be considered a bribe."); *United States v. Jordan*, No. 22-40519, 2023 WL 6878907, at *7 (5th Cir. Oct. 18, 2023) ("[In *United States v.*] *Hamilton*, this court adopted the First Circuit's interpretation of § 666 that 'reward' is included 'to prevent a situation where a thing of value is not given until after an action is taken.").

Second, Hutchison claims the evidence was insufficient because Hall's testimony did not connect payments to specific projects, and Hall did not know if or when he would receive payment for a project. These arguments are unavailing. An "agreement between the public official and the person offering the bribe need not spell out which payments control which particular acts. Rather, it is sufficient if the public official understood that he or she was expected to exercise some

influence on the payor's behalf as opportunities arose." *United States v. Terry*, 707 F.3d 607, 612 (6th Cir. 2013). Moreover, bribery "can be accomplished through an ongoing course of conduct," and does not require the government or jury to link every dollar paid to a specific action performed. *See United States v. Ganim*, 510 F.3d 134, 149 (2d Cir. 2007); *United States v. Jefferson*, 674 F.3d 332, 359 (4th Cir. 2012); *United States v. Wright*, 665 F.3d 560, 568 (3d Cir. 2012) ("The bribery theory does not require that each *quid*, or item of value, be linked to a specific *quo*, or official act. Rather, a bribe may come in the form of a 'stream of benefits.'").

Finally, Hutchison argues that the Government's attempt to link the ledger to the payments made to Hall was riddled with inconsistencies and thus, failed to show an agreement. Even if that was the case, Hall's testimony sufficiently established an agreement and payments from Hutchison. Hall testified that he first received a payment between $3,500 and $4,500 from Hutchison following a walk-through on a project repairing damage from Hurricane Harvey, after Just Construction had been designated as a preferred vendor. (Doc. No. 208, Trial Tr. Day 4 PM at 27–31) (Testimony of Gerron Hall). From that point on, Hall received payments periodically, usually when jobs were near completion, at the walk-through phase, but before the final invoice was signed for payment. (*Id.* at 34). By the fourth or fifth payment, Hall began to expect a payment during a walk-through. (*Id.*). In total, Hall received about ten different payments from Hutchison. (*Id.* at 70). From this, the jury could reasonably conclude that Hutchison and Hall had an unspoken agreement that Hutchison would pay Hall cash in exchange for approving the final invoice on a project.

While Hall did not remember the school names of specific projects, some of the payments Hall testified to were corroborated by the Hutchison ledger. According to the ledger, Hall received a payment in mid-December 2017 for work at Las Americas Elementary. This entry in the ledger

was dated 12/12 and included the designation "4241." (GEX 1, Doc. No. 177). The Government submitted phone records showing that on December 12, 2017, Hutchison texted his home address—4241 Purdue Street—to Hall. (*Id.*); (Doc. No. 207, Trial Tr. Day 3 AM at 138–40) (Testimony of Paul Kindred); (GEX 954-F, Doc. No. 200-11 at 10). Hall testified that at some point, Hutchison and Hall were texting, and Hutchison told him to come by his house or come by his office. When Hall arrived at his home, Hutchison then gave him an envelope of cash. (Doc. No. 208, Trial Tr. Day 4 PM at 33–34). Additionally, the January and November payments on the ledger are consistent with the timeframe Hall testified he received payments—around 2017 to 2018. (*Id.* at 31).

Based on the evidence, the jury could have easily concluded the existence of a prior agreement and a corrupt *quid pro quo*. As a result, there is sufficient evidence to support the jury's verdict on Count 5.

**c. Count 6: Payments to Luis Tovar**

Count 6 is the final bribery count Hutchison challenges. Count 6 alleges that in approximately 2017, Hutchison paid Luis Tovar approximately $10,000 in bribe payments for projects connected to "various HISD schools." (Doc. No. 42 at 10) (Superseding Indictment). Hutchison argues that based on the evidence, a rational jury could not find beyond a reasonable doubt that Hutchison made a *quid pro quo* payment to Tovar. At best, he contends the jury could have found Hutchison paid Tovar a gratuity—which, as noted above, is not unlawful under § 666. Hutchison also argues that the Government's presentation of evidence regarding Count 6 constructively amended the Superseding Indictment.

At trial, the Government demonstrated that in 2017 Tovar was on the approval panel evaluating Just Construction's bid for a minor maintenance contract with HISD. (Doc. No. 227,

Trial Tr. Day 4 AM at 99–102) (Testimony of Luis Tovar). Alfred Hoskins, Tovar's supervisor, pressured Tovar to rank Just Construction at the top of the list during the evaluation, so Tovar did, even though he had never worked with Just Construction before. (*Id.* at 99–102). Just Construction ended up being approved for that contract. (*Id.*). Also in 2017, sometime after Hurricane Harvey hit Houston in August, Hutchison paid Tovar for the first time. Hutchison gave Tovar $10,000 saying, "I help those who help me out." (*Id.* at 102–04). Tovar initially pushed back the money, saying "I don't need that," but he ultimately accepted the payment. (*Id.* at 137). Tover then testified about the second payment he received from Hutchison. Tovar was asked, "How long – *just a ballpark*, how long after the first payment did you get the second payment?" To which he responded, "*About* 2018." (*Id.* at 104–05) (emphasis added).

Tovar continued to receive and accept payments from Hutchison. Hutchison paid Tovar three payments throughout 2017 and 2018 for $10,000, $7,000, and $3,000, respectively. (*Id.* at 105–109). In 2019 Hutchison paid Tovar a $10,000 payment. (*Id.*). While he was actively receiving payments from Hutchison, Tovar again sat on a vendor evaluation panel, this time for HISD's painting contract, on which Hutchison through Just Construction had bid. (*Id.* at 130–32). Tovar ranked Just Construction highly. (*Id.*). Tovar testified that at that time he did not want to use Just Construction as a vendor because its pricing was "extravagant," and a lot higher than the other vendors. (*Id.* at 94). Tovar also testified that he would only sign a vendor invoice after he performed a walk-through to make sure the work was done, and that vendors would not be paid until the invoice was signed, thus Tovar's signature was an important step in the process for Hutchison to be paid by HISD. (*Id.* at 86–88).

First, Hutchison argues that the evidence at trial did not demonstrate a *quid pro quo* agreement between Tovar and Hutchison *before* the 2017 payment, and because Count 6 of the

indictment alleges a 2017 payment, the Government presented no evidence that Hutchison bribed Tovar in 2017. As a result, Hutchison claims there is insufficient evidence to support his conviction for *quid pro quo* bribery on Count 6. That is not so.

Tovar's testimony indicates that the dates he recounted were approximate and not exact. For example, he remembered he received his first payment from Hutchison sometime "[a]fter Harvey," although he could not "remember how far [after], but it was in 2017." (Doc. No. 227, Trial Tr. Day 4 AM at 101–02) (Testimony of Luis Tovar). When he was asked to give an estimate, or "ballpark," of when he received his second payment from Hutchison, he answered, "[a]bout 2018." (*Id.* at 104–05). Tovar's testimony revealed his recollection was not precise as to the exact time frame of the first few payments. The jury could reasonably conclude that a *quid pro quo* existed between Hutchison and Tovar "on or about 2017" as the indictment alleged. When considering the sufficiency of the evidence, all evidence is "reviewed in the light most favorable to the [G]overnment, with all reasonable inferences to be made in support of the jury's verdict." *United States v. Masha*, 990 F.3d 436, 442 (5th Cir. 2021) (internal quotation omitted). For these reasons, there is sufficient evidence to support the jury's verdict on Count 6.

Hutchison also argues that even if payments he made to Tovar *after* 2017 were bribes, Hutchison could not be guilty of Count 6, since the Superseding Indictment only identified a 2017 payment from Hutchison to Tovar, not the 2018 and 2019 payments the Government proved at trial. He argues that the Government did not prove the existence of a *quid pro quo* before the 2017 payment, and so the Government constructively amended the Superseding Indictment allowing the jury to convict him on facts not pled in the indictment. For the reasons stated below, this argument fails. Even if the evidence only demonstrated the existence of a *quid pro quo* between Hutchison

and Tovar *after* 2017, Hutchison's conviction still stands because there was no constructive amendment or material variance.

"[A]fter an indictment has been returned, its charges may not be broadened through amendment except by the grand jury itself." *United States v. Hoover*, 467 F.3d 496, 500 (5th Cir. 2006) (internal quotation and citation omitted). "A constructive amendment occurs when the government changes its theory during trial so as to urge the jury to convict on a basis broader than that charged in the indictment, or when the government is allowed to prove 'an essential element of the crime on an alternative basis permitted by the statute but not charged in the indictment.'" *United States v. Girod*, 646 F.3d 304, 316 (5th Cir. 2011) (quoting *United States v. Robles–Vertiz*, 155 F.3d 725, 728 (5th Cir. 1998)). A constructive amendment violates the defendant's Fifth Amendment right to a grand jury indictment. *United States v. McMillan*, 600 F.3d 434, 451 (5th Cir. 2010).

Not every divergence between the indictment's allegations and the proof at trial results in a constructive amendment. *See Girod*, 646 F.3d at 316; *United States v. Munoz*, 150 F.3d 401, 417 (5th Cir. 1998). When the evidence at trial proves facts different from those alleged in the indictment but does not modify an essential element of the charged offense, then no constructive amendment arises. *Munoz*, 150 F.3d at 417. This situation is understood as a variance. "A variance occurs when the proof at trial depicts a scenario that differs materially from the scenario charged in the indictment but does not modify an essential element of the charged offense." *Girod*, 646 F.3d at 316 (internal quotation omitted).

In the Fifth Circuit, "an allegation as to the time of the offense is not an essential element of the offense charged in the indictment and, within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient." *Id.* (internal quotation

omitted). As a result, the prosecution need not prove the exact date alleged in the indictment; it suffices if a date reasonably near is established. *United States v. Tunnell*, 667 F.2d 1182, 1186 (5th Cir. 1982). Moreover, the indictment does not exactly state "2017." It alleges "on or about 2017." (Doc. No. 42 at 10) (Superseding Indictment). The 2018 and 2019 payments both occurred before the return of the indictment and within the statute of limitations, and the time of the offense was not an essential element. The 2018 and 2019 payments to Tovar were also within the time period covered by the conspiracy alleged in Count 1. Therefore, the discrepancy in dates regarding Hutchison's payments to Tovar supporting Count 6 did not result in constructive amendment and must instead be analyzed as a variance.

If a variance occurs, the conviction should be reversed only if "the variance prejudiced the defendant's substantial rights." *Girod*, 646 F.3d at 316. When analyzing a variance, the concern is whether the indictment has sufficiently notified the defendant of the accusations, allowing him to prepare his defense so that he is not surprised at trial due to a failure to define the offense with particularity. *Id.*; *Munoz*, 150 F.3d at 417. If the defendant is sufficiently on notice of the particularities of the charged offense, then the variance between the allegations in the indictment and the proof at trial is not fatal under the harmless error analysis. *Girod*, 646 F.3d at 316–17.

Any variance between the date alleged in the indictment in Count 6 and the proof adduced at trial is not material and does not require acquittal or a new trial. It is true that timing is important in determining whether a *quid pro quo* has occurred as required by § 666 because the agreement must occur *before* the payment. *See Snyder*, 603 U.S. at 19. However, that importance in timing is distinguishable from the date of the payment alleged in the indictment. The jury was instructed that to find Hutchison guilty on Count 6 it must find a "*quid pro quo*." (Doc. No. 153 at 19) (Final Jury Instructions).

From the testimony described above and the other testimony placed before the jury, the jury could easily conclude that an agreement between Tovar and Hutchison existed after Tovar accepted the first payment from Hutchison in 2017. Although Tovar believed Just Construction to be expensive, he continued to assent to Just Construction proceeding on jobs that Tovar was supervising, and he signed off on final invoices for those jobs, allowing Just Construction to be paid. Hutchison's behavior, both with Tovar and other HISD officials, indicated that he intended his payments to influence Tovar's actions in this regard. As a result, there was sufficient evidence for the jury to conclude that Hutchison agreed to pay Tovar in exchange for Tovar treating Just Construction favorably, which satisfies the required "*quid pro quo*." The fact that this evidence included payments made in 2018 and 2019 was not a material variance that prejudiced Hutchison's substantial rights. *See Girod*, 646 F.3d at 316.

Moreover, Hutchison clearly had sufficient notice. Hutchison was indicted on numerous counts in addition to Count 6, including Count 1. Count 1 of the Superseding Indictment charged Hutchison and Busby with a multi-object conspiracy under 18 U.S.C. § 371 consisting of three objects under § 666: (1) offering bribes, (2) soliciting and receiving bribes, and (3) defrauding HISD. (Doc. No. 42 at 2–9) (Superseding Indictment). The indictment alleged the conspiracy began "in or around 2011" and continued through "in or around 2020." (*Id.* at 2). The indictment also included numerous specific overt acts of the conspiracy spanning from 2011 to 2020. (*Id.* at 6–9). This included Hutchison's bribe payments to Tovar, explicitly identifying Hutchison's "*first* payment to Tovar" in 2017, suggesting more payments existed. (*Id.* at 9) (emphasis added). Furthermore, GEX 1, Hutchison's ledger, reflected the notation "L" on two entries later on in the ledger. (GEX 1, Doc. No. 177 at 4). Hutchison was clearly on notice that he might have to defend against allegations of payments to Tovar stretching into 2018 and 2019.

To conclude, the Court finds the evidence is sufficient to support the jury's verdict on Count 6. In the alternative, the Court finds there was no constructive amendment, and any error caused by a variance between the date alleged in Count 6 of the indictment and the evidence presented at trial was harmless.

### 5. Alleged Amendment of the Superseding Indictment

In addition to the alleged payment date in Count 6, Hutchison also argues the Government's presentation of evidence, the jury instructions, and the verdict form constructively amended the Superseding Indictment. He claims they each did not specifically allege what "official act" each bribe recipient took in exchange for payment and as a result, the pre-*Snyder* Superseding Indictment failed to put Hutchison on sufficient notice of his alleged offenses.

As previously explained, it is this Court's position based upon Fifth Circuit authority (and the consistent opinions of all other circuits that have addressed the issue) that *Snyder* did not impose § 201 and *McDonnell*'s definition of "official act" into the "*quid pro quo*" required by § 666. Section 666 captures acts falling under the "official act" definition of § 201 as well as other conduct. The statute prohibits corruptly accepting anything of value, "intending to be influenced or rewarded in connection with *any business, transaction, or series of transactions of such organization, government, or agency* . . . ." 18 U.S.C. § 666(a)(1)(B) (emphasis added). Nowhere does § 666 place any definitional limits on the business or transactions to be influenced—beyond requiring them to be "of" the organization receiving more than $10,000 in federal funding and to have a "value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B); *see Ng Lap Seng*, 934 F.3d at 133.

That being said, Counts 2 through 7 of the Superseding Indictment expressly incorporated paragraphs 10 through 16 of the "Manner and Means section of Count One of the Indictment." (Doc. No. 42 at 10) (Superseding Indictment). This section alleges multiple acts the bribe

recipients took in exchange for payment. For example, the Superseding Indictment alleges that "BUSBY, Sanders, Hoskins, Hall, Tovar, and Skillern-Jones" assisted Hutchison "in obtaining or retaining business with HISD" in exchange for "cash bribes." (*Id.* at 4). "BUSBY helped award HUTCHISON HISD jobs. BUSBY took steps to expedite payment by HISD to HUTCHISON . . . ." (*Id.* at 5). "Skillern-Jones caused to be placed on a 2017 HISD Board agenda, and voted to approve, an expenditure of funds for school landscaping and construction projects that were awarded to HUTCHISON." (*Id.*). These acts are more than sufficient to satisfactorily allege the particular *quo* § 666 requires and to put Hutchison on notice of the offenses charged. *See United States v. Adams*, 760 F. Supp. 3d 6, 19–23 (S.D.N.Y. 2024) (discussing the specificity of the "*quo*" required by § 666 and suggesting that a city mayor influencing the city's regulation of a specific foreign-owned building and consulate influencing would fall within § 666's *quo* requirement); *United States v. Owens*, No. 3:24-CR-103-DPJ-LGI, 2026 WL 1350787, at *6 (S.D. Miss. May 14, 2026) (suggesting that making a call to a city employee to accelerate an administrative deadline that could limit competition for a specific city-funded project might be a sufficient *quo* under § 666). As a result, this challenge fails.

#### 6. Hutchison's Challenge to the Conspiracy Count Due to its Reliance on the Bribery Counts

Finally, Hutchison argues that his conviction on Count 1 must be vacated because the § 371 conspiracy jury instructions under Count 1 referred to the instructions regarding Counts 2 through 7, which as stated previously, Hutchison believes were improper. Hutchison states: "If the Court agrees that Hutchison is entitled to a new trial on Counts 2 through 7 due to the vague jury instruction, it follows that he would also be entitled to a new trial on the conspiracy to bribery charge in Count 1, that relies on the same jury instruction." (Doc. No. 296 at 49–50). For the

reasons already stated, the Court does not agree with Hutchison on this issue and so this argument fails.

#### 7. Conclusion on the Bribery Counts and the Conspiracy Count

To conclude, the Court does not find any of Hutchison's challenges to the bribery counts or his challenge to the conspiracy count to be meritorious. As a result, his motion for acquittal or new trial on these counts (Counts 1–7) is denied.

### B. Hutchison's Challenges to the Wire Fraud Counts (Counts 14–24)

Next, Hutchison challenges his convictions on the wire fraud counts. The jury convicted Hutchison of eleven counts of wire fraud under 18 U.S.C. § 1343, which makes it a crime for anyone to use interstate wire communications in carrying out a scheme to defraud. (Doc. No. 153 at 23) (Final Jury Instructions); (Doc. No. 160) (Jury Verdict). Hutchison makes two arguments: (1) the Government failed to prove any *interstate* wire communication; and (2) the Government failed to prove specific intent to defraud. The Court will address each argument below.

#### 1. Wire Fraud: *Interstate* Wire Communication

Hutchison first argues that the Government failed to prove the interstate commerce element of wire fraud. The elements of wire fraud under 18 U.S.C. § 1343 are "(1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme," and the "particular predicate for jurisdiction for wire fraud requires a communication in interstate or foreign commerce." *United States v. Stanford*, 805 F.3d 557, 566 (5th Cir. 2015) (internal citation and quotation omitted). The wire fraud statute "does not apply to purely intrastate communication." *Id.* "[I]t is beyond debate that the Internet and email are facilities or means of interstate commerce." *Barlow*, 568 F.3d at 220.

Two alleged schemes sit at the center of the wire fraud counts. First, there was the mowing scheme. This scheme involved Hutchison emailing mowing proposals or invoices to HISD claiming Southwest Wholesale would cut each property four times per month during the growing season, billing HISD for those four cuts, but only performing two, or at most three, cuts each month during the growing season. HISD then paid the falsely inflated invoices. Second, there was the Kiddie Cushion scheme. Hutchison, through Southwest Wholesale, contracted with HISD to supply its playgrounds with Kiddie Cushion mulch. The ground-maintenance contracts provided for a cost-plus-twenty-percent markup fee for materials like the Kiddie Cushion mulch. Hutchison falsely inflated the cost he paid for the Kiddie Cushion mulch (which had the effect of not only inflating the cost, but it also inflated the percentage markup) and the amount he bought from the supplier so that HISD had to pay a higher price per volume. HISD then paid Hutchison's inflated Kiddie Cushion invoices.

Both schemes involved specific emails corresponding with each wire fraud count. The emails were sent from two of Hutchison's Southwest Wholesale email addresses to various HISD email addresses. These emails served as the interstate jurisdictional nexus for each count of wire fraud. Hutchison claims the Government's evidence of interstate wire communication was wholly insufficient, and so a judgment of acquittal, or at least a new trial on all eleven wire fraud counts is required. That is not so.

Three email addresses associated with Hutchison are relevant to this discussion. The first two email addresses, (1) "accountsreceivable@swat4241.com," and (2)"hutchison@swat4241.com," are referenced in the Superseding Indictment. The indictment alleges an email was sent from one of these two accounts to various "@houstonisd.org" email addresses as follows:

| Count Number | Associated Hutchison Email Address |
|---|---|
| 14 | Accountsreceivable@swat4241.com |
| 15 | Hutchison@swat4241.com |
| 16 | Accountsreceivable@swat4241.com |
| 17 | Accountsreceivable@swat4241.com |
| 18 | Accountsreceivable@swat4241.com |
| 19 | Accountsreceivable@swat4241.com |
| 20 | Accountsreceivable@swat4241.com |
| 21 | Accountsreceivable@swat4241.com |
| 22 | Accountsreceivable@swat4241.com |
| 23 | Hutchison@swat4241.com |
| 24 | Accountsreceivable@swat4241.com |

(Doc. No. 42 at 14–15) (Superseding Indictment). Emails originating from these accounts are the interstate wire communication supporting each of the eleven counts of wire fraud.

At trial, a third email address was brought up: (3) "admin@swat4241.com." To prove the interstate commerce element, IRS Special Agent Jason Webb ("Agent Webb") testified that the second email address: "hutchison@swat4241.com," and the third email address: "admin@swat4241.com," were both registered to Anthony Hutchison and his Southwest Wholesale and Just Construction businesses, and that these two email addresses were Google-hosted email addresses. (Doc. No. 232, Trial Tr. Day 13 AM at 116–18) (Testimony of Jason Webb); (GEX 902, Doc. No. 198-14); (GEX 903, Doc. No. 198-15). Agent Webb did *not* testify about whether the first email address: "accountsreceivable@swat4241.com," was a Google-hosted email address, nor did the Government provide documentation from Google demonstrating this fact like it did for the second and third email addresses: "hutchison@swat4241.com," and

"admin@swat4241.com."[8] Through this testimony the Government sufficiently proved that "hutchison@swat4241.com," and "admin@swat4241.com." were Google-hosted email addresses.

To demonstrate that emails sent from Google-hosted email addresses during the relevant time period crossed state lines, the Government then offered Government's Exhibit 997 ("GEX 997"), without objection from the defense. GEX 997 was a letter from Google that read:

> Dear Special Agent Liu: After a diligent search and reasonable inquiry, we found no records reflecting that Google had Gmail servers in the state of Texas for the date range June 1, 2017 through and including July 29, 2019. Therefore, we do not have documents responsive to your request.

(GEX 997, Doc. No. 200-33).[9] Based on this letter, Agent Webb testified that during the relevant timeframe, emails sent from a Google email address necessarily crossed state lines because Google had no email servers in Texas, even if the email was sent from Houston to another person's email address in Houston (e.g. from Southwest Wholesale to HISD). (Doc. No. 232, Trial Tr. Day 13 AM at 119–21) (Testimony of Jason Webb).[10]

Hutchison raises multiple arguments challenging this evidence, all of which ultimately fail. First, Hutchison claims that Agent Webb had no relevant professional experience to support his testimony. Hutchison attempts to bolster this argument by citing *United States v. Hoffman*, which does not support his cause. 901 F.3d 523, 546 (5th Cir. 2018), *as revised* (Aug. 28, 2018). In *Hoffman*, the Fifth Circuit affirmed wire fraud convictions where the interstate commerce element was proven by a Yahoo paralegal. *Id.* The paralegal testified that Yahoo did not have any email

[8] The email address "admin@swat4241.com" is not included in the Superseding Indictment as an account originating an email serving as the basis of any wire fraud count. Certain exhibits in this case are emails sent from this account, and there is witness testimony regarding its frequent use by Southwest Wholesale employees.

[9] The Court notes the lack of objection is quite significant in this instance. Had an objection been made, the Government could have easily called a witness to cure any perceived problem. Since there was no objection, there was no need for the witness.

[10] The Government also offered, again without objection, evidence about HISD's email servers. Eugene Salazar, a 25-year HISD employee familiar with the school district's IT system, testified that HISD's email is hosted by Microsoft, in a cloud-based system that is stored in different geographical areas of the country. (Doc. No. 217, Trial Tr. Day 9 AM at 125–26) (Testimony of Eugene Salazar).

servers in Louisiana during the relevant time, so necessarily the email would leave the state even if it was sent from someone in Louisiana to someone else in Louisiana. *Id.* Defense counsel effectively cross-examined the paralegal to show the limits of her technical knowledge, and there was no contrary evidence presented at trial. *Id.* As a result, the jury was left to decide if they believed the Yahoo paralegal's testimony or not, and they ultimately decided to believe it and convict. *See id.*

In all material ways, *Hoffman* is indistinguishable from Hutchison's case. Agent Webb testified that his 2003 undergraduate degree in management information systems addressed computers, networking, and database administration; that he had worked in that field for about two years; and that he was familiar with how email systems are hosted and administered. (Doc. No. 232, Trial Tr. Day 13 AM at 116–18) (Testimony of Jason Webb). Agent Webb appears to at least have the same amount, if not more, technical experience than the Yahoo paralegal in *Hoffman*. While obviously not having any burden of proof, Hutchison also presented no evidence to contradict Agent Webb's testimony or the letter from Google (GEX 997). The jurors could rely on the letter from Google, and Hutchison's counsel could have cross-examined Agent Webb on his experience and knowledge or could have challenged the letter from Google at trial, but they chose otherwise. As a result, *Hoffman* demonstrates that Agent Webb's testimony was sufficient.

Second, Hutchison argues the Government did not establish that the emails from "accountsreceivable@swat4241.com" crossed state lines because Agent Webb did not testify about that email address. The Government clearly established that emails sent from or to "hutchison@swat4241.com" crossed state lines because it established the email was a Google-hosted email account and Google had no email servers located in Texas at the relevant times. Thus,

Counts 14, 15, and 23 are supported by sufficient evidence on this element.[11] The proof regarding the wire fraud counts supported by emails solely sent from accountsreceivable@swat4241.com is more circumstantial (Counts 16, 17, 18, 19, 20, 21, 22, and 24). The Government did not present direct evidence from Google that the "accountsreceivable" email was registered with Google like it did with the other two emails ending in "@swat4241.com." Agent Webb also did not testify about the "accountsreceivable" email and whether it, too, was hosted by Google. Nevertheless, the Government did provide uncontroverted exhibits to support this claim. GEX 588 (which is directly relevant to Count 16) and GEX 616 (which is directly relevant to Count 24) contain the following notation at the top of the email:


Southwest Wholesale Mail - Invoice 2018-600795 HISD Monthly Ma... https://mail.google.com/mail/u/1/?ui=2&ik=6c01afbcaa&jsver=qld...

Gmail by Google

Accounts Receivable <accountsreceivable@swat4241.com>

**Invoice 2018-600795 HISD Monthly Maintenance (North, South, N. Forest) - June 2018**

Accounts Receivable <accountsreceivable@swat4241.com> Tue, Jun 26, 2018 at 11:27 AM
To: "Peral Adams, HISD" <padams4@houstonisd.org>

(Excerpt from GEX 588, Doc. No. 193-11) (highlight emphasis added).


7/29/2019

Gmail by Google

Accounts Receivable <accountsreceivable@swat4241.com>

**HISD (N,S,NF) July 2019 Monthly Maintenance**
1 message

Accounts Receivable <accountsreceivable@swat4241.com> Mon, Jul 29, 2019 at 10:04 AM
To: HISD Accts Receivable <hisd_vendorinvoices@houstonisd.org>
Cc: "Peral Adams, HISD" <padams4@houstonisd.org>

[11] Count 14 was sent by "accountsreceivable@swat4241.com" but the email copied "hutchison@swat4241.com." Based on the evidence presented by the Government, this email would also have crossed state lines because it was sent by carbon copy to the "hutchison@swat4241.com" email address.

(Excerpt from GEX 616, Doc. No. 194-11) (highlight emphasis added). This notation demonstrates these two emails were sent from a Google-hosted email account.

Considering Agent Webb's testimony and the direct evidence that the two other "@swat4241.com" email accounts were hosted by Google (GEX 902 & GEX 903), these exhibits demonstrate that the "accountsreceivable" email was also a Google-hosted email. Accordingly, based on GEX 997 and Webb's testimony, which states that Google had no servers in Texas at that time, the jury could have reasonably concluded that "accountsreceivable@swat4241.com" was also hosted by Google and the emails from that account also traversed state lines. As a result, there is evidence to support that each email underlying all the wire fraud counts traveled across state lines, thus there is no basis for a new trial or judgment of acquittal on this ground.

Third, Hutchison complains about GEX 997's admission. He points out that when the Government admitted GEX 997, the transcript reflects discussion of "Government's Exhibit 917," rather than 997. (Doc. No. 232, Trial Tr. Day 13 AM at 118–119) (Testimony of Jason Webb). He cites the Court's exhibit list (Doc. No. 152) to show that the true GEX 917 was not admitted into evidence, and it was not the letter from Google. GEX 917 instead was a photograph of an office space. Due to this mix-up, Hutchison claims GEX 997 was likely not submitted to the jury.

The record demonstrates GEX 997 was properly admitted and a new trial is unwarranted regardless of whether the mix-up in the record was a misstatement by the Government or an error in the transcript. It is clear that the Government, in its questioning, read the entirety of the contents of GEX 997 into the record in front of the jury, and Agent Webb affirmed that the contents were correct while he reviewed GEX 997. (Doc. No. 232, Trial Tr. Day 13 AM at 118–119) (Testimony of Jason Webb). As a result, it is clear that GEX 997 was considered by the jury. Exhibit 917 was not. To the extent counsel's number reference was a misstatement, the parties and the Court clearly

understood that Exhibit 997 was being addressed as the witness described the document and read the substance of it into the record. To the extent "917" was a transcription error, it is a minor, understandable error that does not warrant a new trial. *See United States v. Neal*, 27 F.3d 1035, 1044 (5th Cir. 1994) ("A transcript need not be correct in every detail. Instead, it need only report the proceedings with reasonable completeness and substantial accuracy.") (internal quotation omitted). This argument fails.[12]

**2. Wire Fraud: Specific Intent**

In Hutchison's second challenge to the wire fraud counts, he claims the Government failed to prove that he acted with a specific intent to defraud. He argues this in regard to the counts related to the mowing fraud (Counts 14–17 and 23–24) and the counts related to the Kiddie Cushion fraud (Counts 18–22). A conviction for wire fraud requires a showing that the defendant acted with "specific intent to defraud." *Hoffman*, 901 F.3d at 545. "A defendant 'acts with the intent to defraud when he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself.'" *United States v. Umawa Oke Imo*, 739 F.3d 226, 236 (5th Cir. 2014) (quoting *United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005)); *United States v. Scully*, 951 F.3d 656, 671 (5th Cir. 2020) (applying the same principle for wire fraud). "A jury can infer intent from the facts and circumstances." *Scully*, 951 F.3d at 671.

Hutchison has presented no compelling reason to disturb the jury's verdict here. As to the mowing fraud counts, the jury could readily infer that Hutchison acted with a specific intent to

---

[12] Hutchison also claims the interstate commerce element was not explained sufficiently in the jury instructions or the verdict form because the instructions allegedly did not explain that the eleven emails had to cross state lines. It escapes the Court how this can be so considering Title 18 itself defines "interstate commerce," as used in that Title, and the Court used the Fifth Circuit Pattern Jury Instructions' definition of "interstate commerce" (without objection from counsel) which tracked the statute's definition. The Court instructed the jury that to find that Hutchison transmitted or caused to be transmitted communications in interstate commerce, they would have to find that the emails "travel[ed] between one state, territory, or possession of the United States and another state, territory, or possession of the United States, including the District of Columbia." *See* (Doc. No. 153 at 25) (Final Jury Instructions); 18 U.S.C. § 10; FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 1.44 Interstate Commerce—Defined (2024).

defraud from the evidence presented. Hutchison hand-wrote annual mowing proposals for HISD including four cuts per month in the growing season. He then had his staff type them up and send them to HISD. Subcontracted mowers were then assigned to specific schools where they had exclusive responsibility over the mowing. These mowers testified that Hutchison told them to only mow their respective HISD properties two times per month in the growing season instead of the four cuts for which he was billing. This schedule was reflected in their proposals and invoices to Hutchison, which Hutchison initialed and approved. The evidence made it clear there were no additional cuts happening at those properties. When Hutchison's office manager raised the discrepancy between the number of cuts to Hutchison, he told her "his other people" were doing the missing cuts. However, no Southwest Wholesale employee or mower was aware of any "other people" that existed (and that mowed twice a month). The jury was entitled to reject Hutchison's claim that "other people" existed and accept the other evidence that demonstrated Hutchison was billing for four cuts during the growing season but only providing two. The jury was also entitled to deduce Hutchison's specific intent from his hiding the overbilling by approving false invoices and by claiming his "other people" were completing the additional cuts. (Doc. No. 216, Trial Tr. Day 8 AM at 8–9, 17, 22, 87–88) (Testimony of Tracey Alexander); (Doc. No. 235, Trial Tr. Day 9 PM at 80–94); (Testimony of Eugene Salazar); (Doc. No. 210, Trial Tr. Day 6 AM at 12–14, 38–45) (Testimony of Sam Arrez); (*Id.* at 101–08) (Testimony of Maria Estala Gonzalez); (*Id.* at 131–134) (Testimony of Zulma Emicela Navarrete); (Doc. No. 228, Trial Tr. Day 6 PM at 17–23) (Testimony of Mirna Fortuna); (*Id.* at 141–42, 161–67) (Testimony of Elyce McAfee); (Doc. No. 229, Trial Tr. Day 7 AM at 4–7) (Testimony of Elyce McAfee).

Hutchison's challenge to the Kiddie Cushion counts suffers the same fate. As discussed above, the evidence presented at trial showed that, under Hutchison's contract with HISD, he was

permitted to charge HISD for the actual cost Southwest Wholesale incurred in purchasing mulch, plus a 20% markup. (Doc. No. 235, Trial Tr. Day 9 PM at 24–25) (Testimony of Eugene Salazar). The jury heard that Hutchison purchased mulch from Bailey Bark Materials for $11 per cubic yard but represented to HISD that it cost $25 per cubic yard—approximately 127% more than the actual cost—and marked up the inflated $25 per cubic yard amount by another 20%, for a total markup of approximately 172%. (Doc. No. 233, Trial Tr. Day 8 PM at 165, 175, 186–98) (Testimony of Kortni Bailey). Both Eugene Salazar, the senior manager of FMO finance, and Kortni Bailey, a Bailey Bark sales representative, testified to this disparity. The jury also heard that Hutchison set the $25 figure and was personally involved in drafting the proposals and invoices to HISD that reflected the inflated price, quantity and transportation figures. (Doc. No. 235, Trial Tr. Day 9 PM at 97–107) (Testimony of Eugene Salazar); (Doc. No. 233, Trial Tr. Day 8 PM at 174–84) (Testimony of Kortni Bailey); (Doc. No. 217, Trial Tr. Day 9 AM at 4–34) (Testimony of Kortni Bailey); (Doc. No. 229, Trial Tr. Day 7 AM at 26–27, 33–50) (Testimony of Elyce McAfee). From this evidence, the jury could readily conclude that Hutchison was misrepresenting prices to HISD for his own personal gain and to HISD's detriment, which demonstrates specific intent to defraud. *See Umawa Oke Imo*, 739 F.3d at 236.

Overall, Hutchison's challenges to the wire fraud convictions fail, and the Court denies his motion as to Counts 14 through 24.

### C. Hutchison's Claims of Prosecutorial Misconduct

Next, Hutchison moves for a new trial due to alleged prosecutorial misconduct. He raises two separate arguments against the Government's conduct. First, he contends the Government violated *Brady v. Maryland*, 373 U.S. 83 (1963). Second, he argues the prosecution made multiple

improper statements in its closing arguments. He argues both of these alleged errors warrant a new trial. The Court will address each argument in turn.

### 1. Alleged *Brady* Violation

First, Hutchison argues the Government violated his rights when it failed to disclose that Larry Nabors changed his story right before he was set to testify at trial, dissuading the Government from calling Nabors as a witness. Nabors was the grounds manager for HISD, and he was responsible for managing the landscaping of the schools, which included managing external landscaping vendors, like Southwest Wholesale. (Doc. No. 240, Trial Tr. Day 12 PM at 13:14–23) (Testimony of Kendrick Solomon).

A brief summary of Nabors and his involvement (or lack thereof) in the trial is relevant here. From the record, Nabors' putative testimony appears most relevant to the mowing fraud underlying two of the wire fraud counts. The Government's position, as discussed previously, was that Hutchison tried to cover up the mowing fraud by claiming Southwest Wholesale accidentally overbilled HISD for mowing services. After the FBI search warrant, Hutchison claims he paid back some of what he "accidentally" overbilled HISD. Since Hutchison did not testify, he relied on the testimony of Tracey Alexander, his former office manager, to put this evidence before the jury. She testified that she was present at a conversation with Hutchison and Nabors where the topic was a mistaken overbilling by Southwest Wholesale for certain 2019 projects. (Doc. No. 233, Trial Tr. Day 8 PM at 79–83) (Testimony of Tracey Alexander). She claimed this conversation happened in the early fall of 2019 (a few months before the search warrant), and that she was told by Hutchison to wait for instructions from Nabors on how to correct the overbilling. (*Id.* at 83–85). Alexander stated that she was ultimately never told how to correct the issue. (*Id.*). Based on pretrial interviews, the Government seemingly expected Nabors to testify that no phone call like

the one Alexander described ever occurred or at least that he did not remember a call. This would reasonably suggest to the jury that Hutchison's story about the "mistaken" overbilling was not accurate, and reinforce the other evidence that his mowing fraud overbilling was intentional. The Court points out that even if it were to adopt Hutchison's argument, it only affects, if it affects at all, Counts 23 and 24 because those counts of the indictment apply to a 2019 invoice and proposal which Alexander referenced in her testimony. Nevertheless, the Court needs to address the argument.

In its opening statement, the Government previewed what it expected Nabors' testimony to be, stating:

> Five days after the search, [Hutchison] has a meeting with HISD, and there were some follow-up correspondence. And the communication was basically, Oh, my God, we've made this amazing discovery in the office. We've been mistakenly overbilling HISD. And so he says he wants to pay it back, and so he writes a check to HISD for $850,000, which covers the overbilling for just the 2019 year, and HISD deposits the check. Mr. Hutchison says, during these – this correspondence, that he had actually discovered this -- this, quote, problem in his finance department, and he discovered it four months before and he told Larry Nabors, who's head of the grounds maintenance group -- the mowing group, basically, at HISD -- he told Mr. Nabors about it, and he's been waiting for someone at HISD to get back to him. That's his story.
>
> Mr. Nabors will come in and testify and say he doesn't remember a conversation like that, no one told him, and he would remember if someone told him that there was an 850,000-dollar billing error. He'll say he never heard that one.

(Doc. No. 206, Trial Tr. Day 2 AM at 34:0–35:5) (Government's Opening Statement).

Ultimately, the Government did not call Nabors as a witness. In his closing argument, Busby's counsel emphasized that point, saying, "Larry Nabors. Larry Nabors, who the prosecution didn't see fit to bring to you, who had been over the grounds this whole time. I mean, he was the guy." (Doc. No. 251, Trial Tr. Day 19 PM at 72:10–12) (Busby's Closing Arguments). Hutchison's counsel emphasized this point even more so. She stated:

> Now, remember we talked about Larry Nabors. There's something I don't want you to forget. In opening statement, the government said to you, "I'm going to bring Larry Nabors, and he's going to testify, and he's going to tell you about the mowing. He's going to tell you about the overbilling." That's what they promised you.
>
> Where was he? As much as you heard Larry Nabors's name throughout this entire trial, why didn't they bring him here? We don't have a burden. You can't say when you get back there, well, Mr. Hutchison should have brought Larry Nabors. The Constitution says he doesn't have to prove his innocence. They have to prove that he's guilty beyond a reasonable doubt. You can't circumvent the burden. Please don't let anybody do that. Please hold tight to what the oath is. Treat them the way you would want to be treated if it were you on trial.
>
> They have the burden. If he -- Mr. Hutchison was stealing and defrauding HISD and you heard that Mr. Nabors was the ground maintenance man -- for 30 years he ran that company. They told you he took pride in what he did. If Mr. Hutchison was defrauding Larry Nabors, why wasn't he up there telling you that? Because he should have been. He should have been the first witness when it came to mowing. Because he was the one responsible for signing off on it. Because remember, the department head has to sign off on the invoices. He's been the ground maintenance manager for 30 years. They should have brought him. That should cause you concern. That should cause you concern if he's trying to defraud.

(*Id.* at 93:25–95:3) (Hutchison's Closing Argument). In response to these arguments, the Government then told the jury in its rebuttal closing argument the following:

> There's one issue I need to clear up on the front end, and there's been discussion about whether the government should have called this witness or that witness, and there's also been lengthy discussion about what the Constitution provides.
>
> One thing the Constitution provides is that the government is not allowed to call witnesses who we believe will perjure themselves. We're not allowed to do that, and we don't do that. And so we make our decisions of who to call with that in mind. So I'll just leave it at that.

(*Id.* at 135:20–136:12) (Government's Rebuttal Closing Argument). No objections were made at that time.

Since it was very late in the day when the final arguments concluded, the jury was dismissed to come back in the morning to begin deliberations.[13] After the jury was dismissed, Hutchison's counsel objected to the Government's rebuttal closing argument where AUSA Johnson said the Government did not call certain witnesses because it believed they would commit perjury. Hutchison's counsel said, "Well, obviously, the defense is not permitted to do that either. The only witness who was referenced who the government didn't call was Larry Nabors, who the defense did call. That was plainly improper . . . disparaging of Mr. Nabors's testimony . . . ." (*Id.* at 143:22–144:14). The portion of the statement "who the defense did call" was a misstatement, as the defense never purported to call Nabors as a witness. The next exchange is the heart of Hutchison's *Brady* argument. The Government stated:

> And, Judge, I'd just like to say that I'm addressing -- in saying that, I'm addressing a specific allegation made by defense that we purposely didn't call a witness and that why wasn't this witness called? And it was improper for the government not to call the witness.
>
> And I'll tell you, that witness changed his story dramatically right before we were going to put him on the stand. That's why we didn't, because we believed he was lying to us. So we can't -- if they're going to make that kind of allegation on the record, I have to address it.

(*Id.* at 145:16–25). Hutchison argues the Government's failure to disclose that Nabors changed his story right before he was supposed to testify was undisclosed *Brady* evidence, which warrants a new trial.

Under *Brady v. Maryland*, the Government "violates a defendant's due process rights if it withholds evidence that is favorable to the accused and material to the defendant's guilt or punishment." *United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018). *Giglio v. United States*, 405 U.S. 150 (1972), applies *Brady* "to evidence affecting the credibility of key government

[13] This dismissal included the alternate jurors who were instructed that they did not have to return the next morning.

witnesses." *United States v. Dvorin*, 817 F.3d 438, 450 (5th Cir. 2016). To establish a *Brady* violation, a defendant must show: "(1) the evidence at issue was favorable to the accused, either because it was exculpatory or impeaching; (2) the evidence was suppressed by the prosecution; and (3) the evidence was material." *Id.*

**a. Was the Evidence Exculpatory or Impeaching?**

The Government argues that this alleged *Brady* material is not exculpatory because it is too speculative. The Government claims Hutchison can only speculate that had Nabors testified, he would have corroborated Hutchison's defense because the only information was that "maybe there [was] a phone call" between him and Hutchison prior to the search warrant's execution. (Doc. No. 251, Trial Tr. Day 18 PM at 148:4). On the other hand, Hutchison argues this evidence is exculpatory or impeaching because had Nabors changed his story, that testimony would have corroborated Hutchison's defense. It was particularly important to Hutchison because of the Government's emphasis on Nabors in its opening statement.

First, as the Court pointed out before, this purported evidence would only affect Counts 23 and 24. Second, the Court was never presented with the substance of what Nabors would say or even a summary of it, so the purported content of any testimony is pure speculation. Nevertheless, the allegation that Nabors arguably changed his story mid-trial right before testifying could theoretically present exculpatory material. Presumably, Nabors' original story would have corroborated the Government's view of the evidence. If Nabors changed his story and testified that "there [was] a phone call" between him and Hutchison before the search warrant's execution, Nabors might or might not have corroborated Hutchison's claim concerning Southwest Wholesale's 2019 overbilling—depending on the content of the alleged phone call. Specifically, the hypothetical testimony could corroborate that there was a conversation months before the

investigation unfolded during which Hutchison informed Nabors that a Southwest Wholesale employee inadvertently overbilled HISD on invoices in 2019. Regardless, the analysis does not turn on this point, so the Court need not make a firm determination on this element.

**b. Was the Evidence Suppressed?**

Evidence is suppressed if the government fails to disclose it, or if the evidence was disclosed too late to make effective use of it at trial. *See United States v. McKinney*, 758 F.2d 1036, 1051 (5th Cir. 1985). Here, the Government disclosed that Nabors may have changed his story or at least was hedging on what he had told them after the jury was dismissed after the completion of closing arguments. (Doc. No. 251, Trial Tr. Day 19 PM at 141–147). At this point, the Government had rested its case-in-chief, both Defendants had rested their presentation of evidence, and the Government had rested its rebuttal case. Closing arguments had occurred. As a result, the evidence was likely suppressed because, absent leave of Court, it was disclosed too late to make effective use of it at trial. *Cf. Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994) ("Because we find that the existence and contents of the [evidence] were disclosed at trial, we hold that the prosecution did not suppress any evidence."); *United States v. McKinney*, 758 F.2d 1036, 1049–50 (5th Cir. 1985) (holding that the prosecution did not suppress evidence where *Brady* materials were disclosed at trial and reasoning that "[i]f the defendant received the material in time to put it to effective use at trial, his conviction should not be reversed simply because it was not disclosed as early as it might have, and indeed, should have been").

**c. Was the Evidence Material?**

The main dispute here is whether the evidence at issue was material. "Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Dvorin*, 817 F.3d 438, 451 (5th Cir.

2016) (quoting *United States v. Brown*, 650 F.3d 581, 588 (5th Cir. 2011) (citation omitted)). A "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Spence v. Johnson*, 80 F.3d 989, 994 (5th Cir. 1996)). The materiality of *Brady* evidence depends almost entirely on the value of that evidence relative to the rest of the evidence presented by the Government. *United States v. Sipe*, 388 F.3d 471, 478 (5th Cir. 2004). "Thus, when the undisclosed evidence is merely cumulative of other evidence in the record, no *Brady* violation occurs." *Id.* (internal quotation omitted). Likewise, if the undisclosed evidence is impeachment evidence, it is generally not material when the testimony of the witness that might have been impeached is strongly corroborated by other evidence supporting a guilty verdict. *Id.* On the other hand, if the impeaching evidence "would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material." *Id.*

In assessing *Brady* evidence, the Court must place the facts that form the substance of its analysis in the context of the specific elements of the charged offense. *Id.* at 479. Among other charges, Hutchison was charged and convicted of eleven counts of wire fraud under 18 U.S.C. § 1343, which makes it a crime for anyone to use interstate wire communications in carrying out a scheme to defraud. *See* 18 U.S.C. § 1343; (Doc. No. 153 at 23) (Final Jury Instructions). Two of those counts were related to the subject matter of the alleged phone call. The first element requires a finding beyond a reasonable doubt that Hutchison "knowingly devised or intended to devise any scheme to defraud; that is, he submitted fraudulent proposals or false invoices to [the school district] for providing mowing services or mulch in order to overbill [the school district] for these materials and services." (Doc. No. 153 at 23) (Final Jury Instructions). The fourth element requires the jury to find that Hutchison "acted with a specific intent to defraud."

*Id.* "A 'specific intent to defraud' means a conscious, knowing intent to deceive and cheat someone. The proper time for identifying fraudulent intent of any statement is when the statement was made, not when another person relies on the statement or is injured by it." *Id.* "A representation is 'false' if it is known to be untrue or is made with reckless indifference as to its truth or falsity." *Id.*

Hutchison argues that the evidence is material because had Nabors testified, he would have corroborated Hutchison's defense against the wire fraud charges. He believes that Nabors' testimony could support Hutchison's contention that, contrary to the Government's theory, he did not intentionally defraud HISD because upon discovery of a mistake, he affirmatively took steps to remedy the error. Furthermore, Hutchison argues that this evidence is not merely cumulative of the existing evidence in the record—thus, it is material.

Hutchison relies on *United States v. Sipe*, 388 F.3d 471 (5th Cir. 2004). In *Sipe*, the Fifth Circuit analyzed multiple alleged *Brady* violations and their materiality to the trial's outcome. Namely, it focused on an undisclosed prosecution memorandum that revealed impeachment material of a key government witness. *Id.* at 480–82. That memorandum revealed that the key witness disliked the defendant before the incident, which contradicted that same witness' testimony before the grand jury, when he said he did not "dislike" the defendant, but "he's not somebody I associate with." *Id.* at 480–81.

The *Sipe* court found this evidence material for multiple reasons. First, the government's case was founded largely on unsympathetic witnesses so its key witness—and his credibility—were essential to lend credibility to the unsympathetic witnesses. *Id.* at 482. Second, the prosecution memorandum was not "cumulative" evidence to the testimony before the grand jury; it contradicted the witness' sworn grand jury testimony. *Id.* at 481. Third, and "most significantly," Sipe, the defendant, did not possess any other information with which to impeach the key witness'

credibility. *Id.* at 483. As a result, evidence of that witness' dislike of the defendant was his only avenue of impeachment, which caused the evidence to possess an added importance. *Id.*

The present case, however, is quite distinguishable from *Sipe*. First, while Hutchison characterizes Nabors as one of the Government's "key witnesses," (Doc. No. 320 at 53, 55), multiple other witnesses testified regarding the mowing fraud, and there is no indication that those witnesses were "unsympathetic" like those in *Sipe*. *Sipe*, 388 F.3d at 482. For example, Tracey Alexander, Southwest Wholesale's former office manager, testified that when she noticed the billing discrepancy at the heart of the wire fraud charges she informed Hutchison, and he told her "his other people" did those cuts. (Doc. No. 233, Trial Tr. Day 8 PM at 127–130) (Testimony of Tracey Alexander). However, Alexander herself was never aware of any "other people" doing HISD cuts, and Southwest Wholesale's records and multiple witnesses' recollections did not reflect any "other people" cutting the lawns. Elyse McAfee, Hutchison's administrative assistant, testified that she was involved in planning and tracking the HISD mowing, and she knew of no "other mowers" beyond those subcontracted mowers involved in the schedule, team meetings, and who received mower schedules. (Doc. No. 228, Trial Tr. Day 6 PM at 161–67) (Testimony of Elyce McAfee); (Doc. No. 229, Trial Tr. Day 7 AM at 4–7) (Testimony of Elyce McAfee). Four different subcontracted mowers testified that they only cut their assigned schools twice per month in the growing months, that they followed the frequency chart provided by Southwest Wholesale, the mowers invoiced Southwest Wholesale for two cuts in the summer, and they never cut a school four times per month. (Doc. No. 210, Trial Tr. Day 6 AM at 12–14, 38–45) (Testimony of Sam Arrez); (*Id.* at 101–08) (Testimony of Maria Estala Gonzalez); (*Id.* at 131–134) (Testimony of Zulma Emicela Navarrete); (Doc. No. 228, Trial Tr. Day 6 PM at 17–23) (Testimony of Mirna Fortuna). Overall, there is no evidence in the record to indicate these numerous additional

witnesses or their testimonies were viewed as unsympathetic or untrustworthy by the jury, nor has either party indicated such to the Court. *Sipe*, 388 F.3d at 484.

Another important distinction from *Sipe* is in regard to that court's ultimate holding. *Sipe* involved five different alleged *Brady* violations, and three violations that survived *Brady*'s first two prongs. *Sipe*, 388 F.3d at 477, 491. Here, there is only a single alleged violation. The Fifth Circuit did not affirm the district court's order of a new trial on this single *Brady* violation regarding the prosecution memorandum. *Id.* at 491–92. It considered all three violations to determine that "[a]t the very least, this evidence would have seriously unsettled an already weak case," since "[t]he evidence against Sipe, while sufficient for conviction, was not strong." *Id.* at 492. Overall, the "closeness of [the] case based solely on those facts presented at trial, the government's failure to disclose *copious amounts* of evidence casting doubt upon the credibility of *almost all* of the key witnesses severely undermine[d] [the court's] confidence in the outcome of this case," so it affirmed the granting of a new trial. *Id.* (emphasis added). Again, there is no indication that the Government failed to disclose *copious amounts* of evidence here, and there is no evidence that Nabors' testimony would impact the jury's credibility determination of the numerous other witnesses who testified in a manner to support Hutchison's conviction on the wire fraud counts.

Moreover, Nabors was *not* called as a witness at trial. While the Government did preview his expected testimony in its opening statement, the jury was repeatedly instructed that any questions, statements, objections, or arguments by the lawyers were not evidence. *See* (Doc. No. 245, Trial Tr. Day 19 AM at 109:4–9) (Final Jury Instructions) ("Remember that any questions, statements, objections, or arguments made by the lawyers are not evidence."); (Doc. No. 206, Trial Tr. Day 2 AM at 7:16–17, 8:18–19) (Preliminary Jury Instructions) ("Just as the indictment is not

evidence, neither is the opening statement evidence . . . . Just as I told you about the opening statements by the attorneys, the closing arguments are not evidence either."). Jurors are presumed to follow the instructions given to them. *United States v. Paul*, 142 F.3d 836, 844 (5th Cir. 1998). Hutchison makes no attempt to overcome this presumption. To the extent Hutchison worries that the jury considered the Government's preview of Nabors' testimony during its opening statement as evidence in their deliberations, the law presumes they did not. *See id.*; *United States v. Scott*, 48 F.3d 1389, 1397 (5th Cir. 1995). Furthermore, the Defendants never requested that this Court reopen the evidence so that Nabors could testify. *See* (Doc. No. 251, Trial Tr. Day 19 PM at 146–150).

There is not enough evidence in the record to suggest that Nabors potentially testifying that "there may have been a call" would have "put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Valas*, 822 F.3d 228, 237 (5th Cir. 2016) (internal quotation omitted). As previously stated, significant witness testimony and documentary evidence—separate and apart from Nabors' hypothetical testimony—supports the jury's guilty verdict on the wire fraud counts. Furthermore, there is little certainty regarding what Nabors may have testified to; thus, little certainty as to its impact on the overall trial. Nabors may have testified in line with his previous statements to law enforcement (that there was no call); he may have testified in contradiction with his previous statements to law enforcement (that there was a call); the Government may have impeached him if he changed his story; or Hutchison may have impeached him if he decided to flip-flop on his story. The Court cannot say with any amount of certainty how Nabors' testimony may have influenced the trial. Moreover, even if everything that Hutchison claims is, in fact, accurate, Nabors' hypothetical testimony would only impact two of the wire fraud counts. Counts 23 and 24 are the only counts which involve invoices or proposals

from 2019, which is the year Alexander testified that Hutchison "mistakenly" overbilled HISD. In that context, it would be inappropriate to grant a new trial beyond those two counts.

Finally, and very important to this Court's analysis on materiality, is the fact that defense counsel represented to the Court that Nabors' attorney had indicated that if Nabors were called as a witness, he would exercise his Fifth Amendment right not to testify. (Doc. No. 251, Trial Tr. Day 19 PM at 147–50) ("Mr. Deguerin: Neil Davis is Larry Nabors's lawyer. He told me that Larry Nabors would refuse to testify based on his privilege, but he wouldn't tell me why . . . ."). No one challenged this representation, and the Court had the right to rely upon, and did rely upon the unchallenged statement. A trial court has a duty to protect the Fifth Amendment rights of witnesses. *United States v. Lyons*, 703 F.2d 815, 818 (5th Cir. 1983). If a judge sustains a witness' assertion of his Fifth Amendment privilege, "the defendant has no right to call the witness to the stand merely to force invocation of that right before the jury." *Id.* Likewise, it is impermissibly prejudicial for the Government to call a witness it knows will invoke the Fifth Amendment in an attempt to influence the jury. *United States v. Beechum*, 582 F.2d 898, 908 (5th Cir. 1978). "Moreover, where the government witness indicates beforehand that he will invoke the privilege, the court may properly refuse to allow him to testify before the jury." *Id.* at 909. With these guiding principles in mind, the Court had no reason to believe that it might reopen testimony to allow Nabors to simply take the stand and plead the Fifth.[14] Had the Court allowed/forced Nabors to take the stand and take the Fifth Amendment in front of the jury, rather than exculpate Hutchison, it would have very likely erased any chance of a not guilty verdict. It needs to be emphasized that no one requested the Court reopen testimony to call Nabors to the stand, presumably for these reasons. *See* (Doc. No. 251, Trial Tr. Day 19 PM at 146–150).

[14] No one asked this Court to reopen testimony to allow Nabors to testify.

To conclude, while this putative evidence, if it in fact existed, could have arguably been exculpatory with regard to two counts, Hutchison has no proof that it exists or is material. Further, there is no proof that Nabors would have testified for either side given his lawyer's representations about his intention to assert his Fifth Amendment right not to testify. Finally, Hutchison fails to show that Nabors' alleged testimony has "put the whole case in such a different light as to undermine confidence in the verdict." *Valas*, 822 F.3d at 237 (internal quotation omitted). The Court finds that under the principles set out in *Brady v. Maryland*, there is no reason to set aside the jury's verdict.

**2. Alleged Improper Statements by the Prosecution**

Next, Hutchison argues he is entitled to a new trial under Rule 33 because the Government made improper statements in its closing arguments that constitute reversible error. Improper statements by a prosecutor can, at times, warrant a new trial. *See United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999). The Fifth Circuit generally applies a two-step analysis to claims of prosecutorial misconduct. *United States v. Weast*, 811 F.3d 743, 752 (5th Cir. 2016); *United States v. Aguilar*, 645 F.3d 319, 323 (5th Cir. 2011). First, the Court must determine whether the prosecutor made an improper remark. *Weast*, 811 F.3d at 752. If so, then the Court must determine whether the prosecutor's improper statements affected the defendant's substantial rights. *Id.*; *Aguilar*, 645 F.3d at 325. "This is a high bar, and the determinative question is 'whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict.'" *Aguilar*, 645 F.3d at 325 (quoting *United States v. Gracia*, 522 F.3d 597, 603 (5th Cir. 2008)). To determine whether the trial's outcome was affected by the statements, courts consider three factors: "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the inculpatory evidence other than the improperly bolstered testimony." *Id.* In

assessing whether statements made by a prosecutor were improper, it is necessary to look at them in context. *United States v. Washington*, 44 F.3d 1271, 1278 (5th Cir. 1995).

Hutchison challenges three separate prosecutorial statements that he alleges were improper. First, he claims the Government improperly vouched for its cooperating witnesses during its rebuttal closing arguments. Second, he alleges the Government improperly shifted the burden of proof to the Defendant. Third, he argues that the Government misstated the law in closing arguments regarding what evidence was sufficient to constitute a "bribe." (Doc. No. 296 at 79). The Court will address each challenged statement(s) separately.

**a. Challenge 1**

First, Hutchison argues that the prosecution during closing arguments improperly vouched for each of the coconspirators, all of whom were cooperating witnesses who testified at trial. In its rebuttal closing argument, the Government said:

> All right. Onto the substance. So there's really one, I would say, central fact in this case. And that is that five people have pled guilty already to being participants in this scheme. They've pled guilty to conspiracy. And I can tell you, and you should realize from the application of your own common sense, that no one volunteers to go to federal prison. They don't -- people do not plead guilty on a whim. They don't plead guilty because they think it's somehow going to benefit them.
>
> People plead guilty because they truly believe they did something wrong, and they are guilty. All of these people who pled guilty, all five of them, were represented by good lawyers. They pled guilty in front of this judge, and they're questioned by the Court when they plead. And it's a very careful process. And the judge finds them guilty at the end of that process. They're guilty.
>
> And their testimony is the cornerstone of this case. It's not just one person coming here and telling you that they were involved in the conspiracy with these two defendants. It's five. And they all can point to these two gentlemen and say that that's who they were involved with. Four of them can point to Mr. Hutchison and say, "That man put money in my hands." Not one time, over and over and over. Tens of thousands of dollars. Some of them for years.

(Doc. No. 251, Trial Tr. Day 19 PM at 136:13–137:11) (Government's Rebuttal Closing Arguments).

Hutchison argues these statements improperly asserted the Government's personal opinion about the credibility of the cooperating witnesses, effectively bolstering their testimony, rather than letting the evidence speak for itself. In response, the Government claims that it merely summarized the witness testimony from each of the cooperating witnesses, who acknowledged they may go to jail, rather than express an opinion on those witnesses' credibility. At most, the Government argues it pointed out that the coconspirators had no incentive to lie at trial, which it claims is permissible. (Doc. No. 308 at 118) (citing *Gracia*, 522 F.3d at 601).

"A prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence." *Vargas*, 580 F.3d at 278. "[I]t is impermissible *per se* for a prosecutor to offer personal assurances to the jury that government witnesses are telling the truth," and it is improper for a prosecutor to assert his own credibility, or that of the government, to bolster the credibility of a witness. *Gracia*, 522 F.3d at 601–02 (explaining that the "power and force of the government tend to impart an implicit stamp of believability to what the prosecutor says"). That being so, when the defense suggests a witness was lying or mistaken, the prosecutor is entitled to rebut that assertion or show that the witness has no motive to lie. *Aguilar*, 645 F.3d at 323–24.

The Court finds that the Government's statements were proper, both because they summarized the cooperating witnesses' testimony and because they were properly made in rebuttal to the defense's statements in closing arguments. Each cooperating witness acknowledged that he or she pleaded guilty before the judge who accepted their guilty plea, was actually guilty, had agreed to cooperate, and had stated that they had abided by their commitment to testify truthfully.

Several of the witnesses acknowledged that they may go to jail. (Doc. No. 225, Trial Tr. Day 2 PM at 70–72) (Testimony of Derrick Sanders); (Doc. No. 208, Trial. Tr. Day 4 PM at 82–88, 100–01) (Testimony of Gerron Hall); (Doc. No. 209, Trial. Tr. Day 5 AM at 14–15, 85–86, 90–93) (Testimony of Alfred Hoskins); (Doc. No. 227, Trial Tr. Day 4 AM at 159–164) (Testimony of Luis Tovar); (Doc. No. 326, Trial Tr. Day 5 PM at 58, 71) (Testimony of Rhonda Skillern-Jones). As a result, the Government's statements about the cooperating witnesses' plea agreements and their potential sentences merely summarized the evidence or were reasonable inferences or conclusions drawn from that evidence. *Vargas*, 580 F.3d at 278.

Hutchison contends that these statements were not merely references to facts adduced at trial because they insinuated the witnesses were being sentenced all because of *Hutchison*, and not because of their own conduct. (Doc. No. 320 at 63). The record does not support this argument. Each witness testified to their *own* participation in the conspiracy, not that they were found guilty and would be sentenced only because of Hutchison's conduct. The Government's statements in rebuttal arguments merely summarized that each cooperating witness had been charged with a crime due to his or her involvement in Hutchison and Busby's criminal conspiracy. The statements did not suggest the cooperating witnesses were guilty *solely* because of Hutchison's conduct, to the exclusion of their own conduct. Each witness admitted to their own conduct. *See* (Doc. No. 225, Trial Tr. Day 2 PM at 70–72) (Testimony of Derrick Sanders); (Doc. No. 208, Trial. Tr. Day 4 PM at 82–88, 100–01) (Testimony of Gerron Hall); (Doc. No. 209, Trial. Tr. Day 5 AM at 14–15, 85–86, 90–93, 92:22–23) (Testimony of Alfred Hoskins) ("Q: Do you believe that you are, in fact, guilty of the crime of conspiracy to commit bribery? A: Yes, sir."); (Doc. No. 227, Trial Tr. Day 4 AM at 159–164) (Testimony of Luis Tovar); (Doc. No. 326, Trial Tr. Day 5 PM at 58, 71) (Testimony of Rhonda Skillern-Jones). Additionally, the Defendants themselves are the ones who

put the plea agreements into evidence, all of which indicated that the cooperating witnesses were guilty of taking bribes. (Busby Tr. Exs. 1, 2, 3, 4, 5).

Hutchison also claims that, through these statements, the Government made an improper emotional appeal to bolster the cooperating witnesses' credibility by implying they would not lie simply because they pleaded guilty and agreed to go to prison. In his closing argument, Busby's counsel challenged the credibility and truthfulness of the cooperating witnesses. He said:

> And there's where, if you recall four weeks ago when we started out, I characterized the five dealmakers. And we brought to you through cross-examination their deals. Each one of the five -- we had to talk about four of them separately from Rhonda Skillern-Jones, but each of those five made a deal with the government whereby they benefit from their testimony. That is something the judge tells you you may and should consider in considering whether to believe their testimony. That's credibility of the witnesses. In other words, whether to believe them beyond a reasonable doubt. Common sense. Testifying for a benefit.
>
> ***
>
> What's more valuable than gold? What's more valuable than money? Freedom. Every one of those five witnesses is testifying under a threat, under a threat of fear. It's a carrot-and-a-stick procedure. The stick, of course, is we're going to prosecute you because we've got this ledger that shows that you took bribes. And they're afraid. And that gives you every reason to question their testimony, to question the accuracy of it.
>
> And the judge tells you you should take it into consideration.

(Doc. No. 251, Trial Tr. Day 19 PM at 62:15–63:18) (Busby's Closing Argument).

Defense counsel then provided examples to show what he perceived as untruthfulness of Rhonda Skillern-Jones, (*id.* at 65:25–67:17), and Alfred Hoskins, (*id.* at 74:8–75:9). Finally, Hutchison's counsel also called all of the cooperating witnesses' credibility into question when she discussed the higher punishment ranges for bribery, tax fraud, and wire fraud charges, stating "[t]hat's what those guys that testified were running from. That's what all five of them were running from." (*Id.* at 122:7–11) (Hutchison's Closing Argument).

In closing arguments, both Hutchison and Busby's counsel clearly called the credibility of the cooperating witnesses into question. Viewing the prosecutor's statements in that context, it was entirely permissible for the Government to rebut the defense's assertion that the witnesses were lying by showing that they had no motive to lie. *Aguilar*, 645 F.3d at 323–24. Here, the Government did so by pointing to record evidence that each cooperating witness had pled guilty and could be facing federal prison time as a result of their plea and their criminal involvement. Even if these comments could be viewed as bolstering the witnesses, it would be appropriate considering the defense attacked the witnesses' credibility—due to the fact that they each were cooperating witnesses—during closing arguments. *See United States v. Alaniz*, 726 F.3d 586, 617 (5th Cir. 2013) ("[A] prosecutor may present what amounts to be a bolstering argument if it is specifically done in rebuttal to assertions made by defense counsel in order to remove any stigma cast upon her witnesses.") (internal quotation omitted).

The only part of this argument by the Government not directly supported by abundant evidence was its statement that the cooperating witnesses "were represented by good lawyers." (Doc. No. 251, Trial Tr. Day 19 PM at 136:24–25) (Government's Rebuttal Closing Argument). The evidence demonstrates that each cooperating witness was represented by a lawyer, so the only additional comment from the Government is that they were "good" lawyers.[15] Even so, defense counsel seemingly recognized that at least some of the cooperating witnesses were represented by good lawyers. For example, during Derrick Sanders' cross-examination, defense counsel stated, "[y]ou had a very fine lawyer that helped you, Mr. Craig Washington, sitting back here in the

[15] Each cooperating witness testified he or she was represented by a lawyer who was often even present in the courtroom during his or her testimony. *See* (Doc. No. 208, Trial Tr. Day 4 PM at 46, 70, 169) (Testimony of Gerron Hall and Alfred Hoskins); (Doc. No. 326, Trial Tr. Day 5 PM at 119) (Testimony of Rhonda Skillern-Jones); (Doc. No. 225, Trial Tr. Day 2 PM at 81) (Testimony of Derrick Sanders); (Doc. No. 227, Trial Tr. Day 4 AM at 159) (Testimony of Luis Tovar).

courtroom; right?" (Doc. No. 225, Trial Tr. Day 2 PM at 81:24–25) (Testimony of Derrick Sanders). Also, during Gerron Hall's cross-examination, while he was questioned about his awareness of his plea deal's sentencing consequences, defense counsel stated, "[w]ell, I know your lawyer. So I know he explained [the consequences] to you, right?" (Doc. No. 208, Trial Tr. Day 4 PM at 70) (Testimony of Gerron Hall). These comments suggest defense counsel solicited testimony that the coconspirators were represented by "good" lawyers.

There is also no suggestion the isolated adjective "good" had any prejudicial impact. As a result, a new trial based on this comment is unwarranted. *United States v. Castillo*, 77 F.3d 1480, 1497 (5th Cir. 1996) (explaining that for "improper comment or questioning to represent reversible error, it generally must be so pronounced and persistent that it permeates the entire atmosphere of the trial").

**b. Challenge 2**

Second, Hutchison alleges the Government improperly shifted the burden of proof to the Defendants which warrants a new trial. As previously described in detail, defense counsel highlighted in closing argument that the Government did not call Larry Nabors as a witness. In response, the Government told the jury, "[t]he defense obviously has the ability to call witnesses too. They've called a lot of witnesses in this case. They're free to call who they want." (Doc. No. 251, Trial Tr. Day 19 PM at 135:20–136:12) (Government Rebuttal Closing Argument).

As noted above, the defense did not object to these statements contemporaneously but objected only after completion of final arguments and the jury was released for the day. The Court overruled that objection as untimely, but it, nevertheless, did provide a curative instruction the next day before the jury started its deliberations. (Doc. No. 251, Trial Tr. Day 19 PM at 143:21–145:2).

Hutchison claims this rebuttal statement improperly places a burden of proof on the Defendants. Nevertheless, the Fifth Circuit has repeatedly considered and rejected this argument. *See, e.g.*, *United States v. Stephens*, 571 F.3d 401, 408 (5th Cir. 2009) (explaining a prosecutor may say that the defense has the ability to call witnesses in response to defendant's allegation that the government did not call a witness); *United States v. Waguespack*, 935 F.3d 322, 335 (5th Cir. 2019) (holding the same); *cf. United States v. Wharton*, 320 F.3d 526, 538 (5th Cir. 2003) ("A prosecutor is prohibited from commenting directly or indirectly on a defendant's failure to testify or produce evidence.") Here, the Government was not directly commenting on the Defendants' failure to produce evidence. Instead, the Government was responding to defense counsel's closing argument which emphasized the Government's failure to call Larry Nabors. Viewed in context, the Government's remarks were not improper.

Moreover, even if the remarks were improper, the first thing the Court did once the jury was brought into Court the next morning was give a curative instruction—*before they began deliberations*—that the burden of proof is always on the Government and that the defense never has an obligation to call any witnesses. The Court instructed the jury as follows:

> First of all, the burden of proof is always on the government; secondly, the defense has no obligation to call any certain witness or any witness at all; and then -- and then, thirdly, that it's perfectly proper for defense counsel to point out what they believe are holes in the government's case, and if that hole is also the -- they didn't call a certain witness, that's proper argument, and they can point that out.

(Doc. No. 247, Trial Tr. Day 20 AM at 3).

Nevertheless, Hutchison argues that this cautionary instruction was given too late, since closing arguments finished in the evening and the Court gave the curative instruction the next day before the jury began its deliberations. The timing of the instruction was a result of the fact that counsel did not timely object. No objection was made during the argument. After the Government

finished its argument, still no objection was made. It was late in the evening, and the Court excused the jury to return the next morning. It was only after the jury left that an objection was finally made. (Doc. No. 251, Trial Tr. Day 19 PM at 143:22–18). Since no objection was lodged in a timely fashion, it is somewhat incredulous that Hutchison is making a claim about the timeliness of the Court's instruction. That being said, the next morning the Court gave the above-referenced instruction immediately after the jury was seated and before deliberations began. The Court gave its curative instruction as soon as it was feasible, and Hutchison has not directed the Court to any authority indicating the overnight time-period may have caused sufficient prejudice to warrant a new trial. Therefore, any improper burden-shifting that may have occurred was cured through this timely instruction. *See Stephens*, 571 F.3d at 408; *Waguespack*, 935 F.3d at 335.

Within his second challenge, Hutchison also argues that it was improper for the Government to suggest in its rebuttal that Nabors would have perjured himself, since that was not evidence adduced at trial. Specifically, the Government said: "One thing the Constitution provides is that the government is not allowed to call witnesses who we believe will perjure themselves." (Doc. No. 251, Trial Tr. Day 19 PM at 135:20–136:12) (Government Rebuttal Closing Argument).

As discussed above, a prosecutor is prohibited from referring to any evidence that was not admitted at trial. *United States v. Anderson*, 755 F.3d 782, 797 (5th Cir. 2014). Hutchison attempts to characterize the Government's statement here as a "fact" that was not in evidence. Nabors did not testify. So, whether or not he may have perjured himself was not a fact in evidence. The Government's actual statement was not a direct statement about Nabors. Instead, it was an unspecific reference that could be understood as a response to defense counsel's focus on Nabors' absence in closing arguments.

First, no timely objection was made. Even assuming, *arguendo*, that this statement was improper, it cannot be said that this statement met the "high bar" of casting serious doubt on the correctness of the jury's verdict. *Aguilar*, 645 F.3d at 325. As previously stated, Nabors did not testify, so his credibility was not an issue for the jury to determine. Furthermore, any reference to Nabors was in opening statements and closing arguments, and the jury was properly instructed that those statements were not evidence it could consider in its deliberations. Hutchison has not overcome the presumption that the jury followed those instructions in arriving at its guilty verdict. Hutchison's second challenge fails.

**c. Challenge 3**

Third, Hutchison claims the Government misled the jury during closing arguments that evidence of a payment, regardless of any *quid pro quo*, constituted a bribe. When reading the Government's closing arguments in context, in light of the jury instructions, it is clear the Government was arguing the coconspirators accepted payment in exchange for assigning and approving HISD projects to and by Hutchison. Hutchison's argument is simply another version of his bribes versus gratuities argument, which the Court has repeatedly rejected. The Government did not mislead the jury that it could convict Hutchison for making gratuity payments rather than bribes. As a result, this challenge fails.

Overall, Hutchison's claims of prosecutorial misconduct fail, and his motion is denied as to those issues.

**D. Hutchison's Challenges to the Tax Counts (Counts 27 & 28)**

The jury convicted Hutchison on two counts of willfully filing false tax returns in violation of 26 U.S.C. § 7206(1). (Doc. No. 160 at 10) (Jury Verdict). Under 26 U.S.C. § 7206(1), a person who "[w]illfully makes and subscribes any return, statement, or other document, which contains

or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter" is guilty of a felony. Hutchison argues the Government failed to prove that he made false statements that were material and that he willfully violated § 7206(1).

Counts 27 and 28 involved Southwest Wholesale's Corporation Income Tax Returns (Form 1120) for 2017 and 2018, respectively. The Superseding Indictment alleged Hutchison knowingly (a) overreported his cost of goods sold; (b) underreported his total income; and (c) underreported his taxable income, which resulted in Hutchison (d) substantially underreporting and underpaying his total tax amount. (Doc. No. 42 at 17–18) (Superseding Indictment). Specifically, the Government alleged that Hutchison wrote checks from his business, Southwest Wholesale, addressed to individuals who then cashed the checks and returned a majority of the cash to Hutchison. Then, Hutchison deducted those checks as business expenses on his business' tax returns when they were not legitimate business expenses. The individuals Hutchison allegedly used to cash checks in this scheme were Ted Theilen (or his company, Bulldog Timber) and Ulysses Tejada, who both testified at trial.

Ted Theilen owned Bulldog Timber, a timber factoring business[16] located in Cleveland, Texas. (Doc. No. 240, Trial Tr. Day 12 PM at 88) (Testimony of Ted Theilen). On the side, Theilen had a check-cashing business where he would cash checks for a 3% fee. (*Id.* at 90). Theilen cashed checks for Hutchison and other gamblers. (*Id.* at 99). It was Theilen's understanding that Hutchison

[16] Bulldog Timber bought "timber tickets," which loggers received once they delivered a truck load of logs to a timber mill. The timber mill did not pay the loggers right away. Instead, the mill would pay the logger within a week or ten days after their delivery through the timber ticket. Bulldog Timber would buy the loggers' timber tickets at a discount, so the logger received cash immediately for their load, and the timber mill later paid Bulldog Timber the face value of the timber ticket after seven to ten days. Bulldog Timber did not do any landscaping work, nor did it do any work for HISD. (Doc. No. 240, Trial Tr. Day 12 PM at 88–89, 99) (Testimony of Ted Theilen).

used the check proceeds from the checks Theilen cashed to pay gambling debts, and that with these checks, "[Hutchison] was hiding gambling money from his company." (*Id.* at 115).

Ulysses Tejada had known Hutchison for years because his mother, stepfather, and brother all worked for him at Southwest Wholesale. (Doc. No. 228, Trial Tr. Day 6 PM at 40–41) (Testimony of Ulysses Tejada). Tejada was also one of the contract mowers Hutchison hired to complete landscaping contracts at HISD schools. (*Id.* at 51–52). When Hutchison and Southwest Wholesale paid Tejada for mowing work, the check was addressed to Tejada's mowing company. (*Id.* at 66–71). At times, Hutchison wrote Southwest Wholesale checks to Tejada personally, which Tejada cashed at Hutchison's instruction, returning virtually all of the cash from the check to Hutchison. (*Id.*). In return for facilitating this "transaction," Tejada would keep a small portion of the cash. (*Id.*).

At trial, the Government demonstrated that Hutchison included the checks written to Bulldog Timber and Ulysses Tejada as business expenses on Southwest Wholesale's tax returns. The checks were from Southwest Wholesale LLC's account, not Hutchison's personal account. *See* (GEX 710-B, Doc. No. 196-13); (GEX 710-A, Doc. No. 196-12). IRS Special Agent Webb analyzed Hutchison's Southwest Wholesale 2017 and 2018 tax returns and identified the specific checks Hutchison deducted as costs of goods sold. (Doc. No. 242, Trial Tr. Day 13 PM at 105–108) (Testimony of Jason Webb). Agent Webb explained that one Bulldog Timber check and sixteen Tejada checks in 2017, and six Bulldog Timber checks and twelve Tejada checks in 2018 were included as business expenses. (GEX 701, Doc. No. 196-1) (2017 Checks); (GEX 702, Doc. No. 196-2) (2018 Checks).

As to the Bulldog Timber checks, Theilen testified that he did not complete any work for HISD let alone complete any of the work mentioned in the memo lines of the Southwest Wholesale

checks. (*Id.* at 99). For example, a 2018 check from Southwest Wholesale to Bulldog Timber included the memo "Sharpstown Drainage." (GEX 712-B, Doc. No. 196-17). Thielen testified that he had no idea what Sharpstown drainage was, nor did he do any drainage work at Sharpstown school. (Doc. No. 240, Trial Tr. Day 12 PM at 100) (Testimony of Ted Theilen). Agent Webb testified that the cash from these checks was used to cover Hutchison's gambling expenses, and payments to gamblers were not a legitimate business expense of Southwest Wholesale. (Doc. No. 242, Trial Tr. Day 13 PM at 111) (Testimony of Jason Webb).

As to the Tejada checks, Tejada actually did contract work for Hutchison at HISD. Tejada testified that when he was paid for legitimate mowing expenses, the checks from Southwest Wholesale were made out to his company, instead of him personally. (Doc. No. 228, Trial Tr. Day 6 PM at 66–71) (Testimony of Ulysses Tejada). Each of the checks at issue were addressed to Tejada personally, rather than his company, indicating they were not for Tejada's mowing expenses. (*Id.* at 67–69). Tejada testified that he cashed the checks, returned virtually all of the money from these checks in cash to Hutchison, and that Hutchison issued him a 1099 tax form for that money. (*Id.* at 66–71). According to this testimony, these checks were improperly included as materials expenses of Southwest Wholesale on its tax returns. (Doc. No. 242, Trial Tr. Day 13 PM at 119) (Testimony of Jason Webb).

### 1. False and Material Statements

First, Hutchison argues that the Government failed to prove that he made false statements on an income tax return that were material, as required under 26 U.S.C. § 7206(1). He contends the Government failed to show the payments to Tejada were false because they were legitimate business expenses. Hutchison primarily focuses on the five 2018 checks addressed to Tejada with memo lines related to Welch Middle School. As previously stated, Tejada testified that when

Hutchison paid him for legitimate mowing expenses, the checks from Southwest Wholesale were addressed to Tejada's company, not Tejada personally. (Doc. No. 228, Trial Tr. Day 6 PM at 66–71) (Testimony of Ulysses Tejada). The checks at issue that referred to Welch Middle School were addressed to Tejada personally, rather than his company. That being the case, they were not for Tejada's mowing expenses. (*Id.* at 67–69). Tejada testified that he returned virtually all of the money from these checks in cash to Hutchison. (*Id.* at 66–71).

To undermine Tejada's testimony, Andrea Hutchison, Hutchison's sister and former Southwest Wholesale employee, and Mark McClure, who worked various jobs for Hutchison, both testified that Welch Middle School was a real job for which Southwest Wholesale completed work. (Doc. No. 249, Trial Tr. Day 17 PM at 37) (Testimony of Mark McClure); (*Id.* at 110) (Testimony of Andrea Hutchison). Moreover, Andrea Hutchison testified that she recalled Tejada was one of the subcontractors who worked on the Welch Middle School project. (*Id.* at 110) (Testimony of Andrea Hutchison). Through this testimony, Hutchison argues that Tejada clearly did work at Welch Middle School and so the checks made out to Tejada personally with "Welch" written in the memo line were obviously legitimate expenses.

While Hutchison characterizes Tejada's testimony about the checks as "dubious," (Doc. No. 296 at 88), it was entirely within the jury's province to assess the weight of all the evidence presented and the credibility of the witnesses, resolving any inconsistencies in the testimony. *United States v. Gardea Carrasco*, 830 F.2d 41, 44 (5th Cir. 1987); *see Scully*, 951 F.3d at 672 (5th Cir. 2020) (a jury is entitled to reject defendant's explanation of the evidence and instead credit other testimony). From the evidence presented, the jury reasonably could have concluded that the checks made out to Tejada personally were not for work Tejada or his company completed for Southwest Wholesale, so the checks were not for legitimate business expenses. Yet, Hutchison had

them deducted on Southwest Wholesale's tax returns. As a result, the evidence supports the jury's conclusion that Hutchison made false statements on his tax return.[17]

**2. Willfulness**

Hutchison also argues the Government failed to prove beyond a reasonable doubt that he made any false statement willfully. Willfulness is defined as "the voluntary, intentional violation of a known legal duty." *Cheek v. United States*, 498 U.S. 192, 201 (1991). If the defendant acted pursuant to a good-faith belief that he was acting within the law, even if that belief was unreasonable or incorrect, the defendant did not act willfully. *United States v. Simkanin*, 420 F.3d 397, 410 (5th Cir. 2005). Likewise, if the defendant relied in good faith on advice from a tax professional and he provided that tax professional with a complete disclosure of all relevant facts, the defendant did not act willfully. *United States v. Masat*, 948 F.2d 923, 930 (5th Cir. 1991).

First, Hutchison attempts to blame his accountants, claiming he relied on them in good faith, and any errors stemming from his miscommunications were not a knowing violation of the law. The testimony demonstrated that Hutchison's bookkeeper and accountants took direction from Hutchison's own notations on the checks which indicated that the payments were for items like "Sharpstown Drainage," "Welch Floor Repairs," and "Hillard E.S. haul, demo, clear," and classified the payments in the general ledger and tax returns accordingly: as deductible business expenses. (GEX 702, Doc. No. 196-2). They regularly reviewed the general ledger and tax returns with Hutchison, and Hutchison did not correct the classifications in question and ultimately signed the tax returns with these classifications. (Doc. No. 238, Trial Tr. Day 11 PM at 152–155)

[17] Regarding materiality, Hutchison claims that since the Tejada checks were, in his eyes, legitimate business expenses, only one Bulldog Timber check was improperly deducted in 2017. That check was for $14,000. Without support, Hutchison claims this amount was unlikely to influence any decision of the IRS, and so it was not a material item. As the Court explained, it was reasonable for the jury to conclude that the checks addressed to Tejada were not legitimate business expenses that were also deducted on Hutchison's 2017 tax return, so this argument fails.

(Testimony of George Baugh). From this, the jury could reasonably find that Hutchison willfully made false statements, and that he did not rely in good faith on a tax professional. The evidence demonstrated that he clearly knew that these were not legitimate business deductions.

Second, Hutchison claims the evidence demonstrated his gambling addiction and that he used the money from the checks cashed at Bulldog Timber to pay his various gambling debts. As a result, he claims he "was not trying to hide income or avoid payment of taxes." Instead, he maintains this demonstrates that he just was a bad gambler. (Doc. No. 296 at 101). First, the Court notes that being a bad gambler and being guilty of tax fraud are not mutually exclusive. Second, Hutchison presented this defense to the jury, and, to the extent this actually constituted a defense, the jury declined to believe it. The jury heard testimony that Hutchison was "not too good" of a poker player and that he paid gambling debts with checks he cashed at Bulldog Timber. (Doc. No. 232, Trial Tr. Day 13 AM at 53–61) (Testimony of Ayaz Mahmood); (Doc. No. 240, Trial Tr. Day 12 PM at 94) (Testimony of Ted Theilen). This testimony, however, does not support these checks as being legitimate, deductible business expenses of Southwest Wholesale. The jury found Hutchison guilty of Counts 27 and 28 because, again, these were not legitimate business deductions.

Overall, there was overwhelming evidence to support that Hutchison willfully filed false tax returns for both 2017 and 2018. There was also substantial evidence for the jury to reasonably conclude that he understood that the Bulldog Timber and Tejada payments were not for legitimate business expenses, yet he deducted them as such. Based on the evidence, it was reasonable for the jury to conclude that Hutchison did not hold a good-faith belief that he was acting within the law and willfully violated § 7206(1). To conclude, the evidence supports the jury's verdict on Counts

27 and 28, so Hutchison's motion for acquittal or, in the alternative, new trial is denied as to those counts.

**E. Hutchison's Ineffective Assistance of Counsel Claim**

The Court now arrives to Hutchison's final challenge. He claims his trial counsel was so ineffective and incompetent that he should be granted a new trial on all counts. Under *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is entitled to a new trial when counsel's performance falls below an objective standard of reasonableness and the outcome of the proceeding was prejudiced as a result. *Id.* at 687–89. Courts apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. "Surmounting *Strickland*'s high bar is never an easy task," *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010), and Hutchison fails to do that, here.

Hutchison argues that his trial counsel was ineffective in three respects: by failing to call Larry Nabors as a witness, by failing to cross-examine Tejada on work he performed for Southwest Wholesale, and by failing to object on authenticity grounds to Google's subpoena response, introduced and testified to by Agent Webb. As to Nabors, his lawyer had told defense counsel that if called to testify, Nabors would plead the Fifth Amendment. Assuming hypothetically that someone had asked to call Nabors and that this Court would have allowed Nabors to plead the Fifth Amendment in front of the jury, it may have made Hutchison look more guilty in the jury's eyes. As previously stated, if a judge sustains a witness' assertion of his Fifth Amendment privilege, the defendant has no right to call the witness merely to force him to invoke his rights on the stand. *Lyons*, 703 F.2d at 818. Hutchison's counsel were experienced trial counsel and no doubt knew this principle. Secondly, the record demonstrates that even had Nabors testified exactly how Hutchison desired (corroborating Hutchison's story regarding the wire fraud Counts 23 and 24),

the jury's verdict was still supported by a wealth of other uncontroverted evidence. Further, the decision *not* to call Nabors could have been a reasonable, strategic choice for Hutchison's trial counsel, since he could have testified consistently with the Government's position. Hutchison has not shown that his counsel performed unreasonably or in a manner that prejudiced him.

Second, Hutchison contends his trial counsel should have cross-examined Tejada more thoroughly to rebut his testimony regarding the Welch Middle School checks. Tejada did not deny that he performed legitimate work for Hutchison that was covered by checks made payable to his company. It was only the checks made to him personally which he cashed and returned the funds to Hutchison that were the basis for the tax fraud charges. Moreover, the decision as to what is included in an examination of a witness by counsel falls squarely within the exercise of reasonable professional judgment. It is clear that "[t]he decision whether to cross-examine a witness, and if so, how vigorously to challenge the witness' testimony, requires a quintessential exercise of professional judgment." *Ford v. Cockrell*, 315 F. Supp. 2d 831, 859 (W.D. Tex. 2004), *aff'd*, 135 F. App'x 769 (5th Cir. 2005). Hutchison's defense counsel put on the testimonies of Andrea Hutchison and Mark McClure in an attempt to contradict Tejada's testimony and undermine his credibility and, the jury chose to reject this defense.. (Doc. No. 249, Trial Tr. Day 17 PM at 37) (Testimony of Mark McClure); (*Id.* at 110) (Testimony of Andrea Hutchison). This argument lacks merit.

Finally, Hutchison claims his trial counsel lawyers were deficient due to their failure to object to Agent Webb's testimony and GEX 997, the subpoena response from Google explaining Google had no email servers in the state of Texas during the relevant time period. *See* (GEX 997, Doc. No. 200-33). On this topic, the Court agrees with the Government's assessment of this element as presented in the hearing on this motion. This Court admits whatever exhibits it can at

the Final Pretrial Conference so that the jury's time is not wasted by having to hear witnesses answer routine questions to prove up documents that all sides know are admissible or can easily be proven to be admissible. Consequently, the objection would have first had to have been made before trial. Had Hutchison's trial counsel objected to GEX 997, the Government would have provided the Court with an affidavit from Google setting out the facts that would make it admissible. Had counsel then lodged an objection to that affidavit, the Government would have asked the Court to hold a hearing on it. Had the Court still sustained defense counsel's objection to GEX 997's admission, the Government would have called a witness from Google to testify to the contents of the letter. Such testimony would have been clearly admissible. Moreover, a live witness would likely have been more effective for the Government and would have destroyed any chance of Hutchison attacking the interstate commerce issue. The Government had weeks to procure and call such a witness, and it could have been done so easily. Of added import in this present challenge, no one provided any evidence to suggest GEX 997 was incorrect. Hutchison fails to demonstrate how this "failure" to object was unreasonable or that it prejudiced him in any way.

For the foregoing reasons, Hutchison's Motion for Judgment of Acquittal or New Trial Under Rules 29 and 33 is denied in its entirety.

## IV. Brian Busby's Motion for Acquittal or New Trial Under Rules 29 and 33 (Doc. No. 294)

In his motion, Busby challenges his convictions for bribery, witness tampering, and willfully filing false tax returns. Busby also moves to dismiss the Superseding Indictment. Like Hutchison, Busby argues that the Government engaged in prosecutorial misconduct warranting a new trial. Busby raises some arguments that are duplicative of those raised by Hutchison, which

the Court has already addressed. Where appropriate, the Court will refer to its prior analysis regarding the same issues from Hutchison's motion.

**A. Busby's Challenges to the Bribery Counts (Counts 8–13)**

The jury convicted Busby of six counts of federal programs bribery under 18 U.S.C § 666(a)(1)(B) (Counts 8–13). (Doc. No. 153 at 20–22) (Final Jury Instructions); (Doc. No. 160) (Jury Verdict). Busby makes similar arguments to Hutchison regarding these counts, and he asks the Court to vacate his convictions or in the alternative grant him a new trial. The Court will address his arguments in turn.

**1. Alleged Improper Statements by the Prosecution**

Like Hutchison, Busby claims numerous statements by the Government were improper and that their cumulative impact resulted in prejudice to Busby. First, Busby, like Hutchison, argues the Government tried a "gratuities" case, despite the Supreme Court's decision in *Snyder* holding that § 666 does not criminalize gratuities. As previously discussed, despite the fact that there was not a second Superseding Indictment post-*Snyder*, the Government's presentation of evidence demonstrates that it tried a bribery case, and the evidence was sufficient to demonstrate *quid pro quo* bribery. If anyone attempted to prove these payments were gratuities, it was the defense.

Specifically, as to the cooperating witnesses, Busby argues that the Government, through its lines of questioning, misled the jury and misstated the law as to § 666. Busby seems to suggest that because the cooperating witnesses' plea agreements were executed before *Hamilton* and *Snyder*, they all pleaded guilty to accepting *gratuities*, not bribes. Because of this, Busby argues that the Government's questioning of the cooperating witnesses regarding their plea agreements "corrupted the entire trial" because it confused the jury into thinking that they could convict Hutchison and Busby under § 666 for *gratuities*, rather than *quid pro quo* bribes. Busby focuses

on Hoskins' testimony specifically, arguing that it clearly demonstrated the Government's attempt to confuse the jury regarding the law applicable to § 666. At one point on cross-examination, defense counsel asked Hoskins "This was a gift, right? That's what you thought it was?" (Doc. No. 209, Trial Tr. Day 5 AM at 119) (Testimony of Alfred Hoskins). Hoskins responded, "Yes, sir. Yes, sir." (*Id.*). On re-direct, the Government questioned Hoskins about his plea agreement, and Hoskins affirmed the fact that he pleaded guilty to conspiracy to commit bribery and that he swore under oath that the factual basis for his guilty plea was true. (*Id.* at 90–93).

First, this argument myopically focuses on small portions of Hoskins' testimony and necessarily ignores his testimony as a whole, which clearly established a *quid pro quo* between Hoskins and Hutchison as described previously. It was also reasonable for the Government to discuss Hoskins' plea agreement with him on re-direct to attempt to address the testimony Busby notes that defense counsel elicited from Hoskins. Moreover, the Government elicited testimony and submitted evidence demonstrating a *quid pro quo* between Hutchison and each of the cooperating witnesses. Even assuming that each cooperating witness pleaded guilty to accepting gratuities—which they clearly did not do—the testimony at trial was sufficient to establish the *quid pro quo* required to convict under § 666. Busby fails to demonstrate how the Government's questioning was improper. Even if the remarks were somehow improper, he also fails to show that this questioning impacted Busby's substantial rights. *See Aguilar*, 645 at F.3d at 324–25) (describing that prosecutorial remarks must both be improper and affect the defendant's substantial rights to result in reversible error).

On this topic, Busby also argues the Government's closing argument was improper because it misstated the law and improperly vouched for the cooperating witnesses. For the same reasons stated above, the Government did not misstate the law regarding § 666 nor did it improperly vouch

for the cooperating witnesses during closing arguments. These arguments fail for the same reasons already discussed.

### 2. Challenges to the Jury Instructions and the Verdict Form for § 666

Next, Busby claims the jury instructions were improper because they: (1) equated bribery with "receipt of money payment;" (2) failed to instruct the jury regarding the specific "official act" required to prove each violation of § 666; (3) used the term "mere" when describing a gratuity; and (4) failed to properly instruct the jury regarding the nature and timing of the agreement required to violate § 666.

First, Busby claims the Verdict Form invited error by the jury because it improperly equated "receipt of money payment" with the crimes Busby was charged with in Counts 8 through 13: bribery concerning programs receiving federal funds. Busby claims this effectively told the jury that accepting a gift or a gratuity equates to bribery.[18]

The Verdict Form regarding each bribery count with respect to Busby (Counts 8–13) stated the following:

> **Count 8:** Alleging Bribery Concerning Programs Receiving Federal Funds, namely, receipt of money payment on or about September 16, 2017
>
> We, the Jury, unanimously find defendant **BRIAN BUSBY**:
>
> ____________ Not Guilty ____________ Guilty

(Doc. No. 160 at 4) (Jury Verdict). Each bribery count on the Verdict Form reflected the respective count number and the date of payment alleged in the indictment for that count.

[18] Defense counsel raised this concern about the "receipt of money payments" phrase in the verdict form at the final charge conference, and counsel agreed that the objection could be fixed by adding the term "alleging" to the title of the count. The Court made this change, and counsel approved of the additional language, agreeing that it addressed his concerns with this part of the Verdict Form. (Doc. No. 250, Trial Tr. Day 18 PM at 205–12).

Busby suggests that the use of the word "namely" could be read to suggest that the second phrase "receipt of money payment" is an example of the first phrase. Verdict forms are not read in isolation. The Verdict Form must be read in tandem with the Court's Final Jury Instructions, which informed the jury's deliberations. *See United States v. Piper*, 912 F.3d 847, 860–62 (5th Cir. 2019) (explaining that verdict forms are considered part of the jury instruction and courts evaluate their combined effect on the jury); *United States v. Jones*, 132 F.3d 232, 245 (5th Cir. 1998), *aff'd*, 527 U.S. 373 (1999) (explaining that confusion created by a verdict form may be cured by a jury instruction).

The Court explicitly instructed on Counts 8 through 13 that the jury must find the existence of a *quid pro quo* to convict Busby. These instructions also made it clear to the jury that a payment amounting to "mere gratuities" or "gifts" with "no intent to act on a person's behalf in exchange for the thing of value" were not criminalized by the statute. (Doc. No. 153 at 21–22) (Final Jury Instructions). Read alongside the Court's instructions, the Verdict Form did not allow the jury to convict Busby for *only* receiving a money payment; the jury was required to find a *quid pro quo* in order to convict. The use of "receipt of money payment" on the Verdict Form did not expressly contradict the instructions provided to the jury regarding the elements of the bribery charges. *Cf. Jones*, 664 F.3d at 981–82 (finding the use of a lower *mens rea* on a verdict form than that required by statute resulted in reversible error because the verdict form "expressly contradicted what the district court said in its charge"). The inclusion of "receipt of money payment" did not change the essential elements of § 666 bribery on which the jury was also expressly instructed. Thus, the Court finds that this was not error.

In Busby's next argument, he claims the Court erred by omitting any definition of "official act" in the jury instructions. As explained in Section III.A.2, § 666 does not contain an "official

act" element nor was the proffered instruction accurate, so the Court properly declined to instruct the jury with the proffered definition. This challenge fails.

Busby next complains of the Court's use of the qualifying word "mere" before "gratuity" when it instructed the jury that § 666 "does not criminalize soliciting, demanding, accepting, or agreeing to accept *mere gratuities*, gifts, or donations to a charitable organization, political candidate, or party with no intent to act on a person's behalf in exchange for the thing of value." (Doc. No. 153 at 21–22) (Final Jury Instructions) (emphasis added). He argues this phrasing suggested to the jury that only small or slight gratuities are excluded from criminal liability, while "non-mere" or large gratuities are criminal.

This language mirrors that which the Fifth Circuit used in *United States v. Hamilton*. 46 F.4th at 399 ("Section 666 criminalizes only a *quid pro quo*, not *mere* gratuities.") (emphasis added). Accordingly, the Court finds no error. Nevertheless, any potential error that may have been introduced by using the word "mere" was certainly removed by the Court's other instructions surrounding the term "mere." From the Court's instructions, it was clear the jury must find the existence of a *quid pro quo*, the defendant's specific intent to act on someone's behalf in exchange for a thing of value from that person, and an intent to exchange, among other things. (Doc. No. 153 at 21–22) (Final Jury Instructions). A gift from that person, whether it be simple or extravagant, standing on its own, would not satisfy this element of the statute as made clear by these other additional instructions. As a result, this challenge fails.

In Busby's next challenge to the § 666 jury instructions, he argues the Court failed to instruct the jury that an agreement between the bribe payor and payee must exist *before* the agreed-upon official act. He claims this was a significant and prejudicial omission under the law that warrants acquittal or a new trial. While it is true the instructions did not use the term "before" when

describing when the agreement must occur, the instructions did state that "the defendant must have had a specific intent to act on a person's behalf in exchange for a thing of value received from a person." (Doc. No. 153 at 21) (Final Jury Instructions). Busby's chief concern is his contention that the instructions allowed the jury to convict him if they found he "accepted money as a thank-you gift for an official act already taken." (Doc. No. 294 at 39). As previously stated, the instructions clearly explained that the statute did not criminalize gratuities or gifts, and that the Government must prove the existence of a *quid pro quo* agreement and exchange beyond a reasonable doubt for the jury to convict. Therefore, this challenge fails.

Busby also claims the Verdict Form constructively amended the Superseding Indictment because it broadened the charges against him. First, he repeats his prior argument and claims the Verdict Form improperly equated receiving money with bribery which allowed the jury to convict him for receiving legal gratuities. The Court already found this argument to lack merit.

Second, Busby claims that neither the Verdict Form nor the Jury Instructions included the alleged payment amount or the alleged official act purportedly taken in exchange for the alleged payment, which he claims are both essential elements of the crime charged. As a result, he claims the jury was able to convict him for conduct not alleged in the Superseding Indictment.

According to the statute and as recommended by the Fifth Circuit Pattern Jury Instructions, the alleged payment *amount* and the official act purportedly taken in exchange for the alleged payment are not elements of a violation of the statute. *See* 18 U.S.C. § 666(a)(1)(B); FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL CASES) § 2.33B (2024). First, the Fifth Circuit has explained that "[t]he term '*anything* of value' in § 666(a)(1)(B) is broad in scope and contains no language restricting its application to transactions involving money, goods, or services." *United States v. Marmolejo*, 89 F.3d 1185, 1191–92 (5th Cir. 1996) (emphasis in original). As a result, the

amount of the payment is not an essential element of the crime since there need not even be a money payment at all. *Anything* of value could be used to effectuate a bribe or a corrupt *quid pro quo* under § 666. *Id.* (holding conjugal visits at issue in that case qualified as "anything of value" as contemplated by § 666(a)(1)(B)).

Second, a *specific* official act is also not an essential element of bribery under § 666. Bribery "can be accomplished through an ongoing course of conduct," and does not require the government or jury to link every dollar paid to a specific action performed. *See Ganim*, 510 F.3d at 148–49 ("[B]ribery can be accomplished through an ongoing course of conduct, so long as evidence shows that the favors and gifts flowing to a public official [are] in exchange for a pattern of official actions favorable to the donor.") (internal quotation omitted); *Jefferson*, 674 F.3d at 359 (explaining that the prosecution can demonstrate bribery through an "ongoing course of conduct" and it need not show that the defendant intended each payment to be tied to a specific official act); *Wright*, 665 F.3d at 568 ("The bribery theory does not require that each *quid*, or item of value, be linked to a specific *quo*, or official act. Rather, a bribe may come in the form of a 'stream of benefits.'"). Many § 666 bribery cases may involve an identifiable and particularized official act, but that is not required to convict. Simply put, the Government is not required to tie or directly link a payment to one *specific* official act by Busby. "The intent that must be proven is an intent to corruptly influence or to be influenced 'in connection with any business' or 'transaction,' not an intent to engage in any specific *quid pro quo*." *United States v. McNair*, 605 F.3d 1152, 1188 (11th Cir. 2010) (quoting 18 U.S.C. § 666). Here, the jury instructions included the "*quo*" of "the intent to be influenced in connection with any business, transaction, or series of transactions of the Houston Independent School District." (Doc. No. 153 at 21) (Final Jury Instructions). This was a sufficient instruction on the required "*quo*," and so this challenge fails.

Overall, the Court finds that Busby's challenges to the jury instructions and the Verdict Form regarding § 666 ultimately fail. The Court also finds that the instructions and Verdict Form did not result in a constructive amendment of the Superseding Indictment.

**3. Busby's Challenges to Government's Exhibit 1: The Ledger**

Next, Busby challenges the admission of GEX 1, arguing it was not properly authenticated as a statement of a coconspirator made during and in furtherance of the conspiracy. As a result, he claims the ledger contained testimonial statements, the admission of which, Busby contends, violated his Sixth Amendment rights.

The Confrontation Clause of the Sixth Amendment guarantees the right of a criminal defendant to confront the witnesses against him. *Ceballos*, 789 F.3d at 613. "Specifically, the Clause bars the introduction of testimonial evidence against a criminal defendant unless the proponent shows both that the declarant is unavailable and that the defendant had 'a prior opportunity for cross-examination.'" *Id.* at 613–14 (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). Coconspirator statements made during the course and in furtherance of a conspiracy are generally not testimonial in nature and their admission at trial is not a violation of the Confrontation Clause. *Jackson*, 636 F.3d at 692.

As previously discussed, the Court found that the Government properly authenticated GEX 1 as a statement of a coconspirator made during the course of and in furtherance of the conspiracy. As a result, the ledger was not testimonial in nature, and its admission did not violate Busby's rights under the Sixth Amendment. *See id.* This argument fails, and the Court need not conduct a full *Crawford* analysis, here.

#### 4. Sufficiency of the Evidence Regarding Busby's Bribery Convictions

In Busby's final challenge to the bribery convictions, he claims the evidence at trial was insufficient for any reasonable jury to conclude beyond a reasonable doubt that he committed the crimes charged. Specifically, Busby argues the Government failed to present evidence that he agreed to take a specific official act in exchange for payment. Relying on *McDonnell* and § 201's definition of "official act," Busby claims his actions of encouraging others to use Hutchison's companies, taking steps to expedite payment to Hutchison by HISD, and facilitating the Skillern-Jones' bribe transaction do not rise to the level of "official acts" under *McDonnell*.

As previously explained, based upon Fifth Circuit authority (and the consistent authority of all other circuits that have addressed the issue), *Snyder* did not impose § 201 and *McDonnell*'s definition of "official act" into the "*quid pro quo*" required by § 666. Section 666 captures acts falling into the "official act" definition of § 201 as well as other conduct. The statute prohibits corruptly accepting anything of value, "intending to be influenced or rewarded in connection with *any business, transaction, or series of transactions of such organization, government, or agency* . . . ." 18 U.S.C. § 666(a)(1)(B) (emphasis added). Nowhere does § 666 place any definitional limits on the business or transactions to be influenced—beyond requiring them to be "of" the organization receiving more than $10,000 in federal funding and to have a "value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B); *see Ng Lap Seng*, 934 F.3d at 133. As a result, the Court finds that the Government presented sufficient evidence of the acts Busby took which serve as the "*quo*" in the "*quid pro quo*" to support the jury's conviction.

At trial, the Government demonstrated that Busby and Hutchison had a longstanding agreement and arrangement where Busby would accept money and other "things of value" in exchange for being influenced and influencing others in connection with his work at HISD. For

example, there is evidence that Busby pressured Derrick Sanders to funnel work to Hutchison and his companies, telling Sanders that "we could all eat from it" if he did, suggesting they all would receive a financial benefit. (Doc. No. 225, Trial Tr. Day 2 PM at 35–36) (Testimony of Derrick Sanders). Sanders knew Busby was receiving money from Hutchison. (*Id.* at 53). The Government showed that Busby also influenced Alfred Hoskins to award jobs to Hutchison by suggesting he ask his direct report, Luis Tovar, to award Hutchison all or part of certain jobs under his supervision. (Doc. No. 209, Trial Tr. Day 5 AM at 72) (Testimony of Alfred Hoskins). Busby actually delivered a bribe payment to Rhonda Skillern-Jones and facilitated and influenced her relationship with Hutchison. (Doc. No. 326, Trial Tr. Day 5 PM at 28–33, 35–38) (Testimony of Rhonda Skillern-Jones). In sum, the evidence at trial, which the Court does not recount in its entirety here, was sufficient to show a *quid pro quo*, and specifically that Busby accepted things of value in exchange for being influenced and influencing others at HISD to give Hutchison and his entities business. This falls squarely within the act or "*quo*" contemplated by § 666. *See United States v. Rooney*, 37 F.3d 847, 851 (2d Cir. 1994) ("[Section] 666's manifest purpose is to safeguard finite federal resources from corruption and to police those with control of federal funds."). *See also Adams*, 760 F. Supp. at 19–23 (discussing the specificity of the "*quo*" required by § 666 and suggesting that a city mayor influencing the city's regulation of a specific foreign-owned building and consulate influencing would fall within § 666's *quo* requirement); *Owens*, 2026 WL 1350787, at *6 (suggesting that making a call to a city employee to accelerate an administrative deadline that could limit competition for a specific city-funded project might be a sufficient *quo* under § 666).

To conclude, each of Busby's challenges to his bribery convictions fail, and the Court denies his motion as to Counts 8 through 13.

**B. Busby's Challenge to the Conspiracy Count (Count 1)**

Count 1 of the Superseding Indictment charged Busby and Hutchison with a multi-object conspiracy under 18 U.S.C. § 371 consisting of three objects, all of which arise under § 666: (1) offering bribes, (2) soliciting and receiving bribes, and (3) defrauding HISD. (Doc. No. 42 at 2–9) (Superseding Indictment). The jury convicted Busby and Hutchison on Count 1. Busby raises two challenges.

First, Busby contends there is insufficient evidence that he accepted bribes in violation of § 666, and for the same reason, the conspiracy count is also supported by insufficient evidence. As explained before, the Government presented sufficient evidence that Busby accepted bribes, so this argument is unavailing.

Second, Busby contends it was error for the Court to instruct the jury on the third object of the conspiracy. He claims there was no evidence he conspired to commit the third object: defrauding HISD. He argues the evidence the Government submitted to support the third object was that of Hutchison's wire fraud (the mowing fraud and the Kiddie Cushion fraud), which Busby claims to have had no knowledge about. Thus, he could not have conspired with Hutchison to commit the wire fraud. As a result, he contends the jury was invited to convict him on an improper basis, and because the Verdict Form did not require the jury to specify which object of the conspiracy it unanimously found, this was reversible error.

A conviction for conspiracy under § 371 requires proof of "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Delgado*, 984 F.3d 435, 450 (5th Cir. 2021) (quotation omitted). The Government offered in the

Superseding Indictment three possible unlawful objectives all arising under 18 U.S.C. § 666, namely: (1) violation of § 666(a)(2) (offering bribes); (2) violation of § 666(a)(1)(B) (soliciting and receiving bribes); and (3) violation of § 666(a)(1)(A) (defrauding HISD).

At the final charge conference, the Court asked the Government what evidence supported the third object of the conspiracy (the § 371(c) charge), and the Government responded that it addressed the mowing fraud Hutchison was charged with in Counts 14 through 17 and 23 through 24 of the wire fraud counts. Busby argues that there were no allegations in the Superseding Indictment that he conspired to commit wire fraud, nor was there evidence at trial that Busby participated in or knew about the mowing fraud scheme. In other words, he contends there was no evidence at trial to support the Government's legal theory in the third object of the conspiracy.

A district court should not instruct the jury on a legal theory absent evidence to support that theory. *Lorenz v. Celotex Corp.*, 896 F.2d 148, 151 (5th Cir. 1990); *Foster v. Ford Motor Co.*, 621 F.2d 715, 717 (5th Cir. 1980). In this case, the Government produced sufficient evidence to permit the Court to instruct the jury on the third object of the conspiracy: defrauding HISD by violating § 666(a)(1)(A).

While there may not be eye witnesses who could testify that Busby participated in or knew of the mowing fraud scheme, there was significant circumstantial evidence from which the jury could conclude that Busby was aware of and agreed to the mowing scheme, if not to conclude that he more actively participated in it himself. The Government demonstrated Busby and Hutchison had a long-standing, close friendship. Even Busby himself testified to this. The two met in 2009 and became close friends, frequently spending time together socially. (Doc. No. 244, Trial Tr. Day 14 PM at 83–84) (Testimony of Brian Busby). This included multiple gambling trips to Las Vegas and Louisiana together, along with other coconspirators. (Doc. No. 236, Trial Tr. Day 15 AM at

40–41, 51–52) (Testimony of Brian Busby); (Doc. No. 326, Trial Tr. Day 5 PM at 23–24) (Testimony of Rhonda Skillern-Jones); (Doc. No. 225, Trial Tr. Day 2 PM at 27–28) (Testimony of Derrick Sanders). Although Busby denied receiving payments from Hutchison, (Doc. No. 236, Trial Tr. Day 15 AM at 49) (Testimony of Brian Busby), Hoskins and Skillern-Jones both testified that they knew Busby was also receiving bribes from Hutchison, and Hutchison's ledger reflected payments to "BB." (Doc. No. 225, Trial Tr. Day 2 PM at 53) (Testimony of Derrick Sanders); (Doc. No. 326, Trial Tr. Day 5 PM at 28–33, 35–38) (Testimony of Rhonda Skillern-Jones); (GEX 1, Doc. No. 177). Hutchison also remodeled Busby's home, and Busby paid little to no cost. Finally, Busby's home safe contained about $90,000 in cash some of which had bankers' bands around it stamped with "First Bank & Trust, Cleveland, Texas." (Doc. No. 232, Trial Tr. Day 13 AM at 126–27) (Testimony of Jason Webb); (GEX 947, Doc. No. 200-3). The testimony established that Hutchison obtained cash from Bulldog Timber, which was located in Cleveland, Texas, certainly leading one to the conclusion that Busby's cash came from Hutchison.

Busby was directly involved in selecting or having Hutchison selected for FMO mowing jobs at HISD. He directed Hoskins to use Hutchison for FMO jobs. Busby would confirm with Hoskins that these jobs should go to Hutchison. (Busby Tr. Ex. 2). Most directly applicable to the mowing fraud scheme is that, as senior management over landscaping at HISD, Busby signed off on all of the mowing invoices which approved the completion of the job and initiated the process to release payment to Hutchison. (Doc. No. 236, Trial Tr. Day 15 AM at 92) (Testimony of Brian Busby). Moreover, Busby was central to Hutchison's scheme. Busby helped Hutchison get the work that was the basis of the scheme, exerted his influence over his subordinates to ensure that Hutchison continued to get work, and approved the final payment. This involvement enabled Hutchison to execute the wire fraud scheme. From this, there was more than sufficient evidence

supporting Busby's knowledge of the mowing fraud scheme and his agreement with Hutchison to pursue that scheme for the Court to justify an instruction regarding the third object of the conspiracy.

The Court finds that it was not error to instruct the jury on the third object of the multi object conspiracy, which was a violation of § 666(a)(1)(A). The jury instructions did not allow the jury to convict Busby on an improper basis. Busby's motion as to the conspiracy count (Count 1) is denied.

### C. Busby's Challenge to the Witness Tampering Count (Count 26)

Busby was convicted of one count of witness tampering under 18 U.S.C. § 1512(b)(3), which makes it a crime to "corruptly persuade[]" or attempt to persuade another person "with intent to hinder, delay, or prevent the communication to a law enforcement officer of the United States of information relating to the commission or possible commission of a federal offense." 18 U.S.C. § 1512(b)(3). The indictment specifically alleged that Busby "did knowingly attempt to corruptly persuade [Alfred] Hoskins to falsely state to investigators that BUSBY did not direct anyone to use any specific contract vendors, when in reality BUSBY directed his subordinates to use HUTCHISON's companies . . . with the intent to hinder, delay, and prevent the communication to a law enforcement officer of the United States . . . ." (Doc. No. 42 at 16–17) (Superseding Indictment). The jury instructions tracked this language. (Doc. No. 153 at 26) (Final Jury Instructions).

Busby argues the following: (1) the Government did not present any evidence that Busby made the statements alleged in the Superseding Indictment so Count 26 was improperly before the jury; (2) no reasonable jury could conclude Busby acted "corruptly" from the evidence presented;

and (3) the Government's closing arguments constructively amended the Superseding Indictment. The Court will address each argument.

First, while the evidence may not be as overwhelming as it is concerning other counts, the Government did present sufficient evidence to warrant instructing the jury on Count 26 as it was pled in the Superseding Indictment. The Court recounts Alfred Hoskins' relevant testimony, as it is essential in resolving this issue. Hoskins testified that on the day the search warrants were executed, at around 5:00pm, Busby called him from an unidentified number. (Doc. No. 208, Trial Tr. Day 4 PM at 141:17–143:19) (Testimony of Alfred Hoskins). Busby had never previously called Hoskins on an unidentified number like this. (*Id.*). On that call, Busby told Hoskins, "[t]his have [sic] nothing to do with you. I don't know what's going on, but I don't want you involved in it. This have [sic] nothing to do with you." (*Id.*). Busby called Hoskins again later that night, around 9:30pm, again from an unknown number. (*Id.*). Hoskins testified on direct examination about that conversation:

> A: He called me back this time, and he said, "Bro, be sure to let the guys know that I didn't have anything to do with Just Construction getting a contract or anything. I had nothing to do with none of that."
> Q: When he said "the guys," what did you understand that to mean?
> A: Luis -- I mean, the guy that was on the RFP [Request For Proposal] evaluation list.
> Q: So was he talking about the -- the award of the annual vendor contract to Just Construction?
> A: Yes, sir.
> Q: And did you agree with that statement, that he had nothing to do with the award of that contract to Just Construction?
> A: No, sir. He -- no, sir.
> Q: Okay. Why not?
> A: No, sir, because he basically told me to make sure that they get the contract.

(*Id.*). Later, on cross-examination by Busby's counsel, Hoskins testified as follows:

> Q: And so Mr. Busby called you up, said, "Don't worry. This is not about you," something like that?

> A: Yes. He -- yes. About five -- 5:30, yes, sir.
> Q: It made you feel better, didn't it?
> A: Well, I was going to sign up -- yes. I was kind of concerned, like, what are you talking about, but it – it's -- he was like, okay. I mean, it was a good thought.
> Q: But he did not tell you to lie, did he?
> A: Which call, the --
> Q: Busby did not tell you to lie.
> A: At the -- deny -- when he called me at 9:30, that's not -- when he called me at 9:30, when he told me to tell the guys that -- to not say -- to not tell them that he was involved with that, that was a lie, sir.
> Q: Yeah, yeah.
> The involvement was with the actual rating of the contractors, right?
> A: Yes, sir.

(*Id.* at 162).

Busby selectively focuses on the exact vocabulary used by Hoskins instead of focusing on the totality of his testimony and the overall context. He contends that Hoskins' use of the word "them" referred to "the guys" which referred to Tovar and Hall, who reported to Hoskins. What is clear from the testimony is that on the day of the FBI raid, Busby called Hoskins—presumably from a borrowed phone, some kind of burner phone, or a new phone with a different number—and told him not to tell the truth and to tell the others to lie as well. (*Id.* at 142–43). Hoskins directly stated that the claim that "Busby was not involved with Just Construction getting a contract or anything" was a lie. (*Id.* at 143). It was not true because Busby had basically told Hoskins to make sure Just Construction got the contract. (*Id.*). Busby told Hoskins to tell "the guys" that Busby had nothing to do with funneling work to Just Construction and Hutchison. (*Id.*). The indictment alleged that Busby "did knowingly attempt to corruptly persuade [Alfred] Hoskins to falsely state to investigators that BUSBY did not direct anyone to use any specific contract vendors . . . ." (Doc. No. 42 at 16). The jury reasonably could have understood this evidence was proof that Busby was instructing Hoskins to adopt and convince others to share the lie that he was not involved with

funneling work to Just Construction. Based on this, the Government presented sufficient evidence to warrant instructing the jury on Count 26 as it was pled in the Superseding Indictment.

Second, Busby claims no reasonable jury could conclude from the evidence that Busby acted "corruptly" because Hoskins' testimony was "incurably contradictory." Under the witness tampering statute, an act is done "corruptly" if the defendant acted "knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice." *United States v. Robinson*, 87 F.4th 658, 669 (5th Cir. 2023) (internal quotation omitted). Busby claims Hoskins' testimony was contradictory because from Busby's perspective, Hoskins answered "yes" and "no" to the same question: whether Busby was involved in awarding a contract to Just Construction. First, Busby points out that Hoskins first claimed that Busby "basically told me to make sure they [being Just Construction] get a contract." (Doc. No. 208, Trial Tr. Day 4 PM at 141:17–143:19) (Testimony of Alfred Hoskins). Second, Busby's counsel asked Hoskins whether Busby was telling the truth when he said, "I didn't have anything to do with the award," and Hoskins responded, "Yes, it's the truth. He didn't pick nobody." (*Id.*). In other words, from Busby's perspective, Hoskins testified both that Busby was involved with making sure Just Construction got a contract and that Busby did not have anything to do with awarding Just Construction the contract, which he contends are contradictory statements.

When viewing this evidence in context with the rest of the evidence at trial, it is clear this testimony was not contradictory. Busby was a member of leadership, eventually becoming the Chief Operating Officer of HISD. At the time in question, the COO did not sit on the selection committees that chose annual vendors, like Busby's subordinates, Tovar and Sanders did, so technically Busby did not do the actual "picking" of vendors. Nevertheless, there was undoubtedly evidence that Busby exerted influence over his subordinates and through his subordinates

(including Hoskins, Sanders, and Tovar) to ensure that the committee chose Just Construction to receive contracts and jobs with HISD. Consequently, it can both be true that Busby told Hoskins, his subordinate, to make sure Just Construction got a contract and that Busby did not make the actual decision as to which vendors were chosen for annual contracts. Those two statements can both coexist and be true, and the jury obviously thought so in this case.

The Government provided sufficient evidence for the jury to find Busby acted corruptly. The specific intent under the witness tampering statute "can be proven with circumstantial evidence alone." *Robinson*, 87 F.4th at 669 (internal quotation omitted). Hoskins knew that Busby was telling him to lie because it directly contradicted what Busby had previously told Hoskins. Moreover, Busby told Hoskins to lie on the day the FBI executed its search warrant, while calling from an unidentified number. This evidence is sufficient for the jury to reasonably find that Busby acted knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice. *See id.*

Finally, Busby claims that the Government misstated Hoskins' testimony and the language of the indictment during closing arguments, effectively amending the Superseding Indictment and allowing the jury to convict Busby for a statement that was much broader than (and never alleged in) the Superseding Indictment. Specifically, Busby accuses the Government of materially changing the "target" of his statement and the "subject matter." (Doc. No. 321 at 40–41). In closing arguments, when summarizing Hoskins' testimony, recounted above, the Government stated, "Mr. Busby called him directly to tell him, 'Make sure that you don't tell them, *the FBI*, that I was in any way part of getting that contract awarded' . . . Brian Busby . . . told [Hoskins] during the time of the 2017 evaluation committee for Just Construction to *get the annual contract* to do a boatload

of work for HISD after Hurricane Harvey." (Doc. No. 251, Trial Tr. Day 19 PM at 18–19) (Government's Closing Argument) (emphasis added).

Initially, Busby argues the Government's closing argument constructively amended the indictment because it changed the *target* of Busby's statement from "the guys" to "the FBI." Busby claims this substitution of target audience, from federal investigators to an HISD colleague, goes to the core of the witness tampering charge. While Hoskins' testimony may not read as clearly as the Government maintains, it can reasonably be understood (and it certainly was in context of his testimony on the stand) that on the day of the raid, when Busby found out he was being investigated by the FBI, he called Hoskins and told him to essentially conceal the facts about Busby's involvement in awarding Just Construction contracts. While Hoskins does state he understood Busby's reference to "the guys" to mean "Luis," Busby's intent seems clear. Now that he was aware of the FBI investigation, he wanted to ensure "the guys" that he told to funnel work to Just Construction did not inform the FBI that he was involved in funneling that work to Hutchison. The jury certainly could have reasonably concluded this from Hoskins' testimony and the rest of the evidence at trial. That being said, the Government did not alter a material element of the offense when it said "the FBI" in its closing argument while summarizing Hoskins' testimony.

Next, Busby argues the Government's closing argument constructively amended the indictment because it changed the *subject matter* of Busby's statement from "using specific contract vendors" to "getting the annual contract with HISD." He claims this was a material misstatement of the evidence because getting an annual contract with HISD and then using a vendor on the approved annual contractor list are two distinct processes at HISD. While it is clear from witness testimony that there is a distinction between the HISD vendor process of "getting" the initial annual vendor contract and "using" vendors from the approved annual vendor list to

complete work, this distinction does not change the point of Busby's instructions to Hoskins. The jury could reasonably deduce from Hoskins' testimony that Busby clearly wanted Hoskins and others to lie about Busby's involvement in getting Hutchison work. Busby wanted Hoskins to lie and say that Busby "didn't have anything to do with Just Construction getting a contract or anything." (Doc. No. 208, Trial Tr. Day 4 PM at 142) (Testimony of Alfred Hoskins). The jury could reasonably infer Busby was speaking of any contract he influenced to be awarded to Hutchison and his companies.

To conclude, there was sufficient evidence to instruct the jury on the witness tampering count, there was sufficient evidence for a reasonable jury to conclude that Busby acted corruptly from the evidence presented, and the Government's statements in closing arguments did not result in a constructive amendment of the Superseding Indictment. Busby's motion regarding the witness tampering conviction (Count 26) is denied.

### D. Busby's Challenge to the Tax Fraud Counts (Counts 29–33)

The jury convicted Busby of five counts of willfully making false material statements on his income tax returns in violation of 26 U.S.C. § 7206(1). Counts 29 through 33 of the Superseding Indictment alleged that Busby willfully (1) underreported his total income; (2) underreported his adjusted gross income; (3) underreported his taxable income; and (4) underreported (and underpaid) the amount of tax due for the tax years of 2015 through 2019. *See* (Doc. No. 42 at 18–19). "Proving a § 7206(1) violation requires the government to prove that the defendant: (1) made and signed a materially false federal income tax return; (2) submitted a written declaration stating under penalties of perjury that the return was true and correct; (3) did not believe that the return was true and correct when he signed it; and (4) signed it willfully and

with the specific intent to violate the law." *United States v. Boyd*, 773 F.3d 637, 644 (5th Cir. 2014). The first element is at issue here, that the federal income tax return was materially false.

There are several recognized methods of proof the Government may use to prove that the defendant's statements were false. In the trial, the Government offered evidence under two methods: the "specific items" method and the "expenditures" method. The specific items method of proof relies on direct evidence and consists of the Government demonstrating particular or specific amounts of reportable income that do not appear on the defendant's income tax returns or appear in materially different amounts. *United States v. Horton*, 526 F.2d 884, 886 (5th Cir. 1976). The "expenditures" method of proof relies on circumstantial evidence. This method consists of showing that the sum of a defendant's expenses for a particular taxable year exceed the total of his reported income, nontaxable receipts, and available cash at the beginning of the year in question. *United States v. Marshall*, 557 F.2d 527 (5th Cir. 1977); *United States v. Boulet*, 577 F.2d 1165, 1167–68 (5th Cir. 1978). In other words, the Government seeks to prove that the defendant could not have spent the amount he did in a given year unless he had more taxable income than he reported on his tax return for that year. *See Boulet*, 577 F.2d at 1167–68. The jury was instructed on both of these legal theories. (Doc. No. 153 at 29–36) (Final Jury Instructions). To contextualize Busby's challenges to the Government's evidence, it is useful to summarize the evidence submitted under each method of proof.

**1. The "Specific Items" Method**

In an unreported income "specific items" case, the Government attempts to establish that the total income received by the defendant is greater than the total income reported in his tax return by identifying specific unreported items that are in excess of the reported income. (Doc. No. 242, Trial Tr. Day 13 PM at 43) (Testimony of Jason Webb). Thus, the evidence would establish that

the defendant failed to report those specific items of income. *Horton*, 526 F.2d at 886.[19] IRS Special Agent Webb conducted the tax investigation for both Busby and Hutchison, and the Government presented his testimony as evidence on Busby's tax counts. For each applicable tax year (2015–2019), Agent Webb reviewed Busby's IRS Form 1040, which included Busby and his wife's HISD earnings, income from their daycare business, and income from their rental properties. (Doc. No. 242, Trial Tr. Day 13 PM at 45–51) (Testimony of Jason Webb). Agent Webb also reviewed all of Busby's cash deposits into his numerous bank accounts. (*Id.* at 61).

Agent Webb then presented GEX 858 which was a chart summarizing his calculations for the specific items method of proof. (*Id.* at 57). The chart first lists 21 bank accounts attributed to Busby and the total amount of cash deposited into each account for the tax years 2015 through 2019.[20] (*Id.* at 58). He then added to the chart the cost of the renovation of Busby's home by Hutchison in the tax year applicable. (*Id.*). Agent Webb testified that he was not aware of any evidence that Busby paid Hutchison for the remodels, so he included the full price in his summary chart. (Doc. No. 234, Trial Tr. Day 14 AM at 26–27) (Testimony of Jason Webb). The chart then subtracts the reported amounts of gross profit and loss of Busby's rental properties, the daycare business, and his gambling winnings. (Doc. No. 242, Trial Tr. Day 13 PM at 58) (Testimony of

[19] While not mandated by the courts, IRS investigators typically structure their "specific items" proof through either the basic approach or the aggregate approach. In the basic approach, an agent can find specific items (in other words payments or transactions) that are clearly absent from the defendant's Form 1040. Agent Webb's Specific Items summary chart is entitled "Specific Item (Aggregate Method)," indicating he used the aggregate method. (GEX 858, Doc. No. 198-10). The "aggregate method" simply requires the agent to identify the total amount of income the subject should have reported in a given year, then the agent compares that number with the aggregate amount of income actually reported on the tax return to arrive at an understatement of income. *See Part 9. Crim. Investigation, Ch. 5, Investigative Process, § 9. Methods of Proof, Subsection 9.5.9.4.3.2. Aggregate Approach*, IRS, https://www.irs.gov/irm/part9/irm_09-005-009 (last updated Apr. 30, 2026).

[20] FBI Special Agent Kathryn Prado testified at length about how she investigated Busby's banking affiliations and the loans he received; subpoenaed numerous bank records; reviewed each of Busby's transactions in the relevant time period to determine which transactions were cash payments and which were not; and summarized all of this voluminous data in her summary chart, GEX 838. *See* (Doc. No. 219, Trial Tr. Day 11 AM at 47–115) (Testimony of Kathryn Prado).

Jason Webb). These were Busby's total *reported* gross receipts. (*Id.* at 65–66). This testimony was offered to ensure that Busby got credit for all of the gross income he received in that tax year. (*Id.* at 64–65). Agent Webb then subtracted that amount of reported total gross reported receipts from the total amount of cash deposited and the value of the home renovation (in the years applicable). (*Id.* at 66). This number then represented the total *unreported* gross receipts, reflecting the amount of money Busby allegedly earned as income that was not reported on his tax return. *See* (*id.* at 59–68); (GEX 858, Doc. No. 198-10). Agent Webb went through this same process for each tax year for which Busby was indicted, 2015 through 2019. *See* (Doc. No. 242, Trial Tr. Day 13 PM at 69–83) (Testimony of Jason Webb).[21]

Using this method of proof, the Government contends the evidence demonstrates that the large amount of cash Busby deposited in his bank accounts reflected a substantial and material amount of money he left off of his tax returns as taxable income. As a result, his reported total income, adjusted gross income, taxable income, and amount of tax due were materially false.

**2. The "Expenditures" Method**

In addition to the specific items method of proof, Agent Webb also performed an expenditures analysis for the tax years 2015 through 2018.[22] The expenditures method is a variant of the net worth method of establishing unreported taxable income. The net worth method involves ascertaining the taxpayer's net worth positions at the beginning and end of the tax period and

[21] When discussing the specific items method of proof summary chart and the underlying evidence supporting it, Webb noted that the total amount of money attributable to the 2019 renovation of Busby's home in GEX 400 was $260,140, and the total amount for the renovation his summary chart was $266,389.86. GEX 400 was a summary chart analyzing all of the costs and the total value of the 2019 home renovation project Hutchison provided to Busby. (GEX 400, Doc. No. 185-5). Webb testified that even if he modified his specific items summary chart to reflect the renovation amount reflected in GEX 400, the ultimate result remained the same. Busby's unreported gross receipts amount still resulted in an underreporting of taxable income and thus underpaid tax liability. (Doc. No. 242, Trial Tr. Day 13 PM at 81–83) (Testimony of Jason Webb).

[22] As discussed later in the text, Agent Webb's expenditures analysis did not include the tax year 2019 because Busby obtained large loans in 2019 which impacted the assumptions that informed Webb's calculations.

inferring from circumstantial evidence that the defendant's net worth increased due to unreported income. *See generally Holland v. United States*, 348 U.S. 121 (1954). The expenditures method involves ascertaining the taxpayer's expenditures which exceed the amount of reported income for a tax year and inferring from circumstantial evidence that the defendant had an unreported taxable income source that allowed him to pay for his expenditures. *See United States v. Adams*, 314 F. App'x 633, 644–46 (5th Cir. 2009) (unpublished) (per curium).

In an expenditures case, the Government must first "demonstrate with reasonable certainty the taxpayer's cash on hand at the beginning of the tax year in question." *Id.* at 645 (citing *Boulet*, 577 F.2d at 1168, 1170). Second, the Government must prove that the expenditures charged to the taxpayer were taxable. *Id.* The Government can satisfy this second burden in either of two ways: "[i]t can show that there is a likely taxable source of the unreported income, or it can negate all possible nontaxable sources of income." *Id.* (internal citations omitted). Naturally, there are difficulties with proving the negative, so the Government can prove "'reasonable certainty' of the lack of non-taxable income sources by demonstrating that it performed an 'adequate investigation that did not disclose non-taxable sources.'" *Id.* (quoting *Boulet*, 577 F.2d at 1168); *Conaway*, 11 F.3d 40, 44 (5th Cir. 1993). In establishing its "adequate investigation," the Government need not negate *all* possible non-income sources of the cash deposits, "particularly where the source of the income is uniquely within the knowledge of the taxpayer." *Boulet*, 577 F.2d at 1168. At the same time, the Government "may not disregard explanations of the defendant reasonably susceptible of being checked." *Id.* at 1169. "Hence, the government also has a duty to investigate leads furnished by the taxpayer with respect to cash on hand that are susceptible of being checked." *Id.*; *Holland*, 348 U.S. at 135–36.[23] "This type of financial analysis and reconstruction is not a science that

[23] IRS Special Agent Webb testified that his expenditures method of analysis was guided by the Federal Criminal Tax Manual. The Manual states it provides only internal Department of Justice guidance, and it is not intended to be

provides an exact answer, but it does provide a reasonable, circumstantial answer based on known facts and related assumptions." *United States v. Marrinson*, 832 F.2d 1465, 1470 (7th Cir. 1987).

Agent Webb's investigation was based on gathered documents, subpoenaed records, and interviews. (Doc. No. 234, Trial Tr. Day 14 AM at 51–52) (Testimony of Jason Webb). To begin, he worked to find a starting net worth and cash on hand figure to establish that Busby had no other previously taxed income or nontaxable income stored away to explain his spending. (Doc. No. 242, Trial Tr. Day 13 PM at 84–86) (Testimony of Jason Webb). Agent Webb used Busby's 2014 mortgage application where Busby stated (and represented that the figures were true and correct) his total assets and total liabilities as of June 24, 2014. (*Id.*). On that mortgage application, Busby listed his total assets as $422,000 and listed no amount of cash on hand under assets. (*Id.* at 86–87); (GEX 817, Doc. No. 197-17). Agent Webb stated that he used that document to determine that there were no other assets besides the assets Busby presented to the bank to obtain that loan. (Doc. No. 242, Trial Tr. Day 13 PM at 88) (Testimony of Jason Webb). Accordingly, Busby's opening balance was determined to be $422,000. Agent Webb did not explicitly state what he determined Busby's cash on hand amounted to; however, the record indicates he assumed that figure to be $0. *See* (*id.* at 86–88); (*id.* at 88:7–11) ("A: I'm using [his statement of total assets of $422,000] to say – or to determine that there are no other assets besides the assets that he's presented to the bank to obtain this loan."). Agent Webb also reviewed Busby's 2015 tax return, and the total assets amount of $422,000 largely aligned with what he reported at that time. Agent Webb never interviewed Busby, nor did any other agent. (Doc. No. 234, Trial Tr. Day 14 AM at 51) (Testimony of Jason Webb).

---

enforceable at law by any party in any matter civil or criminal. (Doc. No. 234, Trial Tr. Day 14 AM at 36) (Testimony of Jason Webb); *see* U.S. DEP'T OF JUSTICE TAX DIV. CRIM. TAX MANUAL (2022), available at https://www.justice.gov/tax/media/1400766/dl?inline.

Next, Agent Webb analyzed Busby's personal expenditures which included his vehicle expenditures, credit card expenditures, real estate expenditures (mortgages), loan payments, and other expenditures. (Doc. No. 242, Trial Tr. Day 13 PM at 88–89) (Testimony of Jason Webb). Agent Webb subpoenaed various entities where Busby had purchased vehicles or taken out a vehicle lease and his financial institutions to gather the supporting data for his vehicle, credit card, and mortgage expenses. (*Id.* at 90–95). The "other" expenditures primarily came from Busby's Schedule A tax form, which included "expenses" of withheld federal income taxes, withheld Medicare taxes, gifts to charity, and mortgage interest. (*Id.* at 88–95). Any cash expenditures by Busby were not included in the expenditures list unless that expenditure hit a financial institution of some kind. (*Id.* at 89–91). Once each of these expenditures were added up, that sum provided a record of how much money Busby spent in a given tax year. (*Id.* at 95).

Finally, Agent Webb compared the total amount of Busby's expenditures for a given tax year against the amount of total income he listed on his tax return for that same tax year. (*Id.*). The difference then revealed that for the years in question (with one exception) Busby seemingly spent well over the amount of income he reported. (*Id.* at 95–96). Agent Webb then concluded Busby had an unreported income source he was using in order to spend the amount of money he did each taxable year. (*Id.*).

Agent Webb noted that his expenditures method of analysis could not apply to tax year 2019 because Busby took out a large amount of loans during that period, but Agent Webb was able to use the specific items method for all the years in question including 2019. (*Id.* at 82–83). As part of the analysis, Agent Webb made the assumption that any loan proceeds, which are nontaxable funds, were available for use and could have been used to purchase the listed expenditures. (*Id.* at 98–99). As a result, Agent Webb was unable to provide evidence through the

expenditures method that Busby's 2019 tax return contained false statements, only through the specific items method. (*Id.*).

On cross-examination, Agent Webb admitted that his calculations did not account for any large amount of cash Busby may have had on hand. The "cash hoard" defense is a common defense to the expenditures method of proof because the Government must prove the expenditures in question were not made from other nontaxable sources—like an unidentified amount of cash the defendant has been holding onto for years, say for example in a safe in their home or under their bed. *See Holland*, 348 U.S. at 127. If Busby had a large amount of cash "hoarded" or "stashed" away, Agent Webb's figures and calculations could be improperly skewed because Busby could have been paying for his listed expenditures with this existing cash hoard. *See* (Doc. No. 234, Trial Tr. Day 14 AM at 9–10) (Testimony of Jason Webb).

At trial, Busby testified that he did have a cash hoard. He testified that he started managing his mother's finances in 2007 or 2008, and in later years he became her legal guardian. (Doc. No. 246, Trial Tr. Day 15 PM at 104) (Testimony of Brian Busby). His mother had a black trunk where she stored certain important items, including her cash. (*Id.*). Since he was caring for his mother, Busby had control over her black trunk. (*Id.* at 106). In 2008, the trunk contained $224,000. (*Id.*).[24] Over time, Busby testified that he would pull money from the trunk as needed to cover expenses related to her care such as utilities, groceries, and her caregiver. (*Id.* at 106–07). Busby claims he eventually started adding some of his money to the trunk, combining it with his mother's money. (*Id.*).

In regard to his tax fraud convictions, Busby claims the Government's evidence was insufficient in three major respects. He argues that the Government failed to: (1) establish an

[24] This is the kind of asset contemplated by the case law that discusses items that are uniquely within the knowledge of the taxpayer. *See Boulet*, 577 F.2d at 1170.

accurate opening balance and cash on hand figure; (2) trace cash deposits; and (3) present any evidence that the cash deposits were taxable income. The Court examines these arguments bearing in mind the burdens and presumptions at work in this type of tax-related prosecution.

**3. Opening Balance and Cash on Hand**

"[I]t is essential for the [prosecution] to establish an accurate cash on hand figure" to begin because in the case that the taxpayer's expenditures came from a safety deposit box or secret cache, "they are not income" when deposited in a checking account or spent. *Boulet*, 577 F.2d at 1169. At the same time, the Government is "not required to prove the opening cash figure with mathematical exactitude." *Id.* at 1170. The proof should make clear whether any of the expenditures could have been paid from the defendant's opening balance or cash on hand. *See id.* at 1169; *Taglianetti v. United States*, 398 F.2d 558 (1st Cir. 1968), *aff'd*, 394 U.S. 316 (1969).

Busby contends the Government's proof of his opening balance and cash on hand was woefully deficient. He contends that the 2014 mortgage application was "uncorroborated" and that "the government did not engage in a tracing analysis, review the records from every relevant financial institution, interview family and friends, consider investments, bond purchases, nontaxable income sources, gifts, or follow every possible lead" to determine the opening balance and cash on hand figures. (Doc. No. 294 at 75).

Here, the Government's evidence began with the 2014 mortgage application. Busby, himself, verified the application was "true and correct" at the time. (GEX 817, Doc. No. 197-17 at 4).[25] The agent also looked at Busby and his then-wife's monthly wages, rental property income,

[25] When Agent Webb testified about Busby's 2014 mortgage application, the Government asked him if it was a crime to lie on a loan application, to which he responded, "[y]es, sir, it is." (Doc. No. 242, Trial Tr. Day 13 PM at 87–88) (Testimony of Jason Webb). Busby argues this testimony was an improper legal conclusion and highly inflammatory, which he believes justifies vacating his tax convictions. While it may have been inadmissible without the appropriate foundation being laid and potentially inaccurate for Webb to testify in response to this question, Busby's counsel did not object to this line of questioning at trial. *See* (*id.*). Moreover, the loan application states that by signing the

and their daycare business income listed on their 2015 tax return. That investigation largely corroborated the income listed on their mortgage application as well. *Compare* (GEX 817, Doc. No. 197-17 at 2) (2014 Mortgage Application), *with* (GEX 801, Doc. No. 197-1) (2015 Tax Return). Busby's checking account records revealed that their HISD paychecks were being paid via direct deposit and not through cash proceeds, so those paychecks would not result in any cash on hand unless they were withdrawn from the accounts. (Doc. No. 219, Trial Tr. Day 11 AM at 61–63) (Testimony of Kathryn Prado). Moreover, his real estate holdings were not liquid assets that would impact the starting cash on hand figure.

FBI Special Agent Kathryn Prado ("Agent Prado") testified that her review of Busby's income sources and financial records included "identifying assets and financial accounts" of Busby and his businesses primarily through public database searches, serving grand jury subpoenas to credit bureaus, and looking at "any possible bank reporting to identify accounts." (*Id.* at 48). The subpoenaed records included those from various financial institutions, loans, credit cards, demand accounts, checking and savings accounts, and casinos. (*Id.* at 49); (Doc. No. 232, Trial Tr. Day 13 AM at 123) (Testimony of Jason Webb) (explaining the IRS along with the FBI "subpoenaed a myriad of Mr. Busby and Mr. Hutchison's financial records" and summarized and evaluated them). Regarding interviews, Agent Webb indicated that, alongside the FBI, he participated in interviewing witnesses. Specifically, he conducted "many, many" interviews of at least 45 people. (Doc. No. 234, Trial Tr. Day 14 AM at 65–70) (Testimony of Jason Webb). Although he did not specify everyone he interviewed, Agent Webb was present in Luis Tovar's interview, and the other five coconspirators. *See* (*id.*).

---

agreement, Busby "specifically represents to Lender . . . that: (1) the information provided in this application is true and correct as of [June 25, 2014] . . . ." (GEX 817, Doc. No. 197-17 at 4).

While the Government is obligated to prove an adequate investigation, which includes "explor[ing] leads thoroughly," the adequacy of this type of investigation "necessarily turns on its own circumstances." *Boulet*, 577 F.2d at 1171. A notably significant difference between this case and the cases that Busby cites to argue this investigation was inadequate is that in those cases the defendant was interviewed by the IRS, sometimes multiple times; here, Busby was never interviewed. (Doc. No. 234, Trial Tr. Day 14 AM at 51) (Testimony of Jason Webb); s*ee, e.g. Boulet*, 577 F.2d at 1170 ("During the investigation, the *taxpayer told* the IRS agents . . ."); *Adams*, 314 F. App'x at 646 ("[T]he government learned *from Adams* that he maintained a safe deposit box which could have contained currency."). The Government has "a duty to investigate leads *furnished by the taxpayer* which respect to cash on hand that are *susceptible of being checked*." *Boulet*, 577 F.2d at 1169 (emphasis added). Agent Webb was not asked *why* Busby was "not interviewed at all" in the investigation, but Webb did explain that he had not heard "Busby's side" of the story. (Doc. No. 234, Trial Tr. Day 14 AM at 51–52) (Testimony of Jason Webb).[26] The fact that Webb had not heard Busby's "side" before trial, which was that Busby had a large amount of cash from his mother, suggests that Busby likely never furnished this lead before the trial. Nevertheless, on the facts of this case, these actions meet the reasonable certainty standard for submitting evidence to the jury and to support the jury's conviction regarding the opening balance and cash on hand figure.

[26] Given the testimony by Busby and his accountant, in addition to the rest of the testimony and financial evidence, it is clear that the amount of cash his mother allegedly had back in 2008 when Busby gained control over it would not have accounted for the 2015 through 2019 expenditures. While he was not asked the question, it is not clear whether this Court would have allowed Webb to express to the jury why he did not talk to Busby if the question was objected to and the answer was going to be that Busby had "lawyered-up."

**4. Tracing Cash Deposits and Demonstrating They Were Taxable Income**

Next, Busby argues the investigation was inadequate because the Government did not try to determine the source of cash underlying all of Busby's numerous cash deposits, nor did it demonstrate that these cash deposits were taxable income as required under *Boulet*. In a specific items case, the Government must demonstrate the unreported income was reportable (or taxable) in nature. *See Horton*, 526 F.2d at 886. In an expenditures case, the Government must prove the additional income Busby allegedly spent to afford his expenditures was taxable. In other words, that the income did not come from tax-exempt sources. *United States v. Penosi*, 452 F.2d 217, 220 (5th Cir. 1971). As previously stated, the Government can do so by showing a likely taxable source of the unreported income or it can negate nontaxable sources of income to show by circumstantial evidence that this income must have been taxable. *See Adams*, 314 F. App'x at 645; *Boulet*, 577 F.2d at 1168–69; *United States v. Hiett*, 581 F.2d 1199, 1201 (5th Cir. 1978). When the taxpayer gives no leads as to nontaxable sources, the Government "satisfies its burden of negating all possible nontaxable sources . . . by showing that it conducted a thorough investigation that failed to reveal any nontaxable source." *Hiett*, 581 F.2d at 1202. In *Hiett*, the Government made a satisfactory showing by "contact[ing] banks and third parties including appellant's family in an attempt to find out if appellant received any income by gift, loan, inheritance, or other nontaxable source," and ultimately located no nontaxable sources that could account for appellant's unreported income.

Under the circumstances of this case, the Government carried its burden to establish no nontaxable sources that could account for Busby's unreported income. In its investigation, the Government subpoenaed numerous financial institutions and credit bureaus to uncover any loans

that may have supplied the funds. (Doc. No. 219, Trial Tr. Day 11 AM at 48–49, 61–63) (Testimony of Kathryn Prado). In fact, Agent Webb's expenditures analysis could not apply to 2019 because Busby took out a loan, the proceeds of which could have accounted for his expenditures in that tax year.[27] Agent Webb seemingly did not look into probate records to determine the date Busby became the legal guardian of his mother or whether he received any inheritance from her, but from financial records, Webb knew Busby was paying for his mother's assisted-living facility. (Doc. No. 234, Trial Tr. Day 14 AM at 9) (Testimony of Jason Webb). As to Busby's current suggestion that the funds could have *all* been gifts from Hutchison, at trial, Busby testified that the gifts he and his family received from Hutchison were *not* monetary. (Doc. No. 236, Trial Tr. Day 15 AM at 49) (Testimony of Brian Busby). Agent Webb and the jury were entitled to discredit the unlikely claim that Hutchison gave Busby hundreds of thousands of dollars in gifts, regardless of the closeness of their friendship. Clearly, the Government was seeking to prove the source of the money was from bribes obtained from Hutchison and the investigation into that source was exhaustive. Therefore, it is clear that the Government identified every source but one, and that source's funds (Busby's mother's cash) were clearly placed before the jury for their consideration.

The evidence shows that Busby likely did not advance his "cash hoard" argument about his mother's black trunk containing about $224,000 dollars in cash until trial. *See* (Doc. No. 234, Trial Tr. Day 14 AM at 51–52) (Testimony of Jason Webb). Nevertheless, the evidence demonstrates that if that cash hoard was applied to the expenditures theory and even if none of it had been used prior to 2015, it would still only account for the first year's expenses (2015), as his total alleged unreported income in 2015 was $108,936.21, and in 2016 it was $224,700. (GEX 808, Doc. No. 197-8). Busby did not testify that he received large gifts of cash, but he did testify

[27] It is important to remember that the time period in question for the expenditure analysis does not encompass 2019.

that he took over his mother's finances around 2009 and at that time, her cash hoard totaled about $224,000. (Doc. No. 246, Trial Tr. Day 15 PM at 103–07) (Testimony of Brian Busby). Over time, he said he would pull from that total as needed. (*Id.*). Over the years he also claimed he started combining his cash with her cash in the trunk. (*Id.*). That being said, Busby's accountant also testified that the cost of his mother's assisted living and care far exceeded the monthly social security and pension payments her accounts received. (Doc. No. 248, Trial Tr. Day 16 PM at 15–18) (Testimony of Theodoesha Malonson). Obviously, the difference would put a drain on Busby's overall cash situation and his ability to fund his deposits from the "cash hoard."

Overall, the Government's evidence was both sufficient to instruct the jury on Busby's tax counts and to support the jury's verdict. The defense cross-examined Agent Prado and Agent Webb on the depths of their investigation, and the jury heard Busby's testimony. Even if the Government presents an adequate investigation, the jury still may not find a defendant guilty unless the Government has established each element of the offense beyond a reasonable doubt. That is precisely what the jury found in this case, and there is no justification to disturb that verdict. Busby's motion on the tax counts (Counts 29–33) is denied.

### E. Busby's Motion to Dismiss the Superseding Indictment

Next, Busby brings a very belated motion to dismiss the Superseding Indictment. He claims the Government knowingly presented false, material information about Hutchison's ledger, GEX 1, to the grand jury, which he believes "undoubtedly influenced the grand jury's decision to indict" him. (Doc. No. 294 at 78). After review, the Court disagrees.

"[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). Federal Rule of Criminal Procedure 12(b) provides that a motion

alleging a defect in instituting the prosecution, including an error in the grand-jury proceeding or a defect in the indictment must be made before trial. FED. R. CRIM. P. 12(b)(A)(v), (B). Failure to comply with this rule generally constitutes waiver. *United States v. Cathey*, 591 F.2d 268, 271 n.1 (5th Cir. 1979). However, a court may excuse a defendant's failure to timely file a motion for "good cause." *Id.*; FED. R. CRIM. P. 12(c)(3).

When a defendant accuses the Government of knowingly presenting false, material information to the grand jury, like Busby does here, a court asks two questions: "(1) did the government knowingly sponsor false information before the grand jury and (2) was that information material, that is, was the information capable of influencing the grand jury's decision." *United States v. Cessa*, 861 F.3d 121, 142 (5th Cir. 2017) (internal quotation omitted). The Fifth Circuit has "refused to adopt the proposition that, absent government misconduct, an indictment is flawed simply because it is based on testimony that later may prove to be questionable." *Id.* (internal alteration omitted). Even perjured grand jury testimony does not warrant dismissal of the indictment "unless the perjury was knowingly sponsored by the government." *Id.* (internal quotation omitted). In cases such as this that have already proceeded to trial, guilty verdicts by a petit jury generally render grand jury errors harmless. *See United States v. Mechanik*, 475 U.S. 66, 70 (1986); *United States v. Dentler*, 492 F.3d 306, 311 (5th Cir. 2007) (courts may consider "the petit jury's unanimous findings-which [are considered] to be, at a minimum, persuasive evidence of how a grand jury would find").

Here, Busby claims the Government knowingly placed false, material testimony before the grand jury. Specifically, he believes the Government (1) improperly characterized the ledger as a bribe ledger to the grand jury; and (2) knowingly misrepresented the coconspirators' statements about the payments they received and how they were reflected on Hutchison's ledger.

After review of the grand jury testimony both for the Original Indictment (Doc. No. 299-1) and the Superseding Indictment (Doc. No. 299-2), it is clear the Government did not knowingly present false information to the grand jury. The Government presented testimony from FBI Special Agent Andy Liu, the case agent in charge of managing and investigating the case. (Doc. No. 299-1, First Grand Jury Tr. at 6) (Testimony of Andy Liu). FBI Special Agent Liu presented GEX 1, and descriptions of the coconspirators' statements as evidence to support the Government's conclusion that the ledger was a bribe ledger. (*Id.* at 27–40, 45–52, 57–59); (Doc. No. 299-2, Second Grand Jury Tr. at 21–28, 36) (Testimony of Andy Liu). It begs repeating that Defendants presented the theory that the ledger was a gambling ledger at trial, and the jury had a large amount of evidence that supports a rejection of that theory. The grand jury transcripts and the petit jury's verdict support that the Government's characterization of GEX 1 as a "bribe ledger" to the grand jury was not a misstatement. There is no basis to conclude the Government "knowingly" put false information before the grand jury because there was sufficient evidence to demonstrate the bribery ledger was exactly that. *Cessa*, 861 F.3d at 142.

Busby also claims the Government knowingly misrepresented the cooperating witnesses' statements when its agent told the grand jury that they had reviewed the ledger and acknowledged the payments within. Busby focuses on what he believes are specific differences between what the FBI's pre-trial interview reports (FBI 302 Reports) reflect the coconspirators said about their payments and what the Government presented to the grand jury. For example, in the grand jury proceeding, Agent Liu testified that Gerron Hall reviewed the ledger and confirmed the payments he received "basically were in agreement with—as set out in the bribe ledger." (Doc. No. 299-1, First Grand Jury Tr. at 47) (Testimony of Andy Liu). The FBI report for Hall's interview reflects Hall reviewed the ledger and advised the dates in the ledger were correct regarding payments he

received, although Hall contested the payment amounts. (Doc. No. 299-4 at 3) (Gerron Hall FBI 402 Report from April 30, 2021). Busby raises similar arguments regarding Hoskins, Skillern-Jones, and Tovar's interview statements about the ledger, and they each fail for the same reasons. The Government's summary of their statements was not materially different to what they eventually testified at trial.

In its brief, the Government represented that it produced the grand jury transcripts and the FBI reports to the Defendants long before trial, and Busby does not contest this representation. Yet, Busby only raises this challenge to the indictment now, after trial, and after the petit jury's verdict. During trial, the petit jury heard live testimony of all the cooperating defendants—Hoskins, Hall, Tovar, Sanders, and Skillern-Jones. They each testified regarding payments they received from Hutchison and the timing, the location, the amount, and other details about those payments. That testimony, of course, concerned events that occurred over five years before the trial. The defense cross-examined those witnesses on the discrepancies Busby points out now in their recounting of the bribe payments with that reflected in the ledger (GEX 1). The Government admitted corroborating documents and communications that tied certain ledger entries to certain coconspirators. The petit jury also heard the Defendants' evidence that the ledger and the payments were related to gambling, instead. Hearing all of this evidence, much of which was presented to the grand jury, the petit jury found both Defendants guilty of all charges. "Measured by the petit jury's verdict, then, any error in the grand jury proceeding connected with the charging decision was harmless beyond a reasonable doubt." *United States v. Mechanik*, 475 U.S. 66, 70 (1986).

The Court finds no "good cause" for this claim, nor does it find that the Government knowingly misrepresented evidence to the grand jury. Busby's motion on this point is denied.

### F. Busby's Objections to the Joint Trial

Busby's final claim is that he was severely and unfairly prejudiced by his joint trial with Hutchison because (1) the Government introduced substantial evidence that Busby views as both irrelevant to the charges against him and highly inflammatory and prejudicial, and (2) Hutchison's statements about Busby in the ledger (GEX 1) were presented to the jury allegedly violating his rights under the Confrontation Clause.

Days before the Court held its pretrial conference, Busby and Hutchison each filed a Motion to Sever asking the Court to try their respective cases separately.[28] *See* (Doc. No. 92) (Busby's Motion to Sever) and (Doc. No. 97) (Hutchison's Motion to Sever). Hutchison withdrew his motion, and the Court denied Busby's motion at the pretrial conference. (Doc. No. 290, Pretrial Conf. Tr. at 1:13–8:4). Nevertheless, Busby renewed his motion to sever at the close of the Government's case-in-chief, which the Court again denied. (Doc. No. 244, Trial Tr. Day 14 PM at 53:23–25). Further, the Court issued a limiting instruction, admonishing the jury that the Defendants were charged with separate crimes and "[e]ach count, and the evidence pertaining to it, should be considered separately and individually." (Doc. No. 153 at 9) (Final Jury Instructions).

A court may sever co-defendants' trials if joinder of the defendants in an indictment would result in prejudice. FED. R. CRIM. P. 8(b), 14(a). Nevertheless, Fifth Circuit precedent "does not reflect a liberal attitude toward severance." *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018). "Severance is an *exception*," *id.*, justified "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539

[28] Scheduling deadlines were extended multiple times in this case; however, the final governing Scheduling Order imposed a pretrial motion filing deadline of December 6, 2024. (Doc. No. 87). Busby filed his Motion to Sever on March 12, 2025, well after the deadline and only seven days before the pretrial conference. Hutchison filed his Motion to Sever on March 17, 2025, two days before the pretrial conference. *See* (Doc. Nos. 92, 97).

(1993). Joint trials are preferred, "particularly in conspiracy cases." *United States v. Daniel*, 933 F.3d 370, 380 (5th Cir. 2019) (citation omitted). To overcome the heavy presumption in favor of joint trials, a defendant must show that "the joint trial prejudiced them beyond district court protection and that the prejudice outweighed any interest in the economy of judicial administration." *United States v. McClaren*, 13 F.4th 386, 398 (5th Cir. 2021).

Busby fails to overcome this heavy presumption. First, Busby addresses three categories of evidence he believes were irrelevant and highly inflammatory that would not have been presented in his severed trial: evidence of Hutchison's "significant gambling problem," evidence regarding the wire fraud counts, and the "strip club evidence." (Doc. No. 294 at 88–91). As to the evidence of Hutchison's "significant gambling problem," it is not clear that much of the same evidence would not have been admitted even if Busby was tried separately. Busby himself testified about gambling alongside Hutchison and other coconspirators in Las Vegas and in Louisiana, among other places, and the evidence suggests he even received bribery pay-offs in Las Vegas. (Doc. No. 236, Trial Tr. Day 15 AM at 40–41, 51–52) (Testimony of Brian Busby); (Doc. No. 225, Trial Tr. Day 2 PM at 49–52). Moreover, much of the evidence Busby characterizes as "the lengths [Hutchison] went to pay his gambling debts" and which he believes would not have been admitted solely against him, was relevant to Count 1, the conspiracy charge. The "lengths" Hutchison went to included cashing checks through Bulldog Timber and Ulysses Tejada which was evidence related to the conspiracy charge. This evidence likely would have been relevant even if Busby was tried separately as that was the likely source of some of the bribe payments. It is important to remember that some of the cash found by the authorities in Busby's safe was wrapped in bankers' bands stamped with "First Bank & Trust, Cleveland, Texas," and the only connection to Cleveland, Texas was Bulldog Timber, where Hutchison cashed his checks. (Doc. No. 232, Trial Tr. Day 13

AM at 126–27) (Testimony of Jason Webb); (GEX 947, Doc. No. 200-3). Additionally, Hutchison's defense of the ledger was that it was a gambling ledger tracking his debts. Without evidence of Hutchison's gambling, the jury may have more readily agreed with the Government's characterization of the ledger—as a bribery ledger.

Next, Busby contends the evidence pertaining to the wire fraud "consumed many days of trial with painstaking testimony" that was ultimately inflammatory and prejudicial to Busby because he was not charged in any wire fraud count. While it certainly was the case that several days of trial were consumed by this testimony, it is not clear that this would not have been the case at a separate trial pertaining only to Busby. Again, Busby was charged with a three-object conspiracy, the third object being that of defrauding HISD. The evidence pertaining to that object largely consisted of the evidence supporting the wire fraud counts against Hutchison. For the reasons stated above, there was sufficient evidence to instruct the jury on the third object of the conspiracy. For the same reasons, much of the wire fraud evidence very likely would have been presented to a jury even if Busby was tried separately.

Finally, Busby focuses on the "strip club evidence." He claims the frequency with which the Government and Hutchison's counsel elicited testimony regarding Busby and Hutchison's presence at strip clubs was highly inflammatory and completely irrelevant. Clearly relevant to the conspiracy charge was Busby's relationship with his coconspirators, which included, among others, Hutchison, Sanders, and Skillern-Jones. Sanders testified about his personal friendship with Hutchison and Busby and that he visited various strip clubs around Houston with both of them. (Doc. No. 225, Trial Tr. Day 2 PM at 27) (Testimony of Derrick Sanders). Skillern-Jones testified that she first met Hutchison at a strip club, and she went to strip clubs with Busby twice. (Doc. No. 326, Trial Tr. Day 5 PM at 120–21) (Testimony of Rhonda Skillern-Jones). It is somewhat

important to remember that Skillern-Jones also testified that Busby actually delivered Hutchison's bribe money to her—so she would have surely testified. (*Id.* at 31, 53–54). At trial, Busby's counsel did not object to any of these lines of questioning, nor was it raised previously in his motion for severance or his motion in limine. There is no indication this evidence "prevent[ed] the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

Additionally, Busby claims Hutchison's statements were presented to the jury in violation of the Confrontation Clause through the ledger, GEX 1. He claims this would not have happened if he was tried separately. As the Court discussed previously, GEX 1 was properly authenticated as a coconspirator statement made during and in furtherance of the conspiracy, so the admission of the ledger did not violate Busby's rights under the Confrontation Clause.

Overall, Busby's arguments regarding severance and a separate trial fail, and his motion is denied on this issue. For the foregoing reasons, Busby's Motion for Acquittal or New Trial Under Rules 29 and 33 is denied in its entirety.

## V. Conclusion

For the foregoing reasons, the Court hereby:

**DENIES** Anthony Hutchison's Motion for Judgment of Acquittal or New Trial in its entirety (Doc. No. 296), and

**DENIES** Brian Busby's Motion for Acquittal or New Trial in its entirety (Doc. No. 294).

Sentencing and the related deadlines will proceed according to the current scheduling order.

Signed on this the 11th day of August, 2026.

Andrew S. Hanen
United States District Judge